STEFAN LUMIERE V. UNITED STATES OF AMERICA        CASE NO. 18-CV-9170 (JSR/BM)

# UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE

2019 JAN 31  PM 4:00

STEFAN LUMIERE,

Petitioner

v.

UNITED STATES OF AMERICA.

Respondent

Case No. 18-CV-9170 (JSR/BM)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-31-19

**2nd Amended 2255 Petition**                    **Dated 1/31/19**

**To be Submitted under Seal According to Protective Order on Information Mentioned.**

**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND CONVICTION PURSUANT TO 28 U.S.C. @2255 OR TO CONSTRUE AS SUCCESSIVE RULE 29 TO DISMISS INDICTMENT AND CONVICTION DUE TO AN INSUFFICIENCY OF EVIDENCE OR ACTUAL INNOCENCE CLAIM, IN LIGHT OF ALL OF THE EXCULPATORY EVIDENCE SUBMITTED HEREIN OR AS A SUCCESSIVE RULE 33 MOTION AND REQUESTS AN EVIDENTIARY HEARING TO SUPPLEMENT EVIDENCE**

[1]Petitioner respectfully requests permission from the Court to supplement this with additional material due to limitation of time to include and hereby respectfully requests time to respond to Government Response prior to rendering an Opinion.

---

[1] Petitioner Lumiere submits 2nd amended 2255 to comply with court order but preserves his right to appeal the following decisions by the court.

- Court's denial of Petitioner's request to have court compel the Prosecutor to provide him with a new copy of Discovery in text searchable format given that many of the files were missing, never completely and thoroughly checked by any of his counsels which he uncovered that many were unreadable due to corrupted drives and DVDs which could not be read. The fact that there were over 15 million files in discovery much of which was in a non-text searchable format making it a constitutional infringement on due process and impossible for any defendant to properly prepare for trial which would and did lead to a trial by ambush.
- Court denied Petitioner's right to a more reasonable extension of time to file a second amended 2255 petition when Petitioner was timely in his filing of his 2255 Petition and filed a subsequent 1st amended Petition within days of filing his original timely 2255 simply to reformat and simplify the reading for the court which was also submitted ahead of AEDPA deadline while the Court and the Prosecutor are aware that Petitioner for the entirety of his imprisonment was blocked from access to his electronic discovery material under the BOP's response that there were too many files to review denying access to inmate for the entirety of his imprisonment. This due process infringement goes well beyond any precedent of denial of extensions to file late 2255 and not amended 2255. This goes beyond the burden of being imprisoned, but constitutes Prosecutor blocking of access to courts. This alone should restart the clock and grant Petitioner another full year to resubmit his 2255.
- Court ordered petitioner to amend his 2255 Petition and trim his petition down from over 400 pages to under 50 pages double spaced while it rejected all of his above requests a virtually impossible task in such a short timeline.
- Petitioner continues to request more time with the abovementioned requests to complete a reasonable 2255 Petition to amend the ones he has already submitted and additionally seeks time to submit and seek affidavits and expert testimony and review the discovery to support his case and prove his innocence. Given the evidence submitted in his 2255 Petition, there is more than enough evidence to show that Petitioner did not have a fair trial due to conflict of counsel, ineffectiveness of trial counsel and appellate counsel.
- Petitioner requests that he be given subpoena power to compel experts Ernst & Young and VRC to provide affidavits to state that they approved and agreed with the valuations and the market approach used by VRC and Visium Valuation Committee and that they were in compliance with GAAP and ASC 820. Additional subpoena requests for members of Visium Valuation Committee, Executive and Risk Committee, and members of Visium Credit Fund to prove the material perjury of witnesses at trial, the unfounded claims of the Prosecutor and the actual innocence of Petitioner.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

## 2255 TABLE OF CONTENTS

| | |
|---|---|
| **TABLE OF CONTENTS** | ii - iii |
| **TABLE OF AUTHORITIES** | iii-iv |
| **TIMELINE OUTLINE** | iv-vi |
| **DISCUSSION** | 1-3 |
| **KEY POINTS SUMMARY** | 3-4 |

I. **PREPONDERANCE OF EVIDENCE PROVES THAT PETITIONER LUMIERE WAS SET UP AS THE FALL GUY, FRAMED BY VISIUM EXECUTIVES, SCAPEGOATED BY PROSECUTOR AND CONVICTED DUE TO CONFLICT OF DEFENSE COUNSEL (4-18)**

II. **DEFENSE COUNSEL WAS INEFFECTIVE AND CONFLICTED AS HE FAILED TO ACT AS PETITIONER'S ADVOCATE WHEN HE DID NOT ESTABLISH THE "GOOD FAITH" AND INTEGRITY BEHIND ALL OF PETITIONER'S AND COOPERATING WITNESS PLAFORD'S ANALYSIS AND ALL OF THE DOCUMENTED INDEPENDENT RESEARCH ON THE NAMES ALLEGED TO BE MIS-VALUED OR CALL THE MULTITUDE OF WITNESSES THAT COULD HAVE TESTIFIED IN PETITIONER'S DEFENSE. (19-24)**

III. **DEFENSE COUNSEL CREIZMAN FAILED TO ARGUE FOR EXPERT WITNESS DISCUSSION AND VALUATION OF ALLEGED SECURITIES MIS-VALUATIONS FOLLOWED BY FAILURE TO CALL KEY EXPERT WITNESS TO TESTIFY (24-29)**

IV. **INEFFECTIVENESS OF COUNSEL IN FAILING TO OBJECT TO AND STOP THE RELENTLESS PROSECUTORIAL MISCONDUCT, MATERIAL MISSTATEMENTS, AND PERJURED TESTIMONY OF PROSECUTOR WITNESSES FALSELY CONFLATING PETITIONER'S TITLE AND FALSELY STATING THAT PETITIONER WAS A PARTICIPANT IN A SCHEME TO DEFRAUD AND KNEW VALUATIONS WERE INCORRECT (29-49)**

V. **INEFFECTIVE ASSISTANCE OF COUNSELS DURING ALL STAGES (50)**

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

## TABLE OF AUTHORITIES

Hill v. United States, 368 U.S. 424, 426-27 (1962)

United States v. Bokun, 73 F.3d 8,12 (2d Cir. 1995)

Hill v. Lockhart, 474 U.S. 52,58 (1985)

Missouri v. Frye, 132 S. Ct. 1399, 1405 (2012)

Glover v. United States, 531 U.S. 198, 202-04 (2001)

Mempa v. Rhay, 389 U.S. 128, 134 (1967)

Strickland v. Washington, 466 U.S. 668, 688 (1984)

Bennett v. United States, 663 F. 3d 71, 84 (2d Cir. 2011)

Pham v. United States, 317 F.3d 178, 185 (2d Cir. 2003)

Machibroda v. United States, 368 U.S. 487, 495

United States v. Aiello, 814 F.2d 109, 113-114 (2d Cir. 1987)

Armienti v. United States, 234 F. 3d 820, 823 (2d. Cir. 2000)

United States v. Tarricone, 996 F.2d 1414, 1418 (2d Cir. 1993)

Von Moltke v. Gillies, 332 U.S. 708, 721 (1948)

Townsend v. Burke, 334 U.S. 736,68 S. CT. 1252 (1948)

Hill v. Lockhart, 474, U.S. 52, 58 (1985)

Lafler v. Cooper, 132 S. CT.  1376 (2012)

Glasser v. United States, 315 U.S. 60, 70 (1942).

United States v. Molee, 220 F.3d65, 69-70 (2d Cir. 2000)

United States v. Lussier, 71 F.3d 456, 461 (2d Cir. 1995).

United States v. Schwarz, 283 F.3d 82 (2d Cir. 2002)

United States v. Piervinanzi, 23 F.3d 670, 684 (2d Cir. 1994)

Wood v. Georgia, 450 U.S. 261, 271 (1981)

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

United States v. Doe, 781 F.2d 238, 248 n.6 (2d Cir. 1986)(en banc)

Amiel v. United States, 209 F.3d 195, 198 (2d Cir. 2000)

United States v. Bernstein, 533 F.2d 775, 788 (2d Cir. 1976)

United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003).

United States v. Cronic, 466 U.S. 648, 662 (1984)

Henry v. Scully, 78 F.3d 51, 53 (2d Cir. 1996);

Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991).

Pavel v. Hollins, 261 F.3d 210, 222 (2d Cir. 2001).


## TIMELINE & PROCEDURAL HISTORY:

~Oct 2007- Petitioner resigns from Brencourt and joins Balanced Fund as PM of a Distressed/Special Situations

~End of 2008- Visium's redemptions cause Jake Gottlieb ("J. Gottlieb") tells Petitioner to liquidate most of positions in Balanced Fund while maintaining his highest conviction ideas.

~May 2009- Visium Credit Fund Launched- Witness Plaford -Portfolio Manager and J. Gottlieb as CIO. Petitioner asked to join this fund to help out as an Analyst.

~May 2009- Visium launches Global Fund which now contain Petitioner's positions from Balanced

~June 2010- Visium President Jason Huemer and Gottlieb asked Petitioner Lumiere to manage 2 books: "Merger Arbitrage" and "Distressed" but offers to help Plaford part-time in Visium Credit

~End of 2010- Petitioner notified by his sister Alexandra Gottlieb that Gottlieb had been slandering him

~Mid-2011- Plaford tells Petitioner that J. Gottlieb instructed him to request additional quotes as backup for internal purposes only.  Petitioner questions why his role and told: "Jake says this is your job."

~ Mid-2011- Visium as member of steering committee of investments receives private information-Plaford states that Visium's mandate requires him to value credit investment positions based on all private information.

~January 8th, 2013 - Petitioner meets with sister and her attorney to discuss how to void employment contract. Advised that Gottlieb is trying ruin Lumiere he is advised to document all processes and functions (A137)

~Jan to April 2013- Lumiere is out of office at home recuperating from 3 planned consecutive surgeries prior to his planned resignation from Visium to start his own fund.

~ March 2013- ATI CEO calls Petitioner w/ reduced projections in ATI- Plaford's response raises red

Petitioner Stefan Lumiere v. United States of America    Case No. 18-CV-9170 (JSR/BM)

~March 2013- Plaford states that he discussed ATI projections w/Steve Ku, Visium CFO

~April 15th, 2013- Lumiere consults with Employment Attorney to seek advice on leaving Visium

~April 16th, 2013-Lumiere called Gottlieb to announce desire to leave Visium and quash non-compete.

`April 29th, 2013- Lumiere locked out of Visium-Deemed as resignation due to dissatisfaction (A114-116)

~May 5th, 2013- Lumiere attends Stroock Event and discusses C-Med with other member of Directing Class

~May 8, 2013- Petitioner Lumiere warns Immunized Witness Thorell about concern that Witness Plaford may be misvaluing some positions and advises Thorell to resign as well. (Tr. Lumiere-Thorell May 2013 to be submitted)

~May 14, 2013- Conv w/ Stroock Attorney to inquire about others values for ATI and C-MED- Does not know answer but refers Petitioner to speak to Park & Jensen

~May 17, 2013- Meeting w/ Park & Jensen ("P&J") to discuss valuation concerns at Visium (meeting Notes)

~May 25th, 2013- Petitioner asked P&J to continue evaluating Visium valuation concern (Email)

~July 10th, 2013- Petitioner contacted employment lawyer based on evidence of disparagement. (See email)

~July 31st, 2013- Thorell discusses new information from Visium about Gottlieb and Ku. (recording Bar)

~August 1st, 2013- Petitioner contacted P&J w/ new information and tells him to contact SEC

~December 19th, 2013- Petitioner asks P&J about whistleblowing to SEC (email)

~Jan 6, 2014- Contacted P&J again to discuss the Visium matter again(email)

~Feb 26, 2014- FBI Executed Search Warrant

~Feb 26, 2014- Meeting with P&J based on AUSA believe Petitioner is a "Subject" seek proffer

~Feb 27, 2014- FBI agent communicated w/ Attorney Park Jensen to coordinate return of cell. (Email)

~Feb 27th, 2014- Knuts states that Petitioner done nothing wrong when calls to discuss proffer

~March 11, 2014- FBI Requested Imaging of 3 computers and thumb drives seized in search so which would be first available to review March 18th to March 25th, 2014 timeframe.

~March 12, 2014- Attorney Udell Proffer with Prosecutor

~March 12, 2014- Attorney Udell notifies Prosecutor of privileged documents (see Proffer)

~March 17, 2014- Petitioner at Proffer volunteers that FBI agent left behind 2 hard drives

~March 20, 2014 – Attorney Udell Proffer with Prosecutor

Petitioner Stefan Lumiere v. United States of America        Case No. 18-CV-9170 (JSR/BM)

~April 3rd, 2014- Attorney Udell sent Prosecutor list of privileged attorney's names (see email)

~April 15, 2014 – FBI drops off equipment and Petitioner w/out Udell signs "Consent" ()

~May 18th, 2014 – Petitioner hired Abramson & Morak and discuss proffer

~October 15th, 2014- Abramson & Morak cancel scheduled proffer

~February 24, 2016 – Abramson & Morak call with Prosecutor asking Lumiere to cooperate

~March 26, 2016 – Petitioner hires Eric Creizman

~June 15, 2016- Petitioner arrested under Complaint with continued request to assist Prosecutors

~July 14, 2016 – Petitioner indicted and arraigned "Not Guilty Plea"

~September 8th, 2016- Defense Counsel Creizman meets with Prosecutor who requests Petitioner's cooperation and offer a reduced charge like Misprision of Felony to help them to build case against Gottlieb and Ku.

~January 11, 2017 to January 19, 2017 – After 6-day trial, Petitioner Lumiere is found guilty on 3 counts. Petitioner filed Rule 33 motion for retrial with request for 90-day extension.  Both are denied.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

## DISCUSSION

Title 28 U.S.C. 2255 allows a prisoner in custody under a sentence of a federal court to move the sentencing court to vacate, set aside, or correct a sentence.  To obtain relief pursuant to 28 U.S.C. 2255, a federal prisoner must establish: (1) the sentence imposed in violation of the Constitution or laws of the United States; (2) the court was without any jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.  See, Hill v. United States, 368 U.S. 424, 426-27 (1962).  Thus, collateral relief under Section 2255 is only available for "a Constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice'."  United States v. Bokun, 73 F.3d 8,12 (2d Cir. 1995) (quoting Hill v. United States,368 U.S at 428).  A defendant in a criminal proceeding has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which include work on case, investigation the case, bringing on specialists in the area where expertise is needed, investigate and find witnesses, experts, review all discovery and present any exculpatory evidence or entering into a plea of guilty, See Hill v. Lockhart, 474 U.S. 52,58 (1985) and Missouri v. Frye, 132 S. Ct. 1399, 1405 (2012), and sentencing, see Glover v. United States, 531 U.S. 198, 202-04 (2001) and Mempa v. Rhay, 389 U.S. 128, 134 (1967).  The precedents of these holdings is contained in the seminal case in this area, Strickland v. Washington, 466 U.S. 668, 688 (1984), wherein it is stated that a Trial attorney has an overarching duty to advocate the defendant's cause."  In order to succeed on a claim of ineffective assistance of counsel, a claimant must meet the two-pronged test that was established in Strickland:(1) he "must show that counsel's performance was deficient" id. at 687, so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance", id. at 69 or 690 Check; and (2) he must show "that the deficient performance prejudiced the defense", id. at 687, in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different", id. at 694.  This "test" was clarified in Bennett v. United States, 663 F. 3d 71, 84 (2d Cir. 2011), ""[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact,'...and we review a district court's conclusions on those issues de novo".  Id. at 85 (quoting Strickland, 466 U.S. at 698).

"The IAC claim must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." Bennett, 663 F.3d at 85; see, Strickland, 466 U.S. at 697. In ruling on a motion under Section 2255, the district court is required to hold a hearing "[u]nless the motion, files, records of the case conclusively show that the petitioner is entitled to no relief". See, Pham v. United States, 317 F.3d 178, 185 (2d Cir. 2003) (2255 does not permit summary dismissals of motions that present facially valid claims). The prevailing standard is that to warrant a hearing. the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief. See Machibroda v. United States, 368 U.S. 487, 495; United States v. Aiello, 814 F.2d 109, 113-114 (2d Cir. 1987).

To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that there was a "plausible" claim of ineffective assistance of counsel, not that "he will necessarily succeed on the claim". Armienti v. United States, 234 F. 3d 820, 823 (2d. Cir. 2000) (quoting United States v. Tarricone, 996 F.2d 1414, 1418 (2d Cir. 1993)). The general procedure is for the district court to determine whether, viewing the evidentiary proffers, where credible, and the record, in light most favorable to the petitioner, he may be able to establish at a hearing a prima facie case for relief. If material facts are in dispute, a hearing should usually be held, and relevant finding of fact made. See Armienti, 234 F.3d at 825 (remanding for a hearing where applicant alleged several specific instances of attorney's deficiencies that were the product of specific conflicts of interest); Aiello, 814 F.d at 113 (holding that hearing is appropriate when application includes "assertions of fact that a petitioner is in a position to establish competent evidence"). The United States Supreme Court, in Von Moltke v. Gillies, 332 U.S. 708, 721 (1948), held that "[P]rior to trial, an accused is entitled to rely upon counsel to make an independent determination of the facts, circumstances, pleadings, and laws involved, and then offer his informed opinion as to what plea should be entered". The Supreme Court then, in Townsend v. Burke, 334 U.S. 736,68 S. CT. 1252 (1948), held that due process requires that a convicted person not be sentenced on "materially untrue" assumptions or "misinformation". See Townsend v. Burke, 334 U.S. at 741 (1948) In Hill v. Lockhart, 474, U.S. 52, 58 (1985), the Supreme Court held that the Strickland test applies to advice given by counsel in the context of guilty plea discussions. This determination was reaffirmed in Lafler

v. Cooper, 132 S. CT. 1376 (2012), where the Supreme Court stated that the Sixth Amendment requires effective assistance of counsel at all critical stages of a criminal proceeding, including the pre-Trial phase. See Lafler at 1381.

## KEY POINTS SUMMARY

1. Defense Counsel's failure was due to lack of preparation and largely the result of a conflict. Defense Counsel entered into conflicted Common Interest( A62) and Joint Defense Agreement (A65, A65.1, A68) with Gottlieb and Visium who agreed to pay legal fees and also offer "assistance". Defense Counsel's abysmal performance at trial proved his ineffectiveness prejudiced Petitioner significantly as he did not prepare any defense which demonstrated "Good Faith". He send case material to Gottlieb's attorney against specific instructions and then denied it. (A68)

2. Evidence on and off-record show that Petitioner was set up as fall guy in the simple task assigned by Plaford, Gottlieb and Ku while at Visium and then continued to be framed by Visium's founder former brother-in-law Gottlieb who indicated that he wanted Plaford to "get his back" and that they were in the "same boat" (Plaford 3500 A-3523). J. Gottlieb then obstructed Defense by manipulating Defense Counsel and blocking witness testimony. Soon after Thorell filed complaint and was later dismissed, he threatened to blackmail Gottlieb on 2 occasions requesting $2 million or he would report Visium to the SEC (A136, A137)

3. The valuations which the Prosecutor focused on during trial such as ATI and C-MED were valued by independent 3rd parties discussed below which the investments significantly greater than the Prosecutor claims they should have been, calling into question all of the Prosecutor's allegations of mis-valuations and why they or Defense Counsel did not submit into evidence in show of ineffective assistance and Prosecutor Misconduct. (Examined in Section II)

4. Petitioner submitted affidavits from Brown Rudnick Partner and AMA Capital CEO who advised Sevan Marine and Nebraska Book which Prosecutors alleged Mis-Valued. Petitioner had presented these witness with a long list of witnesses that would prove Good Faith, however, Defense Counsel never bothered calling any witnesses. (Outlined in Section II.)

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

5. Defense Counsel was unprepared and was ineffective at trial. He was reluctant to raise objections to leading and highly prejudicial testimony and hearsay and did not know court procedure especially as to impeaching witnesses or when to call for a mistrial when required. He lacked any knowledge of financial matters especially the complexity of the securities in this case. His refusal to investigate and understand issues and the securities in question led to his failure to produce a legitimate defense.

## I.  PREPONDERANCE OF EVIDENCE PROVES THAT PETITIONER LUMIERE WAS SET UP AS A FALL GUY WITH THE AID OF A DEFENSE COUNSEL WHO WAS CONFLICTED.

A conflict of interest claim is really a claim in effective assistance of counsel due to counsel's divided loyalties, Glasser v. United States, 315 U.S. 60, 70 (1942). While prejudice is presumed where there is an actual conflict of interest, such that the "courts have noted the incentive to characterize what would otherwise be a claim for ineffective assistance as a conflict of interest", United States v. Molee, 220 F.3d 65, 69-70 (2d Cir. 2000). If an actual conflict is discovered at the district court level and "is so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation, then the Court must disqualify the attorney." United States v. Lussier, 71 F.3d 456, 461 (2d Cir. 1995).

In the instant matter, Petitioner would not learn the full extent of the egregious miscarriage of justice until after trial. At the forefront of Defense Counsel Creizman's representation of the Petitioner was an unsolicited plea by Visium's external counsel that "Visium really wanted to help Lumiere and wanted to indemnify him" paying for his legal defense. However, ironically many months before being charged, Visium refused to provide insurance information or indemnification advancement making it unaffordable for Petitioner to hire Gibson Dunn and then finally agreed to a $25K advancement with $50k cap (A63, A148 p1-9). Defense Counsel Creizman made it clear that an Indemnification Agreement (Exhibit dated Jan 29, 2017: A62) would be very lucrative for himself by stating "this would be really good for me as I would make a lot more money." This resulted in a $1.2 million cap on Defense but only with Creizman, LLC as Attorney. (A64) As a result of finally accepting indemnification from Visium, Defense Counsel took the relationship with Visium to another level by entering into a Joint Defense Agreement and a

Common Interest Agreement with Visium and J. Gottlieb personally which created a clear prejudicial

conflict of interest which infected every aspect of Defense Counsel's representation of petitioner. (A62,

A65, A65.1, A68)

Petitioner Lumiere voiced his concern in trusting Jake Gottlieb ("J.Gottlieb"), because he knew he had been

the one that told assigned the authorized procedures and task of requesting quotes that were allegedly for

internal purposes.  As a result of Gottlieb and Ku's involvement in the valuations, it was clear that Gottlieb

would have an ulterior motive to frame Petitioner.  Additionally since the procedures employed by Visium were

being questioned, it became clear to Petitioner that he had been the designated fall guy from the beginning and

was now going to be become a scapegoat paying for Visium's internal accounting decisions.  Before agreeing to

indemnification, Petitioner Lumiere commanded Defense Counsel Creizman not to communicate with anyone

representing Visium, for he adamantly believed they would corrupt his Defense.  Defense Counsel

communicated with them anyway, and informed Petitioner Lumiere again that they wanted to compensate his

lawyer fees and wanted him to sign an affidavit exonerating Gottlieb of any wrongdoing tied to the allegations.

Incensed by this, Petitioner Lumiere sought to hire a larger law firm.  Petitioner met with Kobre and Kim and

only after they guaranteed they would not be corrupted by Visium, did he authorize them to speak to Visium's

external counsel to seek funding his Defense.  However, Kobre & Kim informed Petitioner that Visium would

only deal with existing counsel.  With no other options, Petitioner Lumiere agreed to indemnification from

Visium for he could not afford Kobre and Kim himself. (See Indemnification Letter dated November 1st 2016:

A63, A64) Petitioner accepted the indemnification only under strict instructions not to share any information or

discovery or files with Visium.  And by no means did the Petitioner agree to allow Defense Counsel to enter

into a Joint Defense Agreement and Common Interest Agreement with Visium and Gottlieb which Petitioner

uncovered after trial.  Visium, Petitioner's former employer, and by extension, Gottlieb, paid Defense Counsel

Creizman, creating an egregious conflict of interest.  (A63, A65, A66. A65.1).

Among the risks posed by having the same lawyer or law firm represent multiple individuals or entities

are: (1) the lawyer's advice to one represented party will be colored by how that advice will affect the other

party; (2) a defense strategy beneficial to one party might be detrimental to the other party; (3) the potential

conflict will animate decisions about cross-examination of witnesses; and (4) the confidences of one client will

be revealed to another client. See United States v. Schwarz, 283 F.3d 82 (2d Cir. 2002). All of these

circumstances explicitly arose throughout the trial.

"Sometimes lawyers from Co-defendants formalize their defense strategy in an oral or written joint defense

agreement. A related issue arises when a defendant is represented by lawyers paid for by an alleged co-

conspirator." United States v. Piervinanzi, 23 F.3d 670, 684 (2d Cir. 1994).

In the immediate case, Gottlieb and Steven Ku were named alleged co-conspirators in the Prosecutor's mis-

valuation complaint which the Prosecutor requested remain under seal. (Department of Justice Letter Filed

Under Seal Dated September 27, 2016 naming Gottlieb and Ku as alleged Co-Conspirators: A66) The court,

during pre-trial motions, demanded that the co-conspirators be revealed during the Petitioner's Trial (A67 p 1-

2): "...the Prosecutor would ask to file the co-conspirators under seal... Court: There's going to be no

concealment at the Trial itself... "(Tr P18 ln16 to P 19 ln 3). During the trial preparation, after the indictment

was filed, the Prosecutor again pursued Petitioner Lumiere's cooperation against Gottlieb and Steven Ku (See

Defense Counsel Memorandum noting meeting on September 8th, 2016 with AUASA Naftalis dated September

12th, 2016: A69 p 1-8)). In this memo, the Prosecutor solicited Petitioner Lumiere's cooperation in return for a

lesser plea of something unrelated such as Misprision of Felony. Defense Counsel did not pursue this offer or

attempt to negotiate a lesser plea offer as it would place his funding from Visium at risk. During trial, and

against court order, the Prosecutor and Defense Counsel obviously conflicted, both avoided the mention or

involvement of Gottlieb and Ku in any valuation and pricing of securities. Instead Prosecutor fabricated

Lumiere's role in the Visium Credit Fund and pointed everything they could concoct at Petitioner Lumiere for

the sole purposes of a win. Defense Counsel remained silent throughout trial like a "potted plant" which

troubled the court (Tr P348 ln 1-13) forcing the Court to admonish him "Mr. Creizman and his colleagues

remained silent throughout" the trial. "The Court: Nevertheless, there comes a point where the court needs to

intervene, which I finally did, but I am interested to know that defense counsel feels this was to his benefit."

And and Defense Counsel's reluctance to object because he did not want to be rude: "But I just didn't want to stand up and tell the witness to be quiet. Do you know what I mean?" (Tr.P367-P370 ln 8.) And Defense Counsels questions were irrelevant and repetitive. (Tr P449 ln 1-20) Instead, Defense Counsel remained silent offering Petitioner no Defense while choosing to protect Visium and Gottlieb at the Petitioner's expense. He did so even though there was significant evidence in discovery including emails, documents, recordings that showed that Visium management were deeply entrenched in the procedures for which Petitioner was being prosecuted. There was also plentiful evidence in 3rd party valuation reports (discussed in Arg II), recordings, emails, documents that refute the Prosecutor allegations of misvaluing of assets. These material facts and evidence were never disclosed by the Prosecutor or Defense Counsel that latter solely due to conflict.

As a result of Defense Counsel's lack of presentation of a Defense, the Court and Jury passed judgment without any of the Good Faith facts. The truth alters the Prosecution's presented theory and raises a serious question of doubt into Petitioner Lumiere's involvement, knowledge and culpability of any of these matters at the time and calls into questions whether there was any crime committed. It is clear why the Prosecutor needed Petitioner Lumiere to cooperate against Gottlieb and Ku. It is clear that even Thorell and Plaford after their payments from Visium post departure, had fabricated a story that removed Gottlieb and Ku from culpability and pointed to Petitioner Lumiere who was not a knowing participant therefore not a conspirator of whatever scheme they had admitted to. Defense Counsel lied to Petitioner throughout and stated that Defense was not permitted to submit evidence based on the Federal Rules of Evidence. As for Gottlieb's involvement in valuations, there is also evidence that Gottlieb when faced with a significant redemption in the Credit Fund decided to use capital from the Balanced Fund to invest in Credit at coincidently the same time which further demonstrates Gottlieb's involvement in the process and valuations. (Documents and emails located in discovery) Gottlieb also likely had a Common Interest Agreement with Chris Plaford and Jason Thorell as well. Both Plaford and Thorell received very large settlement agreements (insert settlement agreements/emails)from Visium which is extremely unusual. Both Plaford and Thorell were paid off after Thorell filed his complaint with Visium. Thorell during his "settlement" discussions with Gottlieb and while he was already a

whistleblower had been working on continuing to seek monetary compensation from Visium. Plaford received a

$600,000 severance package and it appears that concerning a potential investigation of Visium, Gottlieb had

hoped that Plaford would be "on his side" and stated "we're in the same boat on this" and "that Gottlieb was not

hanging Plaford out to dry". This evidence shows that Plaford and Gottlieb had prior to formal investigations

put in place a storyline that would minimize each of their involvements and place unwarranted blame on

Petitioner (3503-23 page 7-page 9)) Evidence in discovery shows that the Thorell's settlement agreement with

Visium contains language that would most likely tip Visium off that Thorell is planning a Whistleblower

complaint. (See Email in Appendix under seal)

After an arranged "settlement" was made to Thorell, his allegations against Plaford and Gottlieb and Ku

were redirected towards Petitioner Lumiere during trial whereas previously, Thorell had not identified Petitioner

as a co-conspirator in any recordings or documents.  Additionally, prior to Thorell agreeing to work with the

Prosecutor as a whistleblower, he had tried to blackmail J. Gottlieb by asking for $2 million dollars or he would

file a report with the SEC with his allegations. (A136; A137)  In this situation Defense Counsel Creizman may

"prevent his client [(Petitioner Lumiere)] from obtaining leniency" by opposing efforts to have the client

cooperate or to properly defend the client in the interest of the alleged co-conspirator (Wood v. Georgia, 450

U.S. 261, 271 (1981)(remanding for determination of whether attorney representing employee but paid by

employer suffered "actual conflict").  At a minimum, "benefactor payments" create doubts "as to whether the

attorney's loyalties are with the client or the payor." (In re Grand Jury Subpoena Served upon United States v.

Doe, 781 F.2d 238, 248 n.6 (2d Cir. 1986)(en banc); Amiel v. United States, 209 F.3d 195, 198 (2d Cir. 2000)

(remanding for evidentiary hearing where habeas petitioner sufficiently alleged actual conflict based on

benefactor payments by petitioner's mother, who was her co-defendant); United States v. Bernstein, 533 F.2d

775, 788 (2d Cir. 1976) (conflict apparent when employer paid for employee's lawyer)).

At the conclusion of trial, Petitioner Lumiere fired Defense Counsel Creizman due to his astonishingly

incompetent performance.  Amongst Petitioner's case files, Petitioner Lumiere found evidence of a Common

Interest Agreement with Gottlieb Visium (A62), and the invoices from Defense Counsel Creizman to Visium

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

(A63, A65 A66, A65.1) indicating Defense Counsel Creizman was working under a Joint Defense Agreement and in a Common Interest Agreement with Jake Gottlieb, tainting and corrupting his defense of Petitioner.

When Defense Counsel Creizman knew he was being fired, he sent the contents of a hard drive that had a protection order from the court to Gottlieb's personal attorney at Paul Weiss in a shockingly odious infringement of the Petitioner's right to justice and fairness (A68 p 1-10). Visium and J. Gottlieb, Chris Plaford, and Jason Thorell now had access to privileged information regarding Petitioner Lumiere's case that they could now use to further frame Petitioner and continue to infect future proceedings and halt payments for legal fees. This became evident when Gottlieb and Visium refused to pay for Petitioner's Appeal after conviction and refused payment to new law firm Foley and Lardner who stepped in to replace Creizman on Post-trial motions. This parasitic infection so tainted the Trial because it "involved a defense attorney's self-interest that actually conflicted with his client's interests so severely as to permeate every aspect of the representation.", United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003).

Incremental evidence uncovered include Gottlieb's personal strategic notes on how to deal with the SEC and Criminal investigation of Visium (A143). In these notes, Gottlieb strategizes how to insulate himself from any of the Prosecutor's allegations. Gottlieb's refusal to finalized indemnification agreement until just before trial to limit work on the case by Defense Counsel. Gottlieb also initial refusal to advance legal payments to Defense unless Lumiere agreed to an interview with Visium counsels or signed an affidavit that Gottlieb was not involved in any of the allegations. (A64) Prior to this Visium wanted Petitioner to agree to an attorney of their choice. (A148). Only after Petitioner was arrested which was likely the result of Visium "guiding" the Prosecutor towards Petitioner via Visium Counsel, Plaford interviews and Thorell, does Gottlieb come forward aggressively to offer indemnification and advancement. He did so clearly to manipulate Petitioner's Defense strategy to keep himself protected. In these notes, Gottlieb reveals his control over Defense which tantamount to obstruction. They also reveal that Stefan is : "Stefan thinks he did the right thing", no crime", "Stefan is dense, severe ADD" "Trouble communicating to lawyers" "thinks valuations were correct" No one else thought anything wrong" " if Stefan did right thing, he is in trouble only because JG's brother in law",

"Lumiere/Indemnify/Advancement" "Incentive to implicate" " Creizman-Going though motions"; Kobre &

Kim" supplement or replace; Ask: Indemnification; Kobre & Kim-whistleblower type + difficulty getting info"

Find ways to figure out if he is (Friend or Foe); "Failure to supervise"; "Does DOJ do Fines"; "Wants a trial

with Visium:. These notes are clear proof of strategic manipulation and obstruction of Petitioner's Defense and

of framing. (A143). Combine these notes , with Defense Counsel's ineffectiveness at trial prep and trial, with

Plaford's 3500 material where Plaford admits to J. Gottlieb discussion to protect each other furthers the

evidence that they pooled resources to get their stories straight to frame Petitioner.

Additional evidence is the fact that when Defense Counsel called Law Firm Morvillo who Visium hired to

represent all other employees from Visium, he was told that if he called anyone from Visium as a witness, they

would be instructed to plead the Fifth Amendment further obstructing the Defense.

Gottlieb was incentivized to set Petitioner up as the scapegoat for all of Visium's decisions. Doing so would

also likely insulate Gottlieb from any further investigation into his role in insider trading which would further

motivate J. Gottlieb to turn the investigation towards mis-valuation of an already closed fund where he could

claim "Failure to Supervise" as also seen in Gottlieb's notes. Petitioner Lumiere was set up and all the evidence

points to that fact. At the onset, when Petitioner Lumiere was asked to get quotes for Gottlieb, Ku and Plaford,

he did so at their direction and instruction and followed a procedure that they had authorized as being valid and

for internal purposes. The evidence also points to this but yet is never used by Defense Counsel.

The transcript references recorded conversations of meetings between Thorell and Gottlieb, Ku and Keily,

paint a completely different picture to the Prosecutor's theories and allegations. However, the Prosecutor clearly

looked to cover that part up in their indictment and presentation to the Court. Thorell when questioned about

meeting with Keily, Prosecutor stated: "without going into substance of what you discussed" and jumped to end

resolution of "David Keily had serviced as an intermediary contact to pass on the override spreadsheet to

operations rather than myself." (Tr P378 ln 1-14)  And again when Thorell's meeting with Ku is brought up, the

Prosecutor again blocks the truth from being revealed by saying: "Now, again, without going into the substance

of what was discussed, how were things left". (Tr. P378 ln 20 to P379 ln 9) The reason that the Prosecutor

Petitioner Stefan Lumiere v. United States of America        Case No. 18-CV-9170 (JSR/BM)

avoided discussions of the content of those meetings, is because the content shows that Plaford, Thorell,

Gottlieb and Ku and Keily were all deeply knowledgeable and involved in the process because Gottlieb Ku and

Plaford were the "masterminds" of the process that they authorized and authenticated. It is clear from the

following meeting with Gottlieb that Thorell is admitting to not being "involved" analytically with C-MED and

is not on the valuation committee while Gottlieb offers that ATI and C-MED are valued by 3rd parties anyway

indicating nothing wrong with those valuations. (JT-JG-6-4-13-2&3) As for the decision to use investment side

input, it is obvious that this was requested by Gottlieb and Ku and not something devised by Petitioner.  Ku in

meeting with Thorell says that it is hard to assess fair value without some input from the trader or portfolio

manager where Thorell states that he completely agrees. (JT-SK-1-7-13-6- P2-Thorell-Ku-Keily meeting July

2013) This is logical and not prohibited and even discussed in the Visium Compliance Manual (A56-57).

Gottlieb even states that Visium in the face of redemptions wants to move more to observable trades rather than

as much analysis.  But this does not include ATI and C-MED where there are no observable trades in the

positions held by Visium and they were valued by the Visium Valuation Committee and by independent 3rd

parties..(Gottlieb-Thorell meeting 6-4-13 Doc 3 p 2 ln 2-24).

A discussion between Thorell, Keily and Ku whereby they are essentially laughing at Thorell for thinking it

had been participating in a crime tell him that the prices provided by the investment team have no bearing on

the NAV of the fund and that they are used for internal purposes only as a yardstick.  This is the same

explanation that was given to Petitioner Lumiere which he relayed to Broker Brook, and which Plaford told

Broker Vandersnow when first asked to request quotes. (JT-SK-1-7-13-1 Thorell meeting with Ku and Keily

P2-P5).

Then Ku goes on to state that Ernst and Young the firm's auditors, will review everything and

independently confirm the valuations and the numbers that come from the investment team have no impact and

that they are just internal indications they use and that they are not for NAV. (JT-SK-1-7-13-2 and 7 P2 Thorell

Meeting with Ku and Keily)

Thorell discusses that he thought he was being set up as a patsy or fall guy which is only after Petitioner discloses his suspicions about Plaford and warns Thorell that Plaford may use Thorell as a patsy fall guy. (Thorell-Lumiere recording May 2013, Lumiere meeting with Knuts, Declaration of Knuts) "Thorell: "I got the impression that he was doing it so that if there ever was an issue with the mark, I'm the fall guy. ... I was going to be the patsy." (JT-SK-1-7-13-3- Thorell-Keily-Ku-meeting July 2013, P2)

The Prosecutors theory was flawed. They choose to Prosecute Petitioner because he would not tell their version of the story which was a fabrication of Whistleblower Thorell. Petitioner only lost the case due to complete failure of his attorney to present the one defense that made sense, the truth. The obvious answer is that Prosecutors knew that Gottlieb and Ku and Plaford were the designers of the process that Petitioner Lumiere followed innocently. What the Prosecutor failed to put together or Plaford failed to tell them was that he had also similarly told Petitioner Lumiere that these quote requests for Gottlieb and Ku were for internal purposes only and just indications of value for the firm's internal measurements and that they did not go into NAV same as was told to Thorell by Ku and Keily. What Plaford likely never told the Prosecutor was that whenever he was questioned by Petitioner Lumiere when he did not understand the values where Visium had determined to be fair value, came back with reasonable explanations every time. And in the end, these turned out to be the proper methodology based on Petitioner's understanding of the Visium Offering Memorandum and Visium Compliance Manual only read ahead of trial. Based on common sense and firm documents, Visium was supposed to value the current information that they had acquired via participation on the steering committees.

The question comes downs to 2 points: Why did Plaford and Gottlieb tell Petitioner Lumiere that it was his job to get the quotes for Plaford's Credit Fund. And secondly, why did Visium and Gottlieb not defend against the Prosecutor's accusations. Likely because Gottlieb would rather make Petitioner Lumiere a scapegoat than to turn the Prosecutor's attention to further investigate him for insider trading. Additional areas of investigation which Defense Counsel failed at pursing due to failure to file a subpoena properly for Plaford's company Claravant. Gottlieb was likely involved with Claravant in some form and had one of his best friend's Brad Hoffman working at Claravant with Plaford. This warrants additional scrutiny given that the business was that

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

of rating drugs awaiting FDA approval.   Given that Plaford and his insider trading co-conspirator David

Blaszczak admitted to using private FDA information for illegal trading purposes, it is likely that Plaford had

been involved in more than he disclosed.  Both Plaford and Gottlieb would have been incentivized to avoid any

investigation into their dealings with Claravant and any potential illegal activity. Below is an outline of other

facts that offer proof of Petitioner being framed and of Defense Counsel Conflict which in turn led to his

providing ineffective assistance of counsel throughout the pre-trial and trial process:

-Gottlieb moved Petitioner Lumiere to No 2 position on Credit Fund Org Chart from historically being at the

bottom of the Org Chart as they know Lumiere is preparing to leave in 2012.

- Petitioner's sister who is Visium Founder's soon to be ex-wife, and her attorney Beslow in January 2013

reveal that Gottlieb has threatened to ruin Petitioner Lumiere and make sure he never works again.  After this

meeting, and at the guidance of his sister and her attorney, Petitioner Lumiere begins to document all the work

he is doing and of all processes at Visium as proof of his work at Visium and of all processes that they have him

doing to counter any slander attacks by Gottlieb. (A5P5 vs. A6 P4, A7 P1, A5 p3, A8 P1, A2 P3, A4 p3)

-Defense Counsel Creizman did not prepare Petitioner or his sister who was willing to do so and did not tell her

after inviting her to trial, that she would be prohibited from testifying as a result. And additionally Defense

Counsel threatened Petitioner  (Jury Selection 1-11-17 P 38 ln 3-19, Affidavit A Gottlieb, A102, A100)

- Defense Counsel Creizman not calling any witnesses from Visium or from the various restructuring advisors

and various funds that served on the Creditor committees alongside Visium (A98, Affidavits from Steve Pohl

and Paul Leand; Email to Defense Counsel Creizman requesting that he call witnesses and Defense Counsel

Creizman notes with list of witnesses)

-Defense Counsel Creizman refused to subpoena the materials Petitioner requested and needed for his defense

(emails, work product, files from Visium). (Emails exist with request from Lumiere to Defense Counsel

Creizman, but due to time constraints does not have time to locate)

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

- Defense Counsel Creizman did no work to argue that the Prosecutor and Jindra's presented prices were wrong and did not represent the fair value of Visium's positions.  Petitioner requested that he hire a forensic accounting firm to break down the numbers, but Defense Counsel Creizman claimed that he learned from Visium's counsel that they had done their own audit and all the numbers used for valuations were in line with fair value and that the Prosecutor recognized that they made an error and that the case would not be about valuation therefore there was no need to hire an accounting firm to analyze the data.

- Defense Counsel Creizman refusal to put into evidence any of the documents that substantiated the valuations that Visium Credit Funds' used that Petitioner persistently asked him to include which is outlined in next section.

-Defense Counsel Creizman did not bother to investigate or even discuss with Petitioner, the Prosecutor's "Painting to the Tape" allegation in reference to the C-MED trade from March 23rd, 2012.  There is clear evidence that Plaford lied in testimony about this trade.  Plaford claimed that Petitioner Lumiere was in his office in NYC where they discussed with Ameesh Shah the trade ahead of time.  However the clear evidence supplied here, but not at trial even though it was supplied to Defense Counsel after Petitioner was made aware of allegation, proves that Petitioner was not in the office with Plaford.  Petitioner was actually in Florida from March 21st to March 26th and at a concert during the time period of the alleged trade where the broker could not locate Petitioner, thereby impeaching Plaford's testimony.  There is supporting evidence that the trade was not out of context of market given the rumors of a management buyout coming out at the time, and the tremendous increase in the stock price.  Even if it was true that it was outside of context and Petitioner had given an order to Broker Brook there is nothing showing that Petitioner set a price for the order to buy at all or whether Petitioner relayed an order to buy from Plaford. Or the possibility that Plaford took advantage of Petitioner Lumiere by giving him an order while he was out of town so that he could not check levels ahead of passing on a simple buy order.

Petitioner Stefan Lumiere v. United States of America        Case No. 18-CV-9170 (JSR/BM)

-Plaford says it is going to be a problem if Lumiere is unavailable to get quotes while he is on vacation unless he is using Lumiere to do something and lying to him about purpose. (Email in Discovery not able to locate due to time constraint)

-Lumiere filed cease and desist order against Gottlieb for slander after which Visium Counsel comes up with after the fact compliance allegations never before disclosed (A105 P1-2)

-Visium had Prosecutor claw-back documents asserting privilege on 4 documents that they had sent over in discovery. Defense Counsel Creizman received a note from Prosecutor that the contents of the documents could bear on the innocence or guilt of Lumiere. Defense Counsel Creizman stated that he would review the documents to see what they were, but he never let Lumiere know what it was. After trial, Petitioner Lumiere came across the files where two of the documents referred to independent audits that were done at Visium around the time of the Thorell complaint to compliance which would have gone to prove that trades were done at Visium were in the context of the market and that valuations were checked again and deemed reasonable. Neither one of these documents were privileged and were highly exculpatory to Petitioner. The claw back of these documents, and the full reports constitute a Brady violation by the Prosecutor. (Documents to be provided under Seal in accordance with Protective Order)

There is further evidence of a conspiracy forming not in mispricing securities, but in framing Mr. Lumiere. The conspiracy begins with Gottlieb and consists of Steven Ku, Keily and then Plaford and Thorell who all had motives to make it appear that Lumiere was the ringleader, which is so far-fetched in light of the preponderance of the evidence on and off the record that it sounds completely ridiculous when taking the time to put it together.

**<u>Gottlieb Involvement in Pricing and Valuation</u>:**

Plaford on direct admits that Gottlieb pressured him to keep assets at Level 2 on cross:

"Did you feel any pressure to classify assets as Level 2?...Q. What was the source of the pressure?/ A. Jake Gottlieb/ Q. What did he say to you?/ A. Try to price everything at Level 2, if you can./ Q. Did you have an

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

understanding of why?/ A. Because, as I said, it was important for investors not to have Level 3 assets, if possible." (Tr P 704 ln 5-17)

In the Gottlieb and Thorell recorded meeting, Gottlieb makes statements about the pricing process and that specifically C-Med and ATI had third-party valuation (Transcript from Thorell's meeting with Gottlieb 6/24/13 P 4 of 11) which proves that the Prosecutor's allegations that Petitioner Lumiere had mis-valued any securities are false. J. Gottlieb was indeed a permanent member of the Valuation Committee. How would it be possible that he did not know what the valuations were that he used for his fund. He even discusses it with Thorell in recordings and in internal emails. These facts however were never presented at trial by either Defense or Prosecution

### Steven Ku Involvement in Pricing and Valuation:

Plaford on direct admits that Ku told him to get Thorell to send the prices that Plaford came up with instead of sending them directly from himself as he had been doing:

Q. At some point, did you, yourself, stop sending prices to operations?  / A. Yes. / Q. And why was that? / A. Steve Ku asked me to have Jason Thorell send them instead. / Q. Do you remember what he said to you? / A. He said it just looks better if the prices aren't coming directly from the portfolio manager. / Q. What did you understand Mr. Ku to mean by that? / A. That if a third party was looking at the process, the portfolio manager should not have that much influence over the pricing process in general. / Q. Did you then instruct Jason Thorell, the Trader, to send the prices to operations? / A. I did. / Q. Did he follow your instructions?

A. He did. (Tr P 677 ln 16 to P 678 ln 7)

When Thorell met with Petitioner Lumiere at a bar in late July 2013 ( ~ 3 months after Petitioner's departure from Visium), he recapped his meeting with Ku and his statement that the firm does not do overrides, overrides don't exist and does not use NAV(Net Asset Value) to calculate values which Petitioner interpreted to mean did not use fundamental value for investments. This was shocking to Petitioner since Plaford told him that Visium was using fundamental valuations such as in their valuations of ATI and C-Med. This statement sounded

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

incredulous, concerning and confusing. What Thorell had just confided ran contrary to what Plaford had told him about the firm policies and mandates he was instructed to follow.

"Q. In the first line you say: He said the valuation committee determines the prices… you said that Ku said we've never had any overrides? / A. He's refuting that overrides exist…Q. And then the defendant says: What do you mean no pricing overrides?... In other words, in disbelief that Steve Ku was making the assertion that there were no pricing overrides… Q. And then you say: So he goes it's never going to NAV. Who is the "he" there. A. The "he" is Steve Ku." (Tr P 394 ln 15 to P 395 ln 18)

Plaford's 3500 material states that Ku gave Plaford mots of his direction (3503-1)

  Plaford & Thorell Involvement but not Petitioner Lumiere: Thorell on direct states his involvement in getting overrides from Plaford. "A. What do you think he's sending me that spreadsheet for? Who is the "he" there, he's sending me the spreadsheet for? / A. That's Chris Plaford. / Q. And that's the overriding spreadsheet you're talking about? (Tr P 394 ln 15 to P 395 ln 18)

Thorell was in a secret closed-door meeting with Plaford where he describes the following event: "Q. In the middle of 2011, did there come a time when you spoke to Mr. Plaford in his office? / A. Yes… Q. Was anyone else present for this meeting? A. No… Q. What did Mr. Plaford say to you during this meeting? A. …he had just come out of some meeting that had to do with the pricing process and making some changes to it... And he concluded the meeting with "Do not tell anyone else in the firm about this conversation."(Tr P 252 ln 15 to P 253 ln 19) This change in process was obviously between Plaford, Gottlieb and Ku and then passed on to Thorell in secret. Plaford then instructs Thorell not to discuss it with anyone else including Petitioner. Also noted in Thorell's report to compliance Keily, Gottlieb and Ku, Petitioner Lumiere is not mentioned once. Thorell only after he singlehandedly attempted to extort Gottlieb for $2 million, and then decides to be a whistleblower, and then reaches a settlement agreement with Gottlieb where he is paid a settlement, does Thorell change allegations toward Petitioner Lumiere. The framing is obvious. It is also likely that his instinct to whistleblow without Petitioner was so that he would not have to share any derived reward. During the Thorell-Steve Ku meeting, Ku, Visium CFO is discussing broker quote overrides and that they don't mean

anything and that they don't go anywhere and to just leave it alone because they are meaningless. (See Transcript of recorded conversation between Thorell and Steve Ku on 8/1/13 Page 2 of 4). Yet the Prosecutor contends these broker quotes were part of an alleged scheme only known by Petitioner Lumiere, Thorell and Plaford. Recorded meeting disprove this. If the processes were indeed incorrect, this is not failure to supervise as was settled with the SEC. How could the Prosecutor possibly believe this given the evidence. Ku and the rest of Visium management knew these broker quote overrides were being emailed between the trader and Plaford and operations because Visium executives are in fact the ones that set this process in motion as per the meeting that Plaford had before his closed-door meeting with Thorell. And just as Thorell is told that these quotes are meaningless and for internal purposes, so is Petitioner told the same by his boss Plaford. The Prosecutor knows this information but instead choose to paint a concocted story just to get a conviction against an easy scapegoat from a large hedge fund. Defense Counsel did not mention any of these recordings or discussions of the content of these meetings during trial which show that management is involved in the same issues of which the Prosecutor is falsely accusing Petitioner.

### Petitioner Lumiere is not knowingly involved in anything unethical or illegal

Thorell admits that he did not tell Lumiere about it: "Q. And June 2011, you leave his office. Do you tell anyone about it? / A. No. / Q. Do you tell Mr. Lumiere about it? / A. No. (Tr P 417 ln 24-25 to P 418 ln 1-3). As for Plaford, he admits that he came up with prices and that Petitioner simply had conversations about the value of companies which is just analytical work. This did not have anything to do with selecting prices as the Prosecutors lead the Court to believe: "Did he dictate the numbers to you or did you dictate the numbers to him? A. Well, the month-end process is where the dictating happened. What I said was Stefan and I had a lot of conversations every week actually about the value of his companies." (Tr P 732 ln 10-14). Further Plaford admits discussions and explanations that Plaford gave to Petitioner: "Q. But you do recall telling—explaining to Stefan why you viewed the security where it was, correct? A. There was a tiering structure in C-med.... Q. Did you tell Stefan Lumiere " but we know that we're valuing this way too high?...A. I don't recall saying that, no." (Tr. P739 ln 14-20)

18

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

## II. DEFENSE COUNSEL CREIZMAN WAS INEFFECTIVE AS COUNSEL DUE TO INEFFECTIVENESS AND CONFLICT AS HE FAILED TO ACT AS PETITIONER'S ADVOCATE WHEN HE DID NOT ESTABLISH THE GOOD FAITH AND INTEGRITY BEHIND ALL OF PETITIONER'S AND COOPERATING WITNESS PLAFORD'S ANALYSIS WITH ALL THE EVIDENCE AT HIS DISPOSAL

There was material exculpatory evidence in discovery and additional evidence Defense Counsel Creizman could have acquired via subpoena but failed to search and use any of it during trial. This evidence provided definitive proof that the Prosecutor's allegations against Petitioner Lumiere were false and that the allegations against Visium as it pertained to valuation were false. However not one of these reports or analyses were presented by the Prosecutor or Defense Counsel during the trial or thereafter. Defense Counsel who had entered into a Common Interest Agreement and Joint Defense Agreement with Gottlieb and Visium was incentivized to leave all evidence out of the trial because it would logically tie Gottlieb, Visium, and everyone else into the matter. The same investments that the Prosecutor alleged were the fraudulent valuations were indeed valued not by Petitioner Lumiere, but by Josh Rozenberg and the Visium Valuation Committee and also by VRC and Ernst & Young's VBM. (A25, A26, A27, A28, See Rozenberg 3509-1,2,3) Defense Counsel was under an obligation to advocate for Petitioner Lumiere, but instead choose to protect Visium and Gottlieb who were paying him. And the Prosecutor was under an obligation to tell the truth and show the information to the Court and Jury, but instead chose to hide it and worse state that it did not exist even though it is clear they were well aware of its existence. The evidence was uncovered by Petitioner after trial within the greater than 18 million documents that were in discovery in non-text searchable format which made the task of finding evidence like finding a needle in a haystack. Petitioner Lumiere had asked his counsel to subpoena this same material from Visium, but he refused to do so. These facts clearly refute the Prosecutor contention that Petitioner Lumiere was involved in any scheme with Thorell and Plaford to mismark securities. This evidence clearly demonstrates the "Good Faith" basis for Petitioner's belief in the values that Plaford had told him which in turn invalidates all of the Prosecutor's arguments and theories presented to the Jury and the Court. There were reports by independent 3rd party valuation firms including VRC on C-MED and ATI, Ernst & Young's Valuation and Business Modeling Group ("VBM") Reports on ATI discussing the valuation and methodology that all supported the valuations used by Visium. VRC had valued Visium's ATI position using a market-based

approach at $28.895 million in March 2013 versus Visium's Valuation Committee value of $27.665 million. and $30.122 million in June 2013 using a market approach.  There is an email from Rozenberg to Ku and Gottlieb and MSAIP about ATI valuation on 6/26/13 stating that increasing value in ATI from ~$21 Million to $25 Million. (A25,A26,A27, MSAIP Rozenberg).  ATI's assets were purchased by Visium and Marblegate via a new company created called Ancora Holdings. (A54.1, A54.2) VRC also valued C-MED on September 30th 2013 at 24.2 with a high of 30.,7 and low of 19.01.  Visium's Valuation Committee assigned a value of 29.4 to the position and had a value of 31.6 for 2Q 2013.  (A28). The Prosecutors or their witness Jindra do not however take into account that the Reuters's price is not reflective of Visium's Directing class holdings.    In the Gottlieb and Thorell recorded meeting, Gottlieb makes statements about the process for pricing and that C-Med and ATI had third-party valuation (Transcript from Thorell's meeting with Gottlieb 6/24/13 P 4 of 11) Additionally, the supported and corroborated valuations call into question the assertion of any mis-valuation. He cancelled the expert witness stating that he would not be needed as the Prosecutor's case was too weak.  He did not seek out the many witnesses that could have testified about Petitioner's role at Visium. He did not call witnesses that could have discussed the Visium Valuation Committee process.  There was not a single witness on the Prosecutor or Defense side from the Visium Valuation Committee or Executive Committee.  As a result, the entire testimony of witnesses was purely speculative and perjured with one single motivation, which was to falsely incriminate Petitioner.  Defense Counsel could have called many witnesses either under voluntarily or under subpoena to explain the logical reasons for the valuations used for ATI, C-MED, Nebraska Book, Sevan which all had a good faith basis.  Some of these are addressed in the two Affidavits provided by the lawyers and advisors involved in these names. The analysis and valuation for investments in ATI and C-MED were thoroughly explained including a discussion of valuation methodology and valuation ranges in Ernst Young Reports, Valuation Committee models and analysis and 3rd party valuations performed by VRC.  (See below) However, none of these valuation reports and witnesses made their way into the trial. Defense Counsel refused to put in any evidence claiming that Defense was not allowed to introduce evidence.  Defense Counsel's motives were clear to protect and serve Visium's Founder Gottlieb who was paying him under an indemnification agreement over $1.2 Million dollars which far surpassed what Petitioner Lumiere could afford.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

This can be the only explanation why Defense Counsel did not submit any of the exculpatory evidence or call for a mistrial (A101) impeach provable perjury of witnesses on material issues. Here is a list of evidence that Petitioner was able to locate, some from Discovery, and some from files that he had maintained that all prove the good faith basis of the valuations used:

VRC reports, Valuation Committee notes on the securities that the Prosecutor alleged were mis-valued such as ATI and C-MED, Alvarez & Marsal reports and Analysis on Nebraska Book Company and documents on Sevan Marine and other models in support of the valuations,  Email about investment in ATI from Valuation Committee to investor MSAIP that explained the valuation used by Visium Credit Funds' and explained its use of old securities as shell positions (A26.1, A26.2, Gottlieb emails on ATI and C-MED: A26.1, A26.2, A27.3, A27.4, A27.6, A27.7, A27.8; VRC Reports: A25, A26, A27, A28, A29, A30; Valuation Committee Notes: A33, A34; ATI restructuring documents Nebraska Book )

ATI: VRC Reports (A25, A26); Ernst & Young Reports (A31, A31.1, A32); Valuation Committee Memos (A26.1,A26.2,A27, A27.1, A27.2, A27.3, A33, A34, A35) which valued ATI at over $29 Million(Rozenberg Email to MSAIP (A27.4) Rozenberg 3500 (A151) (Year-End Review on ATI-A141), Restructuring Discussion Documents (A50-A52.1)

China Medical (C-Med): VRC Reports(A28, A29, A30) Valuing Visium's Directing Class Position in C-Med; Ernst & Young Reports Signing off on C-Med Valuation and Methodology; Year-End Review Transcript (A141) where Cooperating Witness Plaford States C-Med is not Petitioner Lumiere's Position; Valuation Committee Memos Providing for Valuation of C-Med Position; Recorded Transcript with Shah (Analyst) and Plaford Where Plaford Insists His Valuation is Correct; Recorded Transcript where Plaford Gives Explanation of Valuation of C-Med; Recorded Transcript with Brook (Broker) Discussing Different Classes of C-Med Bonds; C-Med Trade Data from Other Broker and Fund and Quote Data on the Following Trading Day; Petitioner Lumiere Airline, Hotel and Concert Tickets in Miami when Plaford Perjured Himself on Lumiere's Discussion with Him and Ameesh in his Office. -Nebraska Book: (A36, A37, A38, A39) Alvarez and Marsal

report identifying $50 Million in Credit Memos; Disclosure Statement Identifying Banker Valuation Estimate of ($300 Million Valuation); Affidavit from Partner at Brown Rudnick (A135)

-<u>Sevan Marine (Voyageur):</u> Failure to comment or introduce evidence of buyout of Sevan Marine by Teekay Shipping, which Paid Bondholders ~74%; company filings disclosing buyout terms months after disclosed to steering committee; Affidavit from AMA Advisors A134 (A40-A49, A49.1)

-<u>US Oncology (USON Escrow):</u> Failure to comment on buyout and settlement offers of USON Escrow by McKesson (Documents from Law Firm Stroock identifying settlement offers and terms; Recorded transcripts of Plaford and Lumiere discussing updated settlement offers and Plaford's assigned value.)

**<u>Witness Testimony and Affidavits:</u>**

Defense Counsel failed to call any of the multitude of witnesses from Visium, restructuring advisors, auditors and valuation research companies (A98) for trial whom would demonstrate the ethics of Petitioner Lumiere and his good faith basis for believing the values that his boss gave him. Petitioner requested that Defense Counsel Creizman call the following mentioned witnesses among others but he refused to do so showing his failure to advocate for client. Petitioner has this far received 2 Affidavits (A134,A135) from Brown Rudnick and AMA Capital which demonstrate the reasons why Petitioner believed the values of positions in Nebraska Book and Sevan Marine. Visium was on steering committee of both and had received private information that was considered positive which Plaford insisted needed to be valued into the price based on Visium's Mandate. These are representative of the situations that Visium was involved with that the Prosecutors claimed were made up and mis-valued which is far from the truth. ATI, CMED and USON mentioned above were similar in this respect where Counsel from Stroock, Ernst & Young and VRC could attest to if permitted to be deposed. Petitioner hereby requests the Court's intervention in the interest of justice to grant Petitioner subpoena power to further prove his innocence to the Court. Few parties have been willing to be forthcoming for fear of retribution and "getting involved". Witnesses would shed light on the truth which was never revealed in trial due to Defense Counsel conflict and ineffectiveness which would show primarily that 1) Petitioner was not a control person or a portfolio manager for the Credit Fund and 2) the securities that displayed a variance from

the Prosecutor's "Reuter's price" were believed in good faith for unique reasons that would require expert testimony and expert analysis as seen in the valuation reports mentioned above.

Witness List: **Sevan Marine**: Affidavit for Paul Leand, Jr shows that Visium was on the Steering Committee and received private information about a formal all cash USD offer to purchase all of the bonds in Sevan Voyageur by Teekay, a large listed Norwegian rig management operator.  The committee members notice of this offer substantially ahead of the marketplace which is what prompted Plaford to value the bonds based on the new offer price.  **Nebraska Book:** Affidavit from Brown Rudnick identifies the 2 material circumstances that would lead to a higher value based on private information from being on steering committee.  First was a private equity firm's offer to purchase out all the outstanding bonds for 85%.  Second, was discovery by restructuring advisor Alvarez & Marsal of a substantial amount of credit memos close to $50 million dollars-worth.  A further list of witnesses that Petitioner currently seeks but is meeting with resistance include: Jayme Goldstein from Stroock, Stroock & Lavan: Legal Adviser to Creditors of ATI, C-MED (Not responsive to Affidavit request likely due to the work in C-Med settlement of claims that is ongoing).  He would state the C-Med litigation is ongoing and that the Directing Class would benefit significantly higher than the rest of bondholders; and ATI was restructured into Ancora Holdings which purchased the assets of ATI and is still in existence and that the holdings were split between Marblegate and Visium and that in USON, the Steering Committee members received information of settlement offers before the rest of the class of creditors.; Ben Jones- Previously CFO of ATI and Restructuring Adviser Conway Del Genio, Meredith Ruble from Stifel Nicolaus- Prepared valuations of ATI for marketing sale of company;  Cross Roads- Performed projection modeling of ATI when placed on HCM2; Cosimo Borelli from Borelli Walsh: represents creditors in C-Med bankruptcy and was involved in the break up into Directing Class and non-directing whereby Directing Class bondholders would receive a significantly larger distribution of proceeds than Tier 3 bondholders (Stated that could not provide Affidavit as still involved in the settlement of claims as of 9/20/18); Richard Nuss and Steven Napier- Ernst & Young- VBM- Performed checks on analysis done by VRC; Valuation Committee's Josh Rozenberg on ATI and C-Med; Expert Witness Tawil, Visium CEO Jason Huemer, Visium Valuation

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

Committee Members (Josh Rozenberg, Steve Ku (CFO), Alan Greenbaum, Mark Gottlieb, Amol Sahasrabudhe (Risk Officer)) (Rozenberg 3509-1, p3),  Visium Credit Analysts Lee Brown and Ameesh Shah,  Visium Risk Committee Member Whit Penski.

These emails, recordings, valuation documents and testimony from advisors who provided restructuring, legal and advisory services on the companies in question would all demonstrate the "Good Faith" basis for the valuations used and that the Petitioner was not knowingly involved in any conspiracy and was simply following authorized directives from his bosses at Visium which he believed were legitimate.  They would indeed as a result not only counter the Prosecutor's arguments that the values used were made up from thin air, but also the false statement that Petitioner Lumiere was the one who came up with the values.

### III. DEFENSE COUNSEL CREIZMAN FAILURE WITH EXPERT WITNESS IN TERMS OF A) CALLING WITNESS AND B) ATTENDING THE DAUBERT HEARING TO ARGUE THE SCOPE OF WHAT THE EXPERT WOULD BE PERMITTED TO TESTIFY TO.

#### A. DEFENSE COUNSEL CREIZMAN FAILED TO CALL EXPERT WITNESS TAWIL WHOM WOULD HAVE PROVIDED INDICATED EXONERATING TESTIMONY, CAUSING A COMPLETE MISCARRIAGE OF JUSTICE.

Mr. Tawil, President and co-founder of Maglan Capital, would have defined confusing terms used throughout this case. He would have explained the complex concepts that the Prosecutor used to manipulate a naive jury into believing the Petitioner may have committed a fraud.  He would have contradicted every argument the prosecution had against the Petitioner, and that all of Petitioner Lumiere's actions conformed legitimately to within industry standards.  He would have enlightened the Jury to the prosecution's misuse and manipulation of industry terms which Defense Counsel was not qualified and did not understand by his own admission: "I'm not sure I understand securities all that well" (Tr P 192 ln 16-22) (Mr. Tawil would have testified about general practice and many different purposes for hedge funds to request broker quotes (A130 P 1-2).  Failing to call Mr. Tawil was such an egregious defect of tact that it was far beyond the bounds of reasonable professional conduct and crosses into the realm of deliberate indifference with a culpable state of mind.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

We see in United States v. Cronic, 466 U.S. 648, 662 (1984) (presumption of prejudice involving representation by inexperienced lawyer under deadline pressure in complex white-collar crime case) "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Cronic, 466 U.S. at 658.  For example, in the unusual case where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," then, for Sixth Amendment purposes, that renders "the adversary process itself presumptively unreliable." Cronic, 466 U.S. at 659.

Several instances of deficient performance may be aggregated in order to construct an ineffectiveness claim, Henry v. Scully, 78 F.3d 51, 53 (2d Cir. 1996); Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991).

Mr. Tawil was told by Defense Counsel Creizman that the reason for cancelling his testimony was that the "Prosecutor's case was too weak", establishing lack of strategic basis for Defense Counsel's deficiencies.  The tact of not preparing an adequate defense because of the belief that the Prosecutor's argument will not be adequate is not in the realm of "strategic choices made after thorough investigation of law and facts relevant to plausible options" Strickland, 466 U.S. at 690.

Defense Counsel decision not to prepare a defense by calling an identified expert witness, and then outside of obvious conflict issues if he did not to call any witnesses solely because he believed the Prosecutor's case would not be adequate, or because he was too busy with his other cases demonstrates carelessness, lack of preparation and ineffective assistance of counsel.  It is apparent from this explanation that Ceizman's decision as to which witnesses to call was animated primarily by a desire to work in cooperation with Visium and Jake Gottlieb, and also to save himself labor - to avoid preparing a defense that might ultimately be detrimental to his cooperation with the indemnity of Co-conspirator Jake Gottlieb and Visium, or to avoid preparing a defense that might ultimately prove unnecessary, Pavel v. Hollins 261 F.3d 210 (2d Cir. 2001).

Failure to call expert witness Tawil because Defense Counsel Creizman didn't think Prosecutor's case was strong enough constitutes ineffective assistance of counsel because it "was not based on... a plausible strategic calculus." Pavel v. Hollins, 261 F.3d 210, 222 (2d Cir. 2001). The decision to not call expert witness Tawil, or any other witness, was not grounded in a strategy serving the interests of the defendant, and that, in the

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

Petitioner's case, there was no strategic reason for counsel's failure to call these witnesses.  But the most egregious reason for the decision to forgo calling Tawil or any witnesses was due to conflict.  Visium and founder Jake Gottlieb were in an indemnification agreement and paying Defense Counsel Creizman for his defense of Petitioner Lumiere.  If Tawil testified, it would have been devastating to the prosecution's case, and the indictment may have shifted to Jake Gottlieb, Defense Counsel's main source of income.  Without Tawil and other witnesses, the Petitioner could not properly mount a defense to dispel the false version of events presented by the prosecution.

## B. FAILURE OF DEFENSE COUNSEL CREIZMAN TO ATTEND IMPORTANT DAUBERT HEARING TO ARGUE PERMITTED SCOPE OF EXPERT TESTIMONY AND FAILURE TO ARGUE THAT HE SHOULD HAVE BEEN ABLE TO ANALYZE AND OFFER HIS VALUATION AND OPINION ON THE VERY SECURITIES THAT PROSECUTOR ALLEGED WERE MIS-VALUED.

Defense Counsel was incredibly ineffective when he failed to attend the most important Daubert hearing that went into deciding what the defense expert witness would and would not discuss.  Doing so significantly prejudiced the Defense at trial.  Defense Counsel Creizman instead sent a junior counsel less familiar with the case than he represent Petitioner's interests.  This junior counsel had little to no experience with securities and had very limited dealings with Petitioner's case.  What the junior attorney ended up doing was a disaster.  She simply backed away from every single Prosecutor request limiting the scope of Defense Expert testimony as she refused to argue a single position. Junior Counsel deferred to every one of Prosecutors objections severely limiting Defense in a complex securities case: a) Classification of securities and the responsibility of such: "I don't think that this is going to be part of his testimony.... the purpose of Mr. Tawil's testimony is really to provide background for the jury on distressed debt." (Tr P 325 ln 4-7) b) Actual securities that are contested: "...their [Prosecutor's] objection to Mr. Tawil [Expert] testifying about whether certain securities were, in fact, valued properly, and I can also say that Mr. Tawil will not be rendering any opinion about whether or not any security in the credit fund was properly valued." (Tr. P 325 ln 15-21) c) Characterization and functions and roles and how a large Hedge Fund operates: "...we would be happy to exclude that from the testimony." (Tr P.327 ln 2-22) She may as well have been working for the Prosecutor.  There is no reason why an expert witness should not be able to discuss how other hedge fund processes work that may bear on the functions and

various roles within an organization and discuss the classification of securities and the actual valuation of these

specific securities.  The Court claimed "you had the general counsel on the stand, and you had plenty of

opportunity to bring out from him how this hedge fund operated and, to some degree, both sides did." (Tr. P327

ln 11-14). This brings out an important point that there was not a single witness that was part of the risk

committee, valuation committee, or executive creating a void of information as to the Visium processes.

Therefore every bit of testimony was nothing but speculation as not even the General Counsel, who was refused

access to the Valuation Committee had no access and therefore did not know the procedures at Visium.

Additionally, there is no reason why an expert should not have been allowed to analyze and review the

securities in question especially given that no one presented any analysis at trial.  The flawed and incomplete

perspective offered by SEC economist Jindra who admittedly did do research on the names and that he "had

[have] some experience with valuation, but I would not say I'm an expert in valuing distressed bonds".

Additionally, the fact that Jindra incorrectly ignored the fact the C-Med prices he came up via IDC did not

reflect the "Directing Class" bonds owned by Visium was "a plain error".  It was an infringement on

Petitioner's constitutional rights to block this from coming in: " …Do you now whether the IDC price reflects

the extra rights that Visium was entitled to by virtue of being part of the directing class of creditors in C-Med?

Prosecutor: "Objection. It assumes facts not in evidence.  The Court: Sustained." (Tr P941 ln 15-21) Plaford on

cross had admitted to the preferential rights of Visium's stake so it absolutely was in evidence: " Yes it did have

preferential rights.  It should have been valued a bit higher because of that… It should be higher than the C

Tranche" (Tr P733 ln 17-23); "there was a tiering structure". (P739 ln 16).  And when questioned if Jindra had

done any work in distressed bonds his response is even less convincing: "Not that I can recall." (Tr. P 934 ln

13-16)  What an expert witness should have been able to testify to is apparent and would have made the

Prosecutor's arguments fail and would have impeached witnesses Vandersnow and Plaford and Thorell: (A130

pg1-2, Memorandum of Indicated Tawil Testimony) Examples of what expert could have done to impeach

testimony of witnesses: Vandersnow, Thorell and Prosecutor stating that Princeridge and Janney Montgomery

were "very small bucket shops", no access to Reuters pricing, a small number of client accounts whereas they

are both reputable firms and quite large firm by broker dealer standards where Princeridge had over 800

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

institutional clients, Thorell and Prosecutor's stated.  Prosecutor and Thorell stated that Reuters was the defacto

benchmark would have appeared ridiculous for any bond broker or bond investor.  Bloomberg is the standard

platform used by bond investors and traders and for bonds it provides some quotations but these are all just

indications and come from other broker representations or runs that may or may not be "stale".  As for the

pricing service, the expert would have said that these pricing services make more mistakes the less liquid the

security.  If there was a restructuring or amendments negotiated as in a distressed situation, it would not reflect

any of that so the output quote indication would not necessarily be representative of the fair value.

The expert could have testified that in distressed situations, members of the creditors committee would get

incremental information that the rest of the market would not know and therefore make the perceived market

price incorrect if it was asked by a manager to stipulate to the fair value of the security.  Or the investors on a

committee may structure unique situations that would give them additional economic benefits that would

change the value of their position such as warrants attached or additional equity that would increase the value of

their position relative to other investors.  He would have testified that there is a whole process to setting a price

in a fund especially for one's that are distressed, less liquid or restructured where the Administrator simply

relying on a feed from a pricing service would be wrong and not reflect fair value.  So the process would entail

that the portfolio manager assist and discuss the issues with the operations and accounting and valuation

committees and investment manager and then communicate this to the Administrator and auditor for their

opinions and final review.  It would not be possible that with an infrastructure in place such as Visium's, that a

"rogue trader" would be able to inflate the value of a security.  There would be too many checks in place that

would need to be argued and discussed and finally approved.

As a result of Defense Counsel's lack of understanding into complex securities, restructurings and issues

surrounding accounting, trading, technology platforms, areas of risk management, processes involved in pricing

in audits, and simple understanding of the plain facts and his refusal to hire counsel with this specialization to

work alongside him on the case, which this case required, the defendant suffered extreme prejudice which

caused him a violation of his constitutional rights to effective assistance of counsel.  Lumiere had

indemnification from Visium which should have gone towards hiring additional counsel with expertise.
Lumiere found such legal experts with knowledge of complex finance, yet, Defense Counsel ignored Lumiere's
repeated requests (Strickland v. Washington).

## IV. DEFENSE COUNSEL CREIZMAN ALLOWED THE PROSECUTOR TO USE A) MISCONDUCT AND FALSE STATEMENTS AND PLAIN ERROR AND B) FALSE, ERRONEOUS, AND PERJURED TESTIMONY FROM WITNESSES
### A) The Prosecutor Made Material Mis-Statements of Fact and Committed Plain Error

The Prosecutor may not make material misstatements of law (U.S. v. Cruz) or fact (U.S. v. Forlorma) or
infect trial with plain error of fact  The United States Attorney is the representative not of an ordinary party to a
controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to
govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that
justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim
of which is that guilt shall not escape or innocence suffer. Berger v. United States, 295 U.S. 78, 88, 55 S. Ct.
629, 79 L. Ed. 1314 (1935).  In the instant case, The Prosecutor made numerous and repetitive obvious
misstatements of facts choosing to ignore obvious facts.  This led Prosecutors to argue irrational and non-
sensical theories while failing to investigate and understand the issues and in several cases preferring to simply
ignore the Truths turning the trial into a persecution of the defendant.  As a result of the numerous plain errors
of fact in pre-trial and trial, the court and the Jury made faulty decisions based on these errors.  Due process
requires that a convicted person not be sentenced on "materially untrue" assumptions or "misinformation" (see
Townshend v. Burke, 334 U.S.736, 68 S. CT 1252 (1948) (at 741).  Prosecutor made material misstatements as
follows which Defense counsel lacked the preparation and ability to defend: "Lumiere's hedge fund" (A18-A21;
Tr P 6 ln 1, P 6 ln 4, P 6 ln 20, P 9 ln 20, P 975 ln 15-16, P 975 ln 18-19, P 975 ln 21-22, P 976 ln 24-25, P 976
ln 2, P 976 ln 13, P 977 ln 3), references to Lumiere being a portfolio manager (A17-A18; Tr P 5 ln 16-17, P 4
ln 13, P 3 ln 19-20, P 4 ln 20, P 5 ln 7, P 5 ln 21, P 5 ln 23) and statements in summation or leading questions
using prejudicial terms such as "Spit back the quotes that Lumiere wanted", "Tell the prices that you wanted and
have the brokers spit them right back"(Exhibits) pervaded the trial. This acted to inculcate, brainwash, and
infect a non-specialized jury and was especially improper because there was no evidentiary basis behind these

material misstatements of fact, apart from pointing and reinterpreting proven perjured testimony of witnesses. The facts are clear that Petitioner Lumiere was not the Hedge Fund's manager or even "The" or "A" portfolio manager for the Credit Fund and he did not report to investors.  These misstatements of fact were done intentionally and maliciously to confuse a jury uneducated in the nuances of many roles within a hedge fund/financial institution and complex securities.  These "improper methods calculated to produce a wrongful conviction", proves Prosecutorial misconduct that justifies a mistrial because it "so infect[ed] the Trial with unfairness as to make the resulting conviction a denial of due process." (Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643(1947)).  Petitioner Lumiere did not and there is no evidence of such that Petitioner ever ask the brokers "to spit back prices".  Petitioner Lumiere did "educate" and enter into discussions with brokers about new information acquired and explained the issues that Plaford had relayed to him.  Petitioner did believe the prices that Plaford gave him at the time based on Plaford's explanation of Visium's mandate to price based on all of Visium's current private information.  Prosecutor made false statements during summation and rebuttal stating that there were no disputes about certain false facts telling the Jury that they did not even need to consider these as they were fact when they were in fact not and in fact false and all disputed: "…let's be clear about what's in dispute and what's not in dispute, what you have to decide and what you don't have to decide.  There can be no dispute that the defendant was secretly pulling the strings behind the scene…that Lumiere knew that using inflated values undermined this process and caused Visium to lie to its investors." (Tr P 974 ln 8-19). "…You heard the defendant, in his own voice on those recordings, admitting he knew what he was doing….He egregiously mismarked securities, and because of that, he is guilty." (TR P974 ln 20-25 to P975 ln 1-9) "...Lumiere and the credit fund fraudulently overrode independent third-party prices to boost the fund's performance."(Tr P973 ln 10-12)  "Indeed, there can be no doubt that Lumiere, an educated and experienced hedge fund professional, understood what my colleague, Mr. Williams told you at the beginning of this Trial...The evidence shows that Lumiere knew.. that their undermining the valuation process and falsely boosting the performance was wrong." (Tr P973 ln 24-25 to P974 ln 1-7)  "There can also be no dispute that the defendant knew that Visium had promised investors that the valuation process was going to be independent from the investment team,…." (Tr P974 ln 15-19)

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

Prosecutor misstates the facts by stating that Lumiere had admitted to what he was doing by using recordings of him almost a year after he left Visium where statements were made after the fact. In fact, the tapes show that the defendant is looking to possibly be a responsible whistleblower if there is something indeed wrong at Visium and consults with an attorney about it before Thorell does. He accuses Plaford of mismarking but this is based on new information acquired from his previous meetings with Thorell who had said that he confronted Gottlieb and Ku where he alleged that Ku denied that overrides existed and denied that valuations were used for NAV. Further Gottlieb told Thorell that ATI and C-MED were valued by third parties and were not mis-valued which Thorell conceded that he was not familiar or involved in the analytics of those investments.

" First, he manipulated and corrupted the independent valuation process at Visium's credit fund; second, he mis-valued securities in that fund to inflate their values, and as he told you in his own words during this Trial, he did that egregiously from 2011 through 2013." (Tr P972 ln 1-5 and similarly "..admitting he knew what he was doing" (Tr P 975 ln 3-5) and again:"…defendant told you that in his own words… There's just no ambiguity there…in charge of ATI and played a large role in China Med." (Tr P978 ln 5-17) and "Lumiere told you that he and Plaford falsified marks, levels, performance." (P978 ln 23-25) and again "when he said he's been doing this since 2011…." (Tr P 997 ln 25 to P 998 ln 8) and "Admit that he would dictate prices to brokers…" (Tr P 998 ln 18-20)

"What does the defendant admit in this conversation? He's dictating the prices…. Because that means that he knows that the prices are all fake." (Tr. P 999 ln 2-9) (Because a security is not traded does not mean that a broker cannot evaluate a security or a position. That is the nature of an illiquid market). There is no evidence whatsoever that Petitioner knew that they did not give an honest assessment of the quotes he was requesting for Plaford's Credit Portfolio. In fact evidence shows, that Petitioner did explain the situations to brokers: Plaford states this: " "he could explain what was going on" and he ended up doing more and more explaining" ( Tr P 675 ln 3-9). When asked if Vandersnow recalls "speaking about any models" or "research that he personally had done" or "why he believed a security was worth a certain amount"         …", He consistently states that " I do not". This statement is in the present about occurrences years prior and he simply states that he does not

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

recall. (Tr P 502 ln 10-21) In response to question if he knows whether brokers did research to come up with the numbers, Thorell states that "No, I do not know that." (Tr P 360 ln 5-7)". Several internal recordings demonstrate that Petitioner did discuss the situations and research with brokers(CMED-Ameesh-Plaford-Lumiere Recording; CMED Brook-Lumiere recording). The Prosecutors picked on 1 single recording where Petitioner read off a list of securities which did not have unique situation except and even here he states that one is a recent issue issued at par which means 100.

"Lumiere was the No. 2 guy. He was also a portfolio manager and an analyst. (Tr P 975 ln15-16) (see Thorell Perjury below which refutes this). "He managed a hundred million dollars on his own, a hundred million dollars worth of distressed debt. That is not a nobody. That's almost 20 percent of the credit fund." (Tr P 975 ln 23- P 976 ln 1) (This was false as seen in Thorell, Keily, Plaford Perjury section. Petitioner did not manage any part of the Credit Fund). "As I mentioned earlier, that's why the defendant on cross-examination kept running away from his title. He's a portfolio manager. He managed a-hundred-million dollars." (Tr P1002 ln 4-7). "They were running around from his title of portfolio manager…You know that's totally ridiculous… Lumiere advertised it on all of his e-mails from 2011 to '13. (Not a single document shows that Petitioner is a PM in the Credit Fund but they do show he is a PM in Global Fund and was PM in Balanced. His title on signature does not refer to Credit Fund) You also heard evidence that he managed a hundred million dollars on his own, a hundred million dollars-worth of distressed debt." (Tr P 975 ln 18-25) (Tr P 999 ln 2-9) This was clearly not part of the Credit Fund. (see Thorell, Plaford and Keily Perjury below where both Plaford and Keily admit that Petitioner was portfolio manager in Global Fund and Balanced, Not Credit Fund.)

The fraud started with the defendant" (P986 ln 4) "It started with the defendant" (P 976 ln 9-11) "These were the defendant's securities." (P1055 ln14)

"He sent emails saying these are mine.because he wanted to get paid off of them..He said please include these in my P&L" (P 1055 ln 13-17) This is false. Email does not mention that the securities are Petitioner's or that requested PNL. He is simply asking for PNL Contribution to the firm for a multi-year period. This proves he is not seeking payment for these (See recording Plaford Review and Jindra Perjury)

So he corrupted the valuation process." (Tr P976 ln 23) (Plaford and Thorell admit that Petitioner is not part of overrides. See Plaford and Thorell Perjury which refute Prosecutor misstatement) Prosecutor misstates the evidence after it has been proved incorrect.  "And then Lumiere told them the prices or the levels that he wanted... Lumiere used those fake prices to override ...were used to calculate the NAV, and that was sent to investors and.... Plaford loved what Lumiere had figured out." (Tr P977 ln 5-15).  "...the defendant lied to investors about the fund's valuation process and about the fund's actual performance." (TR P972 ln 6-8) " He told lies to investors to line his own pockets… " (Tr P972 ln 18-20) These are all proven false as Petitioner did not pocket a single penny of bonus from the Credit Fund for work done in the years of the alleged fraud.  Yet Prosecutors continue to restate the lies " This includes that Lumiere and the credit team were secretly the source of the valuation of securities in the fund.  All, again, in direct violation of what the investors were told." (TR P 973 ln 6-9) In recorded conversation Ku states that quotes from investment team were for internal purposes and did not go to NAV and Stratum report identifies that some positions were not verified by Administrator and some were provided by Investment Manager which is acceptable as per the Compliance Manual and Offering Memorandum). Prosecutors across the board reiterate fabricated allegations and refuse to accept that the Compliance Manual, Offering Memorandum and common sense show that Investment Manager is ultimately responsible for pricing, that the investment team could provide input and should provide input when needed which is exactly in situations like C-Med, ATI, Nebraska Book, Sevan Marine, and USON.  Prosecutor prefer to ignore the truth, simply because the truth would demonstrate that they had no case so it had to be based on a sham theory stuck together with fabricated, ambiguous and perjured testimony

"Claimed that Lumiere did not provide the brokers with his own research"; "Lumiere did not believe the values"; "Claimed that Lumiere's buddies were Vandersnow, Brook and O'Callaghan" ( all if this is proven incorrect by recordings, evidence, testimony on and off the record; CMED-Shah-Plaford Transcript)

The actual undisputed facts are that Petitioner Lumiere was a portfolio manager in the Visium Global Fund in which he managed a perfectly legal and legitimate operation.  Prior to this he managed a perfectly legal and legitimate operation in the Balanced Fund dedicated to Special Situations/Distressed.  These portfolios had

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

absolutely nothing to do with the Credit Fund.  Petitioner was neither expressly nor implicitly a control person or portfolio manager in Credit Fund, nor did he have any say in pricing the securities or in any trading discretion for the Credit Fund which contained the securities that the Prosecutor alleged were inflated (A1-A16; Proof Petitioner is solely Credit analyst in Credit fund, but Portfolio Manager of a different, unrelated fund).

-Prosecution told Judge that Lumiere never made any effort to report issues until FBI raided his apartment. This is a knowingly false statement.  Prosecution knew that Lumiere had been the one that initiated an investigation of the issues by reporting the incident to several attorneys and asking for advice on how to proceed. (See Knuts Declaration and Emails & Thorell Bar recording and Thorell recordings, and Lumiere-Thorell Recording)

-Prosecution alleged that Lumiere had compliance issues at Visium, and did not honor expense requirements, stopped showing up to work, and did not report trading with his brother.  These compliance issues were only introduced to Petitioner after leaving Visium and initiating cease and desist on J. Gottlieb for slander.

-Petitioner was not regulated by FINRA and not a broker and not subject to any of their rules but Prosecutor claimed that he broke their rules.  The introduction of this into trial was an material error.

-Motion to suppress hearing from Oct 19th, 2016: Prosecutor asked if agent knew that there were other recordings based on his investigation and the agent replies yes.  This would have been impossible to know by the time of proffer session where Petitioner made statement that Agent had left behind several hard drives during search going to Petitioner's honesty and good faith which Prosecutor's misstated continuously.

Prosecution claimed that Lumiere corrupted brokers.  This is false. Plaford initiated the call to Princeridge to simply request quotes and offered to give them Visium's estimates.  It was not Lumiere that initiated this process but Plaford at the recommendation and approval of Jake Gottlieb and Steven Ku.

-Lumiere did not have a friendship with Vandersnow and had met him on only one occasion and only spoke to Odeon broker on 1 single occasion on Thorell's landline.

-Agent Callahan Review of evidence was suspect as he only went over it in several hours over 2 day period.  However it is not likely he would have been able to thoroughly review the material within folders, subfolders

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

and files that represented millions of files in several hours. However Defense Counsel failed to question on this. Also why were no protocols followed as in Metter where specific protocols were filed.

-Agent Callahan's claim that he did not know of any other attorneys except for Udell- False statement as Prosecutor had been given list of Petitioner's attorney where asserted privilege and mentioned during Attorney proffer with Udell and Agent (A147)

-Agent Callahan stated that Prosecutor was in cooperative posture with Defendant only through April 15th, 2014 (clearly false as was attempting to cooperate through at least September 2016 (A83, A69)

-Princeridge and Janney Montgomery firm size relative to JP Morgan was irrelevant as most brokers specialize in covering smaller less liquid issues. (Affidavit Expert Pending, A124, A123, A122)

-Princeridge and Janney Montgomery had every ability to check pricing on most issues through customers, their Traders, and interdealer brokers like ICAP and GFI (Affidavit from expert witness still attempting to get)

-Lumiere did not call Princeridge and Janney Montgomery bucket shops. Calling a firm a bucket shop does not make them one regardless as Princeridge are not small brokers but medium sized institutions. Recording where Lumiere mentions bucket shops would be the only ones hurt if Visium shut down and does never reference Janney and Princeridge as such)

"That's, by the way. While he's still working at Visium. That's not after the fact. That's there and now. And he tells Phil don't tell anyone about this, by the way,Phil,, but the fund is—the marking is BS. " (Tr P 1052 ln 18-21) (Prosecutor takes the statement out of context which is the discussion of Petitioner hiring an attorney to leave Visium and 2 days prior to disclosing to J. Gottlieb that he wishes to leave. The context of this telling PB not to say anything was meant for right now as he was leaving the firm. Petitioner then states: " at some point I think—I don't know, I think at some point the SEC will just hear about something." (Conv w PB 4.14.13 P 16 ln ln 7-10) that he will leak the information to the SEC which is does shortly thereafter or at least to a former SEC Attorney at Park & Jensen.) (Transcript Trial; Transcript, Transcript Trial where leaves out leak to SEC)

**Prosecutor Extortion claim**: "Well, first, we can extort him.  I'd love to be able to go get him.." (Tr P 399 ln

6-8).  This was incorrectly transcribed, and the Prosecutors used this manipulated transcription to derive an

argument for motive as to why Petitioner made recordings at Visium.  The Corrected transcript states: "Well of

course we can't extort him.  I'd love to be able to go to him." (A138-A139) This error caused material prejudice

at trial and its inclusion were grounds for a mistrial.  Defense Counsel failed to go over and independently

transcribe recordings showing significant ineffective of counsel.  Regardless, the entire context never should

have been allowed in trial and it is quite obvious that the error was intentional. (Lumiere #3, Transcript

Prosecutor; Corrected Transcript) It is also clear from the language that there is beyond zero intent from

Petitioner to do such a thing, but in other recordings, Petitioner is actually warning Thorell: " Thorell: Would

you sell it to me? SL: What? What do you want? Thorell: To make money. SL: What?. Are you talking about

just trying to expose them? You can't do that.  That's extortion." (A149 p34).  And Petitioner further states that

he does not care about money and that his only concern is that he wants to make sure that investors are treated

properly".   But the Prosecution goes on to use other variations of the incorrect transcript to further infect the

trial and Jury with not a single objection from Defense Counsel.: "it's chilling-it's to extort Chris and Jake of a

hundred million dollars" (Tr. P 1065 ln 11-13) "Lumiere said that he wanted to extort Jake Gottlieb and Chris

Plaford for a hundred million dollars"(Tr P 1006 ln 17-19) Prosecutor knows from recordings that Petitioner

would never do that and had advised and attempted to stop others from doing so:  "..I don't want to use it as a

bargaining chip and I told them don't use this as a bargaining chip because…It's going to be considered

extortion.  And that's an offense." (A P58 ln 6-12).  Prosecutor incorrectly transcribed a revelation of Petitioner

at hearing what Ku was stating to Thorell about NAV: "Even though Chris has been manipulating

valuations",(Tr P395 ln 19-24) when the correct transcript said " So Chris has been manipulating valuations?"

which has a completely different meaning.

-At Motion to Suppress Hearing, FBI Agent lied: a)  Stated falsely that he knew there were other recordings and

that Petitioner did not tell them of the existence; b)  the existence of privileged communications c) knowledge

of any other attorney that Lumiere had worked with.( See Udell Declaration, Knuts Declaration, Udell Proffer,

Petitioner Stefan Lumiere v. United States of America        Case No. 18-CV-9170 (JSR/BM)

Email Callahan Knuts) After being aware of these and agreeing not to use, the Prosecutor submitted, displayed and discussed privileged material into Trial. (Tr P 980 ln 20-24; Exhibit 1010 in Trial and in summation; email from Creizman on points of privilege and mistrial)

- Reuters and other "pricing services" are not defacto benchmarks as Thorell repeatedly stated.  And the pricing services are not markets as the Prosecutor stated repeatedly and witness Jindra stated and published in exhibits. They are not to be confused with valuation services such as those provided by 3rd parties such as Valuations Research Company (VRC).  They are also not exchanges and the price quote published by these pricing services cannot be relied as an expected or guaranteed transaction price especially with less liquid, or restructured securities. (Reuters disclaimer; Reuters white paper; Email Thorell to operations in June 2011 on Reuters errors and example of bonds of GAPT and Reuters pricing 23 points off from market) He also said, this is key, the defendant never told him anything about his own research. The defendant never said, I know this is worth X because I've done all this work. He just was reading list after list of prices. And you heard the very same thing from Plaford. Remember, once the defendant left the firm, Plaford had to take over for a few months and dictate the quotes himself. (Tr P981 ln 22 to 982 ln 5) Thorell's statement of the hierarchy is perjury and the Prosecutor's assertion that Lumiere was "Number Two" as asserted by the Prosecutor in summation is a false statement and without merit. The Prosecutor then in summation and sentencing falsely reinterpreted this ambiguous statement to state that Petitioner was the "Mastermind" and the "Puppet master pulling the strings behind the scenes" of the fraud when it was clear from the evidence that Petitioner was not a ringleader or even knowingly involved in any fraud. Prosecutor states that: "not one document, one model, no shred of paper in this case that shows the defendant had a good faith belief in these prices." (Tr P1059 ln 2-4) The Prosecutor's entire case is based on a chosen signature page, when there are multiple versions of Petitioner Lumiere's signature page, depending on which one's he has updated.  The Prosecutor's argument on this point, is the equivalent to finding a janitor at IBM who also has a hot dog company on the side where he has a business card that states President of Hot Dog Company.  And by the same logical sequence stating that he is the President of IBM.  It simply does not make sense and is knowingly false as every piece of evidence apart from lying

Petitioner Stefan Lumiere v. United States of America        Case No. 18-CV-9170 (JSR/BM)

testimony supports.  As a result of Defense Counsel Creizman's incompetencies, Petitioner Lumiere was deeply

prejudiced at trial.

B) **Perjury of Witness:**  The role of the Prosecutor is to seek truth and justice.  To knowingly allow perjured

testimony into the trial is a crime on the court and on the Constitutional rights of the accused. In the interest of

protecting the rights of the accused, it is extremely important that the Prosecutor does not, intentionally or

unintentionally misstate facts in evidence or mislead the Jury with misleading or false statements to simply gain

an advantage to win a case.  As a result of any material perjury in trial, whereby the Prosecutor "knew or should

have known of the perjury.", the conviction must be set aside "if there is any reasonable likelihood that the false

testimony could have affected the judgment of the Jury." Id. at 456. In United States v. Agurs 427, U.S. 97, 103,

49 L. Ed. 2d, 342, 96 S. Ct. 2392 (1976).  The commentary to 3C1.1 is explicit, that the phrase "impeded or

obstruct the administration of justice includes perjury".  Perjury is committed when a witness testifying under

oath or affirmation gives false testimony concerning a material matter with the willful intent to provide false

testimony.

The Prosecutor allowed knowingly perjured testimony from cooperating witnesses and immunized witnesses,

FBI Agent, and other witnesses at trial and allowed purposely misleading statements from same and from other

witnesses at Trial. Additionally, the prosecution team failed to properly investigate the facts and purposely

denying the facts that were available through every channel.  The prosecution team's introduction of knowingly

perjured statements from witnesses, its own introduction of known false facts and implausible fabricated theory

brought onto the record in opening and closing statements and throughout the trial by using manipulative tactics

such as prejudicial questioning, inflammatory statements, leading questions and questions from witnesses that

lack any foundation. This so infected the trial causing irreparable harm to defendant and an utter denial of his

due process rights.  For a Prosecutor to use devious and underhanded means, cheating, burying facts deep into

18 million non-searchable documents in discovery, hiding facts and evidence, denying obvious facts, knowingly

taking recorded statements out of context, leading witnesses to lie while offering them deals for the sole purpose

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

of winning a case and ignoring the required protections afforded to the accused by the laws of the Constitution is an utter an complete aberration of the Constitution and of the United States system of Justice.

### Immunized Witness Thorell Perjury during Trial and Pathological Liar:

Thorell's testimony was riddled with perjury and purposeful misstatements of facts with the sole purpose of bearing false witness against Petitioner.  He failed to notify Prosecutors of over 30 hours-worth that he had made until just before the trial (Email). He also failed to mention that he attempted to blackmail J. Gottlieb on two occasions for 2 million dollars which J. Gottlieb admitted to when asked. (A136 and A137) He failed to tell the Court and perhaps Prosecutors that Petitioner had been the first one to notify a former SEC attorney of something "potentially" wrong at Visium and offered to have this same attorney speak to Thorell about it.  He also failed to mention that Petitioner had spoken to Thorell and warned him no to trust Plaford and that he should leave Visium. (Recording Lumiere-Thorell; Declaration Attorney Knuts).  He also failed to notify the Court or possibly Prosecutors that he had attempted to purchase Petitioners' recordings at Visium but Petitioner told him that he could not use them for Blackmail as that would be an offense.  He also failed to mention that the transcript of recording which he testified as true was actually a lie.  Petitioner did not say "Well First we can extort him." (Tr P 399 ln 6-8). It said: "Well of course we can't extort him" (A 138-139) which infected the trial and jury.  Given the prior conversations with Petitioner, there could be no confusion that Petitioner had a moral obligation and operated with utmost ethics, yet he turned on the one person that was looking out for him out of greed.  Petitioner told Thorell who wanted to buy his recordings that he could not use them to blackmail Visium as that would be an offense, and that if anything was wrong, the SEC is the only solution as to who to report to.  When it came to a whistleblower discussion, Petitioner stated that he did not care about the fee but was only concerned that investors were treated properly, to which Thorell responds: What? Investors? Who cares?  I want the money!" (A153)  During trial his blatant perjury was abound: "…It was my ***understanding*** that he was portfolio manager in charge of a section or a subsection of the credit fund…" (Tr P 244 ln 7-12.) Thorell differs to "his understanding" as opposed to being sure exemplifying ambiguity over a material matter of control: Thorell hid from an affirmative statement to avoid clear perjury.  This material misstatement misleads the Jury

and the Court to infer responsibility over the Credit Fund.  Whereas when he refers to his true boss Plaford, Thorell states with no ambiguity: "He (Plaford) was the portfolio manager for the Credit Fund. (Tr. P243 ln 16-17 (Tr P 245 ln 9-10) The Credit Fund had only one portfolio manager (Plaford) which was evident throughout every document and other piece of testimony (A4-P3, marketing material, Keily Cross P147 ln 16-25 and P148 ln 1-5; Plaford Cross P756 ln 6-9 and Plaford Direct P 651 ln 25, P 652: ln 11-18; Credit Fund Offering Memorandum.  Lumiere did not manage any part of the Credit Fund A4-P3)

Petitioner was not a portfolio manager in the Credit Fund as Prosecutors (A4P4, A2P17, A4, A5P3, A5, A6P4, A7P1, A8). On cross, Visium General Counsel Keily demonstrated Thorell's perjury: "Q. One was in the Global Fund as a portfolio manager…./ A. Yes.. / Q. And one in the Credit Fund as an analyst…/ A. Yes." (Tr P154 Ln 8-15). "Q. The portfolio manager of the credit fund portfolio was Christopher Plaford…/ A. Yes…/ Q. No dispute about that…/ A. None (Tr P 147 ln 18-22). Keily referring to Plaford: "He was the portfolio manager and had responsibility for everything related to the investment management of the credit fund.  In other words, he, as I understood it, had final responsibility for making buy and sell decisions with respect to the securities in the credit fund held. (Tr P148 ln 1-5).

Thorell continues to testify perjuriously to Prosecutor's leading questions: "Q. Could anyone other than Mr. Plaford or the defendant make the decision to buy or sell a security in the Credit Fund?  A. No." (Tr P 246 ln 5-7).  This was a key issue called "trading discretion" typically tied to area of responsibility for a fund which Thorell lied about.  Witness Plaford the portfolio manager of the Credit Fund does not corroborate Thorell's lie on this material point by stating that all analysts can put on positions of smaller size: "…all of the people who are saying "analyst," Stefan included, had the ability to put on positions in varying sizes on their own without my approval" (Tr P 755 ln 1-7).  Yet Plaford breaks this down further during questioning to further show that Petitioner Lumiere was not a portfolio manager and had no control of Credit Fund : "Q. Could he make trading decisions and by that I mean a decision to buy or sell a security?../ A. Yes…Q. For how long did he have that power?../ A. A year or two.  Q. Was that taken away? …A. Yes…" (Tr P 651 ln 265 - 652 ln 8 ) Given that this decision making authority which he alludes to as trading discretion was taken away due to "allegedly" poor

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

performance according to Plaford which began in 2011, we can logically infer that the since the fund started in May 2009 that Plaford said he had this discretion ended before any of the alleged misconduct.  The ability to make investment decisions defines a portfolio manager as per Keily. (Keily direct Tr P45 ln 18-19, A22) This refutes the following statements by Thorell: "Lumiere managed $50 to $75 million in a subsection of the Credit Fund", "Lumiere directed him to trade"; "Lumiere was a portfolio manager"

It is clear that all of Thorell's testimony is a fabrication, designed for his sole motive of a big payday whistleblower fee feeling no compunction for framing Petitioner (Email showing that Thorell is unusually avaricious and cares only whistleblower fee). What follows is a barrage or re-interpretation and re-invention and fabrication using bits and pieces of recorded statements taken out of context.  Thorell continues to lie to implicate Lumiere: "Where did you get the securities and the prices you wanted from?  Where did you get that information?...Stefan..." (Tr P 359 ln 18-25 to P 360 ln 1-7).  Plaford refutes Thorell's statements.  Plaford admits that he instructed Thorell: "...At some point, did you, yourself, stop sending prices to operations? A. Yes... A. Steve Ku asked me to have Jason Thorell send them instead?... Did you then instruct Jason Thorell, the trader, to send the prices to operations? A. I did. Q. Did he follow your instructions? A. He did." (Tr P 677 ln 13-25 to P 678 ln 3-7).  Thorell even admits that the pricing process was managed by he and Plaford and initiated after Plaford had left a meeting with Visium Executives which we could infer to mean Gottlieb and Ku. He and Plaford both admit that Petitioner is not part of the process.  Thorell's fabricated story does not make any sense but most obviously confused the Jury and the Court:  "...Q. And June 2011, you leave his office. Did you tell anyone about it? A. No. Q. Did you tell Mr. Lumiere about it? A. No. (Tr P 417 ln 24-25 to P 418 ln 1-3)  "A. My understanding was that Stefan was communicating to the brokers that these are the levels and giving the brokers guidance on behalf of himself." (Thorell Direct: Tr P357 ln 5-7)

Yet Plaford reveals that Thorell's "understanding" is a cloaked lie.: "Q. And during those calls you told Mr. Lumiere what prices to ask the brokers for; is that fair to say? A. Yes. (Tr P732 ln 2-4) "Q. Let me break this down. You told Stefan Lumiere what prices you believed C-MED should be at, Correct? A. Correct. Q. You asked him to go to certain brokers and explain to them why you viewed the price the way you viewed it,

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

Correct?  A. Correct." (Tr P739 ln 3-9). Plaford admits material issues that go to "good faith" which refute all of his prior statements, Thorell's testimony and the Prosecutor's allegations.  These statements should have been used to impeach Thorell, Vandersnow and Plaford's own prior testimony and all of the Prosecutor's false allegations which Defense Counsel failed miserably while admitting he did not know how to impeach a witness: Creizman: "Who determines if lying?" (Tr P 428-429)   Thorell's erroneous "understanding" that Petitioner was communicating to the brokers that these are the levels that Petitioner wanted completely contradicts and therefore does not corroborate Witness Plaford's testimony.  Plaford admits that he was the one that told Petitioner Lumiere "Visium's" estimates of prices and he also admits to that he is told to explain to brokers why Visium viewed the prices (values) a certain way.  And Thorell also admits that he does not know if brokers did research "Q. Do you know if the brokers did any research to come up with the numbers they sent back to you? A. No, I do not know that." (Tr P360 ln 5-7).

On cross Plaford discussing overrides admits that Petitioner Lumiere "wasn't involved in that part of the process. No." Therefore how is it possible that he is a knowing member of a conspiracy which allegedly centers around overrides? Nowhere on the record does anyone state that Petitioner is a knowing member of this conspiracy and evidence shows quite the opposite and shows Petitioner's good faith and ethics. Plaford admits to his involvement with Thorell: "Q. Now you were also the one who made Jason Thorell send the override list to operations? correct? A. Correct. Q. And you had him do that for 2 years, correct?..." (Tr P 759 ln 22-25 to P 760 ln 1-11)

Plaford admits that it was he that lead the override process and decided which securities to override:  "Q. It was you who decided every month which securities would be overriden, correct? A. Correct.

Q. And you were the one that highlighted the names on the spreadsheet, correct? A. Correct."  (Tr P 758 ln 14-19) Thorell next uses the Visium Credit Fund Organization Chart to make a case that there was some sort of hierarchy to the organization chart that led him to understand that Petitioner Lumiere was a portfolio manager by selecting the organizational chart designed for March 2013, where Petitioner Lumiere is listed as "an analyst". (A2, A4, A5): " Q. …Who is number two? A. Stefan Lumiere" (Tr P 242 ln 13-25 to P 243 ln 1-14)

Plaford's testimony impeaches Thorell again here when referencing the organizational chart of the Credit Opportunities Fund: "A. I don't draw a big distinction in the order that these are presented either." (P 756 ln 15-16). When asked about his meeting with Gottlieb which Thorell recorded: Q. How did you feel before you contacted him? A. Very nervous, terrified. (Tr P374 ln 15-18). However on cross he admits to a quite different frame of mind. "Q you told my client that you felt that you could outwit Jacob Gottlieb; do you recall that? A. I do. (P407 ln 7-12)

## Cooperating Witness Plaford Perjury:

Plaford incessantly testified with false, misleading, and perjured statements regarding influence and control over setting or marking prices prejudicing the court and jury resulting in a miscarriage of justice. Plaford was brought up on charges of insider trading which based on Plaford's ties to ex-FDA officials and his newly formed company, Claravant which advised clients on FDA drug approvals which had ex-FDA officials on the board as well, makes it likely that he would admit to something smaller in order to avoid further charges. Plaford lied incessantly to the Prosecutors and the FBI which he admitted to: "Q. Now, what was the defendant's role in the credit team? A. He was a senior analyst/portfolio manager... Could he make trading decisions... Yes... For .. a year or two".(Tr P 651 ln 23-25 to Tr P 652 ln 1-8). Plaford falsely states that Petitioner was a portfolio manager and analyst in Credit Fund, but at same time he states that Petitioner did not have the ability to make investment decisions beyond the first year or 2 years of the fund, therefore Petitioner could not have been a portfolio manager during the periods in question. Plaford later on cross admits to this; Q. Stefan Lumiere was not a portfolio manager in the Credit Team--Fund, Correct? A. He was a portfolio manager in the Balanced Global Fund. Q. Correct." (Tr 756 ln 6-9). Plaford lied when he said that China Med was part of Petitioner's P&L: "...A. ATI, Sevan Marine, Nebraska Book, Friendfinder, China Medical, to name a few...." (Tr P 655 ln 9-22)(See YE Review: Plaford states that C-Med is not part of Petitioner P&L). Yet on cross he admits that "Stefan was not the point person on C-Med." (Tr P 741 ln 23) And on cross when asked if Ameesh Shah who was the primary analyst and point person on C-Med was part of inflating the value of the securities, Plaford says " He didn't- he might have been part of the conversation on the painting the tape." (Tr

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

738 ln 5-11). (Recording CMED-Plaford-Ameesh-Lumiere: Plaford discusses the fundamentals of tiering of C-Med and the confusion over other classes of securities) In evidence, it is clear that Plaford has said that Ameesh Shah went to Valuation Committee to amend prices. (3503-5, 3503-18)  So Plaford claims that Petitioner was part of the conspiracy to inflate C-Med while he is admittedly says that Petitioner is not the primary analyst working on it with evidence not his P&L so where is the motive? He even dilutes it further by stating in a frustrated tone: "All I said was that Stefan worked on C-Med and he worked on a number of other things.  I have been clear that Ameesh Shah also worked on C-Med."  (Tr. P 738 ln 5-9) YE review recorded conversation clearly has Plaford state that: "C-Med is not part of your P&L" (YE Review) The positions are the responsibility of the Portfolio manager as Keily stated and the Prosecutors and Plaford are trying to push it onto Petitioner. (A22 Tr P 45 ln 7-19) And the Prosecutor admitted that there is nothing wrong with an analyst to give his opinion or analysis. (Prosecutor Opening: A22.1 Tr P11 ln 17-18). Plaford clearly describes the functions of an analyst or point person that covers a name clearly revolves around building models, keeping track of conference calls and earnings, speaking to management and doing the majority of the research.  These are the functions that Petitioner discussed generally with Plaford weekly. This had nothing to do with setting prices.  Pricing is the responsibility of Visium (Investment Manager) and the Valuation Committee that discusses all this with Administrators and auditors and third-party valuation companies before deciding on a value and making a representation to investors.  The analyst's role is to give his opinion nothing more.  He does not sign off on pricing that is used by management.  This is clearly why, it would not help the Prosecutor's case that Petitioner Lumiere was simply an analyst for the credit fund.  Therefore, through subordination of perjury, leading statement and material misstatements, the Prosecutors decided to conflate Petitioner's position in Visium Global and Balanced Fund with his role in the Credit Fund to mislead the Jury and the Court.  The ineffectiveness of counsel in protecting defendant from this extreme and erroneous prejudice was more than apparent throughout the record. It is clear from the Prosecutor's mistaken theory and statements made on Opening, during direct examination of other witnesses and on Summation in which they continuously asserted that Visium was Lumiere's Hedge Fund, that Petitioner was a portfolio manager in the Credit Fund and managed investments in the Credit Fund to the point of exhaustion, that the point was indeed material.  One

would need to be the portfolio manager and partner to have enough to be able to offer insight and opinion into values used. However, this would also not be enough. He would need to have access and present arguments to Administrators, Executive Committee, Valuation Committee, Auditors to demonstrate that the price being overridden required it to be so to represent fair value. One would essentially need to be a partner and portfolio manager in order to accomplish this and a simple analyst or trader could not possibly have the access to do this. When Plaford said: "It started with Lumiere": Plaford used this ambiguous phrase to purposely mislead the court into believing that Petitioner started the conspiracy. Plaford used it to deflect his own responsibility and to falsely implicate Petitioner Lumiere to cut himself a deal. The actual reference was most likely tied to an investment that Petitioner had recommended for the Credit Fund which was on the steering committee for a litigation against USON (US Oncology) whereby the steering committee received private information from attorneys at Stroock, Stroock and Lavan about a settlement offer which would result in payment of greater than 50% of amounts being litigated. This was the first time that Plaford stated to Lumiere the following: " I [Plaford] am the portfolio manager of the Credit Fund. The investors entrust me to price things correctly and not based on where some brokers that do not know the information we have. I don't need any broker quotes to value the portfolio. Our investment mandate states they we have to value in all the "current private information" that we have. So if we know that the bondholders are receiving a settlement offer, I have to value that in." This was the reference to "It Started" with Petitioner conversation that took place and what Plaford meant. When Plaford stated that Petitioner Lumiere "helped create the values" (TR p 633 2-3...15-16), he simply meant that Petitioner shared analytical information and models as an analyst is required to do and includes new updates, projections and steering committee information (aka private news) He used this classic analyst function as as a way to purposely mislead the court into believing that Petitioner Lumiere assisted Plaford with picking the overrides and selecting the prices used that were sent to operations. "So the Prosecutor then stated "do you mean pick the prices?" A. Yes. (Tr P633 ln 14-16) Plaford committed perjury as he admitted that Petitioner Lumiere had not once picked a price or selected what would or should be overridden. This is seen in the statements above from cross examination. The fact that defense counsel did not impeach him, makes no sense. The argument is easily countered by someone that is attentive to what is being said and

conversant in the technical jargon of wall street investing. Plaford also had admitted that he "picked" the prices and that it was not Petitioner Lumiere. "Q. It was you who decided every month which securities would be overriden, correct? A. Correct. "Q. And during those calls you told Mr. Lumiere what prices to ask the brokers for; is that fair to say? A. Yes. (Tr P732 ln 2-4) "Q. And you were the one that highlighted the names on the spreadsheet, correct? A. Correct." Plaford states that Lumiere was responsible for $50 to $100 Million of the Credit Funds' investments which varied over time. This statement is ambiguous at best. Regardless Plaford admitted that Petitioner could no longer make investment decisions after M 2010 or May 2011 at the latest. And recordings show Plaford stating that he did not consider Lumiere a member of the credit team (A141p) Plaford perjured himself when discussing the alleged "Painting the Tape" trade in on 3/23/12. He stated that Petitioner Lumiere was in his office when they discussed the C-MED Trade on 3/23/12. Petitioner was not in the office, he was in Miami, Florida and he was at a concert at the time. Petitioner had presented his evidence that in Miami at the time (A84-A86) to Defense Counsel after the day after Plaford testified to this trade, but he refused to submit it into evidence and he failed to research this trade in C-Med ahead of time further showing his lack of preparation. Plaford allegedly discusses with Ameesh Shah and Petitioner in his office in NY at the time, buying at an inflated price ahead of a potential tender. Petitioner Lumiere was never part of this alleged conversation. It is not even clear that Petitioner Lumiere would know what the price of C-MED would have been at the time of the trade and whether Plaford simply gave him an order to execute while he was on vacation, what was discussed with broker if anything, or whether Petitioner even executed the trade or placed the order. Additionally the quotes that the Prosecutor presented were stale as they had no markets assigned and there were positive news out and positive stock moves that were material to bond values. (See Jindra Perjury, See Plain Error, See Tickets Airline, See Hotel Ticket, See Concert Ticket). Plaford states on a recorded conversation that Lumiere should tell the brokers about the C-MED directing class.(A140) This discussion refutes Vandersnow's statement that *he does not recall* if Lumiere ever discussed his analysis or research with him. (See Vandersnow perjury). Plaford states that Lumiere was only part of soliciting quotes. Soliciting quotes is not an illegal nor is it an unethical act. Neither is discussing viewpoints, and sharing research or asking a broker to check on a list of internal quote estimates for reasonableness. The Jury and the Court were hoodwinked by lying manipulative

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

witnesses looking to make a deal for themselves and implicate the one person who consistently acted in good faith.

## Scott Vandersnow Perjured Testimony

Vandersnow committed perjury during his testimony clearly in reference to Petitioner's role as a portfolio manager. Vandersnow lacked the foundation to answer this without it being speculation which comes to material perjury: "Q. What was your understanding of what Stefan Lumiere was doing with the prices that you were providing him? A. He was using them to help prices--price the securities in his portfolio" (Tr P491 ln9-11) Non-prosecuted witness Vandersnow has no foundation to base his statement that the request for quotes were for Petitioner Lumiere's portfolio. It is clear that Vandersnow that Vandersnow was prepped for this to aid the Prosecutor to avoid prosecution and the term " What was your understanding" allows Vandersnow to say anything he wants as it does not need to be accurate or True. "Mr. Vandersnow, can you please read what Mr. Lumiere's signature block says? A. Stefan Lumiere, CFA, PM: distressed and special situations. Visium Asset Management. Q. That's enough. So is that consistent with your understanding of his title and role at Visium? A. It is?" (Tr P500 ln1-13).

## David Keily Perjured Testimony

David Keily committed material perjury where he had no basis or foundation and was obviously on the stand to help incriminate Petitioner to avoid prosecution himself. Keily's motives are clear and that was to avoid prosecution himself. In the Thorell-Ku-Keily meeting, Keily and Ku both laugh at Thorell for thinking he had done anything wrong and tell him to continue sending quotes to operations from his boss Plaford because it really meant nothing because it was for internal purposes and did not go into NAV. During the trial, Keily initially responded to Prosecutor question about Petitioner's role at Visium by stating that "His title was both portfolio manager and analyst" (Tr P 45 ln 5-6) and "He worked for the Visium Credit Opportunities Fund." (Tr P 46 ln 16-17). He stated this knowingly false and incomplete information to assist the Prosecutor knowing that he was misleading a jury unsophisticated in matters of investment management. Keily also committed perjury when he stated in response to Prosecutor question that "in 2013 you testified that Visium shut down the credit

Fund? A. in 2013, in April of 2013, Visium informed the investors in the credit fund that Visum would begin to liquidate the positions in the credit fund…." However, to meet a redemption does not mean that the fund is shutting. In Thorell meeting with Gottlieb in June 2013, Gottlieb states:

While discussing Plaford he offers that he was "Portfolio Manager" and "He worked primarily for the Visium Credit Opportunities Fund. He also ran a portfolio in the Visium Balanced Fund." (Tr P 46 ln 18 to P47 ln 1) Keily is forced to clarify: "One was in the Global Fund as a portfolio manager, is that right? A. Yes. Q. And one in the Credit Fund as an analyst, is that right? A. Yes" (Tr P 154 ln 8-15). Then he admits that "He [Plaford] was the portfolio manager and had responsibility for everything that related to the investment management of the credit fund…" (Tr P147 ln 2 to P148 ln 5; A13P18, A4 P3, Due Diligence Questionnaire, A2 P3; A2P5).

Keily lied on likely the most material issue of trial when he responded to the following when the statement comes right out of the compliance manual and is investment management standard and interestingly, the Prosecutor attempts to block this key element from coming into evidence: " if there are circumstances where a portfolio manager believes that fair value would not produce an accurate or fair valuation for a given instrument, it may produce alternative means to value an instrument? Is that fair? /Mr. Naftalis: Objection. / A. No—…" (Tr P 196 Ln 20-25 to Tr P197 ln 1-15). This statement was completely false and baseless and counters logic. Alternative methods are clearly part of GAAP ASC 820 accounting standards and would be required in the circumstances of positions as C-Med and ATI (A56 and A57, A149).

**SEC Witness Jindra Perjured Testimony**

SEC Witness Jindra committed perjury during his testimony about Petitioner Lumiere's position and his responsibilities by stating in response to Prosecutor's questions based on his review of documents who was responsible for ATI as an investment, "Mr. Lumiere"; "Q..Nebraska Book…, A. Mr. Lumiere" "and who was responsible for that Trade in C-Med, "it was Mr. Lumiere ( Tr. P 912- ln 14-16: TR P 917 ln 11-13, Tr P 919 Ln 17-19, P 922 ln 3-7) Jindra had no foundation to know which securities Petitioner was responsible for and meaning of "responsible". An analyst "responsible" for a security follows earnings, news, and renders an opinion. The Portfolio Manager is responsible for the investment decision and for the representations of the

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

Portfolio.  When the Prosecutor asks a leading question about 70 securities and what percentage Lumiere was responsible for he states: "about a third" (Tr P 973 ln 19 to P 924 ln 23) Jindra lacked foundation for this statement which was solely given an email requesting a multi-year period of PNL contribution to the firm for list of securities. The Court accepted this as Jindra's response because Defense Counsel failed to intervene in this ridiculous response as he had throughout the trial.  In this instance, the email that Jindra refers to has a continued email chain (, where Petitioner is being specifically denied access to the numbers that he is requesting because Steven Ku and Plaford block Petitioner's access to the P&L or the pricing for these securities for a simple reason.  Because Petitioner Lumiere was not a portfolio manager in the Visium Credit Fund and he is not even the primary analyst for most of the securities on the list.  In Petitioner's annual review with Plaford, Plaford tells Petitioner that he is not allowed access to the P&L for these securities because he is not the Portfolio manager and he is not the primary analyst for many of these. In this same meeting, Plaford states that he has not even considered Petitioner Lumiere as part of the Credit Team for quite some time as he deemed him to be focusing on his arbitrage portfolio in Global.  This completely refutes the Prosecutors arguments and shows the Perjury of Thorell and Plaford  (A141)  Additionally, the request for PNL is for a multiple year period and in no way implies Lumiere is attempting to be paid for these investments years after they were made and no longer in the Visium Credit Portfolio.  The fact is that Petitioner Lumiere had given recommendations for some of them or helped the primary analyst out on some of them, but this in no way made the securities his responsibility as it pertained to pricing.  It is obvious that Jindra working for the SEC has something to gain from a successful prosecution of Petitioner as there is a parallel civil complaint against Lumiere and Visium from which it stood to profit.  The fact that the Prosecutor chose a biased witness who feigned to be an expert to an unwitting Jury, caused extreme prejudice to Petitioner and as it was largely a result of Jindra's baseless testimony that Petitioner Lumiere was convicted.  The clear fact that the Prosecutor did not want to bring on a expert especially for these complex securities, demonstrates that experts would have shown that the Prosecutor's allegations were incorrect.  Additionally, the Prosecutor did not disclose the bias of SEC witness Jindra to the court which was a due process violation.

Petitioner Stefan Lumiere v. United States of America          Case No. 18-CV-9170 (JSR/BM)

## V. INEFFECTIVE ASSISTANCE OF COUNSEL AT ALL STAGES

As a result of these conflicts, Defense Counsel did not put in any effort into Petitioner Lumiere's case failed on all measures of Strickland v. Washington.  He did none of the things a minimally effective counsel would do to prepare for trial and present a defense:  1) Did not call review and correct transcripts that had clear highly prejudicial errors.  2) Failed to effectively review discovery (did not convert the 18 million plus documents into a text-searchable format.)  2) Failed to hire a forensic accountant to go through the securities as Petitioner had instructed claiming that the Prosecutor realized that the valuations were not incorrect and that the case would shift to liquidity representations. 3) He did not go through phone records and subpoena records to show that most of the calls from Petitioner's cell phone were when he was traveling or at home and that many of the calls were placed on landline's from Visium when on site and similarly called Broker's landlines. 4) He did not add a securities lawyer that Petitioner Lumiere asked him nor did he have any members on his team with securities experience work on the case or present at trial.  5) Failure to follow through on Rule 16 violation- Prosecutors submitted over 18 hours of recordings within week of trial and submitted Jindra Exhibits the evening before trial (A131)

STEFAN LUMIERE V. UNITED STATES OF AMERICA      Case 18-CV-9170. JSR/BM

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

STEFAN LUMIERE
PETITIONER

V.

UNITED STATES OF AMERICA
RESPONDENT

Case No. 18-CV-9170 (JSR/BM)

**DECLARATION OF
STEFAN L. LUMIERE**

I, STEFAN L. LUMIERE, declare under penalties of perjury that the following facts are true and correct:

I am submitting this 2nd Amended 2255 Petition and Appendices as my motion to Vacate Judgment, Sentencing and Conviction. I request that they be submitted under seal as the protective order on all discovery covers much of the evidence referred to in the 2255 and Appendices. To be unsealed only with Government and Court approval.

I hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury under the laws of the United States of America.

January 31, 2019
Executed on

1/31/19

Stefan Lumiere

150 Central Park South, #406, New York, NY 10019

Tel# 212-397-8059          Email: StefanLumiere@gmail.com



**United States District Court**
**Southern District of New York**
*Pro Se Intake Unit*

RECEIVED
USDC PRO SE [ ]
2019 FEB -5  PM 12:07
S.D. OF N.Y.

**To:**   Hon. Barbara Moses
**From:**  V.Bart, Pro Se Intake Clerk, Docket Services, Ext. 0622
**Date:**  February 1, 2019
**Re:**   18cv9170

The attached document, which was received by the Pro Se Intake Unit on January 31st 2019, has been submitted to the Court for filing. The document is deficient as indicated below. Instead of docketing the document for public access, it has been docketed as a court-view only docket entry. I am forwarding it to you for your consideration. *See* Fed. R. Civ. P. 5(d)(2)(B), (4).

☐   Discovery material

☐   Non-paper materials

☒   Other: <u>Request to file under seal.</u>

If you memo-endorse the filing, you do not need to return this memorandum to the Pro Se Intake Unit. Once your memo-endorsement is docketed and filed, all ECF users on the case will be notified.

In the alternative, please return this memorandum with the attached papers to this Unit, indicating at the bottom what action should be taken.

☑   **ACCEPT FOR FILING**

☐   **RETURN TO *PRO SE* LITIGANT**

| Comments: |
|---|
| Please file "TTSS" and "Appendix Table of contents" on ECF. Please file "Appendix5" visible to parties and court users only. |

Dated: 2/4/19

_____
United States District / Magistrate Judge