STEFAN LUMIERE V. UNITED STATES OF AMERICA        CASE NO. 18-CV-9170 (JSR/BM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

RECEIVED

2019 JAN 31  PM 3: 59

---

**STEFAN LUMIERE,**

**Petitioner**

**v.**

**UNITED STATES OF AMERICA.**

**Respondent**

Case No. 18-CV-9170 (JSR/BM)

ELECTRONICALLY FILED

DOC #:

DATE FILED: 1-31-19

# TO BE FILED UNDER SEAL IN ACCORDANCE WITH PROTECTIVE ORDER

MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND CONVICTION PURSUANT TO 28 U.S.C. @2255 OR TO CONSTRUE AS SUCCESSIVE RULE 29 TO DISMISS INDICTMENT AND CONVICTION DUE TO AN INSUFFICIENCY OF EVIDENCE OR ACTUAL INNOCENCE CLAIM, IN LIGHT OF ALL OF THE EXCULPATORY EVIDENCE SUBMITTED HEREIN OR AS A SUCCESSIVE RULE 33 MOTION

## **APPENDIX V**

## **2nd AMENDED 2255 PETITION**

Jason Thorell – went back to office – take the battery out of the phone—Visium – can't take me down without paying me.  They're going to fire me, they're going to pay me. Demanded $2 million.   Moved out of Upper West Side apartment.

Van Der Snow --

A136

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

Thorell:       He's not very bright.

Lumiere:       [Unintelligible 01:34:47] a lot of [unintelligible] out of the business.

Thorell:       I think –

Lumiere:       Of course we can't extort, but I'd love to go to them and say, listen; Jake, Chris, give us $100 million –

Thorell:       Personally, I'm just interested in prison time. I mean –

Lumiere:       Yeah.

Thorell:       I, I –

Lumiere:       Well, I'm very confident that, like, any of this stuff gets out, they'll be shut down.

Thorell:       Yeah –

Lumiere:       It will be shut down.

Thorell:       I think that's very possible.

Lumiere:       Now, what my lawyer says is based on this information, Chris will definitely be out of business. You have to find a way [to tie] that Jake had some way to know about this, but –

Thorell:       Okay. Well –

Lumiere:       Likely the fund would shut down –

Thorell:       Right.

Lumiere:       – like, you have oversight; you're supposed to know all –

Thorell:       Yeah, because of what happened with [Cohen] failure to supervise.

Lumiere:       Yeah [unintelligible 1:35:32], but you're still –

Thorell:       So –

Lumiere:       You're still marketed as a [chief investor,] but how do you not know what's in your portfolio?

31

A138

*Corrected Transcript exhibit, correctly written THORELL*
*1-3-14*

SL: We got a lot of fucking shit that put him, will put him, will put him out of the business.

CS: I think...

**1:34:52**

SL: Of course we can't extort him.

CS: (overlapping) (laughs)

SL: I would love to be able to go to them and say, "Listen, Jake, Chris, give us 100 million dollars between the both of you."

CS: Uh, personally, I'm just interested in prison time. I mean...

SL: Yeah.

CS: I, I, I...

SL: Well, but I, I'm very confident that, like, any of this stuff gets out, they'll be shut down.

CS: (overlapping) Yeah. I think that's very possible.

SL: (overlapping) They will be shut down. Now, what my lawyer says is based on this information, Chris will definitely be out of business. If they find a way to tie that Chr, that Jake had some way to know about this, but [u/i]

CS: (overlapping) Ok, well...at the ve...

SL: ...more than likely, the fund would shut down, because...

CS: Right.

SL: ...people are like, "You have oversight, you're supposed to know all the [u/i]..."

CS: Yeah, because of what happened with Cohen. Failure to supervise. So...

| |
|---|
| |
| |
| |
| Well, first we can extort him. |
| [missing] |
| |
| |
| |
| |
| ' |
| They will be shut down. No. My lawyer says that based on this information, Chris will definitely be out of business. You have to find a way to tie that, that Jake had some way to know about this. But, but - - |
| |
| |
| |
| ' |
| |

84

A 139

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

### Plaford Ameesh CMED

[Start of recorded material 00:01:12]

                    [Phone rings]

**Female Voice:**    Please leave a voice message for –

**Lumiere:**    Want his cell?

**A Shah:**    No, he's at home.

**Lumiere:**    Huh?

**A Shah:**    He's at home [unintelligible 0:01:58]

**Lumiere:**    Yeah, I mean the only thing I'm worried about is if he – if we market at a level outside of the context of the market; this opens up a can of worms.

**A Shah:**    [Unintelligible 0:02:23] how many [unintelligible] –

**Lumiere:**    [Unintelligible] I mean I don't agree with the small lots trading [unintelligible] like million dollar lots. It actually doesn't mean shit to me either. We're talking about a five hundred million dollar [unintelligible] distressed situation. People just do stupid things.

**A Shah:**    Oh, right. Because you have class of investors that are [unintelligible 0:02:48] –

**Lumiere:**    And you also have the concept of like forced sales, because it's in default. Around year end. So – and it happened with me in 2008 [unintelligible] wasn't even in default, but like the market went down from like 85 to 9. And then back up to [farc] with no problem, so it was like fucking crazy, like shit happens. And those were painful marks.

**A Shah:**    All right, well –

**Lumiere:**    So what do you think, he's on a call or something?

**A Shah:**    He's probably on a call. I'll just tell him [unintelligible 0:03:38].

                    [Off mike]

**L Brown:**    [Unintelligible 0:03:57] so that's done. Most of the players are going to be in Fort Myers [unintelligible] if you're not already planning to go, then go down there. So that might be a good thing to do. You know [unintelligible] at Wells Fargo, right? Okay. Well, I can give you his contact information, and then what I would do is just send [unintelligible] down or go yourself, but

1

A 140 P1

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

[unintelligible] I'm already going to be down there [unintelligible] conference. So are you going to that [unintelligible] okay [unintelligible].

Yeah, then you're all over it. But anyway, this [unintelligible 0:05:19] thing might be interesting, so if you're interested, let me know and I'll make the introductions. And then we're going to do a sidebar, you know, just like [unintelligible] with [Terry]. You've got to get the latest greatest from their end. And then we're just really like struggling with getting Jeffrey to provide [unintelligible] get the data row populated so that we can move forward with the sales [unintelligible].

But I mean, but I'm counting on them being pretty ugly. I'm just like you guys [unintelligible 0:05:58] so like [unintelligible] show up with your business card and say, hi, I'm Jeffrey, do you want to buy the company? Like give me a break. Where is the, where are the, where is the pitch book, where are the materials, where's all the information that you supposedly have together. And the thing is, like they probably just – can you hold on just one second? Hey. Hey, honey. I am on the other line. It's, it's all right. What's going on? Uh-huh. You really like it? You like that one better?

You know what I'm going to do? You know what I'm going to do? I'm going to tell you that I [unintelligible 0:06:53] I don't need to, I don't need to be like [unintelligible] and I'm not going to complain about what, any decision you make and say oh, I wish [unintelligible] I've got to go. I've got someone waiting on me. But I trust you. So just, if you – well, we can talk about them, we can talk about that without me seeing it, right? Let me just call you back, okay? Let me call you back. I love you. Bye.

Hey, sorry about that, man. So anyway, where were we? So I'm trying to get the data [unintelligible 0:07:33] populated so we can move forward in providing potential acquirers with everything they need. And, and then the other thing that I'm pressing on is you get a negotiated term with [unintelligible] try to say, if we are able to sell [unintelligible].

[Phone rings]

| | |
|---|---|
| Male Voice: | [Unintelligible 0:08:08] all right? |
| Plaford: | That really hurt. |
| Male Voice: | Well, I don't mean to add to your pain, but have you, has Josh tried to catch up with you? |
| Plaford: | No. |
| A Shah: | All right, so [unintelligible] mark is what we were talking about. So Josh came to us yester-, like the other day, and said, or yesterday and said, we had, |

2

A140

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

|  | I guess he saw that, like [unintelligible 0:08:45] have like [SeaMed] at like 5/6 or 4/6. |
|---|---|
| Lumiere: | We were looking for equity. Like that it was trading on the pink sheets to see if it was still quoted somewhere. And he goes and he sees, I don't know how he did it. He's fast. But he saw [Janny] kind of quoting them 5/6, the bots. |
| A Shah: | And that – |
| Plaford: | And that's not our security name. Here's where the Class 3 is being quoted. |
| A Shah: | Right. So the question is, the way, the way we were, we had these marked, one, we were using the equity value as [unintelligible 0:09:27]. |
| Plaford: | The equity, it doesn't matter, the equity value. It's just, that's not our security, is the answer. |
| A Shah: | So he wants to know how we're going to justify the mark. |
| Plaford: | I mean give him the – do we have anything from [Struck 0:09:42] yet in terms of [unintelligible] structure? |
| A Shah: | I can give him the last – I can give him the spreadsheet [unintelligible] it hasn't been finalized, because we're finalizing it. We were in the process of finalizing, so the notice went out. So [unintelligible 0:09:59] we're going to get that done fairly soon. We're not going to get it done today, but obviously we know that we can, we have the information that shows where the offer – |
| Plaford: | Honestly, dude, I had this conversation with the ops guy like three times already. So, and Josh I guess a part of it. |
| A Shah: | Okay. |
| Plaford: | But the tiering – I mean it doesn't really matter to us where they quote the Tier 3. |
| A Shah: | Okay. |
| Plaford: | So you know, what we, what we should do is just, when we get the, when we get the month end, just [unintelligible 0:10:43] do we trust the brokers not to like go out and talk to people about this in terms of the tiering structure? I mean I would hate to blow up the class, you know, just to justify, you know, just to be able to document [unintelligible] in other words, if we go out and say, look, you know, here's the new tiering structure, whatever the Tier 3 is and, you know, Tier 2's about that and Tier 3 – Tier 1's above that. |
| Lumiere: | Well, it sounds like a can of worms. You start [unintelligible 0:11:20] like everybody is going to be in an uproar. All the holders. |

3

A140

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

| | |
|---|---|
| Plaford: | Well, I mean that's what's going to happen. I just don't want to blow it up before it's done. |
| A Shah: | No, we don't want – that would work against us. |
| Lumiere: | Well, I mean won't they all be invited to participate in the [unintelligible 0:11:37]? |
| Plaford: | Yeah, they're going to be invited. |
| A Shah: | They're invited. Actually, today they got invited. |
| Lumiere: | So – |
| A Shah: | They don't know about [Blunt]. They just said [unintelligible] not, you know – |
| Lumiere: | They're not being told anything about – |
| A Shah: | They're not being told there's like a deal or anything. Which we definitely don't want [unintelligible 0:11:56]. |
| Lumiere: | Yeah, because then – it defeats the purpose, right? |
| A Shah: | It defeats the purpose. |
| Lumiere: | Everybody gets the [unintelligible] yeah. |
| A Shah: | So – |
| Lumiere: | Yeah, I mean I think we [unintelligible] Chris a thing, we can do the same thing that we've been doing. The only thing that makes me a little cautious is I don't want this to be a can of worms with Josh. If Josh goes out there and he – and after he saw Janny quite them, I don`t, you know, the last thing I want is for him to start talking a coup and say I don't know what's going on and shit like that. |
| Plaford: | Yeah, but I mean we've had that conversation. I've had that conversation already so many times. This isn't new. I don't know why, I don't know if he – |
| Lumiere: | Well, the only difference, Chris, is that it's from the same broker. That's the only different. |
| Plaford: | Yeah, I know, but it's not, it's not our security. We're not in the third class. We get the majority of the recovery. He's not – nobody can trace it. I mean it's the same thing we've had, it's the same thing – |

4

A 140

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

| | |
|---|---|
| Lumiere: | No, no, I understand the logic. I just thought – I didn't want it to, I don't want it to get, go beyond that. And that's – that's all. I mean like we can kind of do the same thing we've been doing, Chris, like just be, be – |
| Plaford: | What – can you trust Janny not to like go out and start talking to the rest of the street if we just give them a, you know, we give him a tiering. We don't have to give him a lot of the details. But if we just get a quote, you know, that includes a tiering, so it's the – |
| Lumiere: | I don't know. He's, he's kind of like flipping. Like he's difficult. Uh, he says shit before he thinks about it. So, uh, I don't know. I don't know. I mean if he doesn't think about it and he's got other things to, other fish to fry, like then – but he kind of, he's a blur. So it's kind of touch to control him. |
| Plaford: | Right. So – |
| Lumiere: | I think PrinceRidge is kind of more sly about that stuff. So I think [unintelligible 0:13:58] but we're going to have to give both. |
| Plaford: | Why don't you just have them at a – what are we – what are the controlling class – |
| A Shah: | Well, there's directing holder and then the non-directing holder. And there's the LLC, which is a subset of the directing holder. |
| Plaford: | All right, so just how – I mean without having to explain the tiering structure, why don't we just have the directing holder, you know, [unintelligible 0:14:34] quote directing holders, on, you know, and then, and then can we not – and just be like, what, if he says like what does that mean, just be like, you know, I'll tell you, I'll fill you in on all the details. You know, next week or something. |
| Lumiere: | Well, why don't we just do the same things we've been doing with [unintelligible 0:14:52] we'll call it participating. |
| Plaford: | Well, just call, just him direct. So we won't have him [unintelligible 0:14:59] launches, so it would raise, you know, it would have him be like – |
| Lumiere: | Well, why directing? Isn't directing like – |
| Plaford: | That's a Tier 1. |
| Lumiere: | No, but directing means like, as part of the steering committee, right? |
| Plaford: | Yes, it's [unintelligible 0:15:14]. |

A 140.

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

| | |
|---|---|
| Lumiere: | No, I know, but like there's like tons of securities around a steering committee. Just like, but it doesn't mean that they're different [unintelligible] there's more consistency there. |
| Plaford: | At the end of the day, as soon as this tiering thing is finalized, every, as soon as the expiration of the [Snotus] period, and everybody's locked into their tranche or whatever their tranche they're going to be in, then we're going to go talk to the brokers and let them quote all three tranches. Until then, when we're not, you know, doing it ourselves anymore, having that conversation with them, it's just internal, you know [unintelligible 0:15:57] directing class or something like that. |
| | So I don't want to get into it, you know, and explain the whole thing to them if we don't know if they're going to, you know, have a conversation with somebody else. And the last thing you want to do is get them to have a conversation with somebody else that decides they want to switch gears [unintelligible 0:16:14] something that, you know, Janny said [unintelligible]. But that's – |
| Lumiere: | Yeah, I mean that's the risk, that they come – |
| Plaford: | Right. That's what I'm saying. Just say directing. You know. Right. |
| Lumiere: | Okay, um – |
| Plaford: | I mean look, we just need add, add a little bit more verbiage. He doesn't need to quote all three right now. You know, we shouldn't quantify it. We should just say, you know, [unintelligible 0:16:41] just add something so it's, so it's just, you know, marginally differentiated. But you know, [unintelligible] the brokers do, exactly [unintelligible]. So if you say add directing class next to the SeaMed, then what's he going to say? |
| Lumiere: | Maybe we should have him quote both of them then. |
| Plaford: | No, but that, but I don't want to get into the – |
| Lumiere: | Because he's been quoting the other one anyway. |
| Plaford: | The problem is, if we do that, then that's, that's essentially, you know, that's essentially, you know, telling him exactly, telling him that there's going to be a significantly differentiated recovery. And you know, that, you know, if he has that conversation with anybody else, it's not in the directing, it's exactly what we don't want to have happen. |
| Lumiere: | All right. So what's the context of where we should be marking them? |
| Plaford: | Same [unintelligible 0:17:52]. |

6

A140

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

| | |
|---|---|
| Lumiere: | Same? Okay. All right. All right, let me, let me try to do that. We're going to have to do the same thing for Janny and for PrinceRidge. And we'll probably need to find other brokers. I don't know how much longer PrinceRidge is in business. |
| Plaford: | Are they going out of business? |
| Lumiere: | Yeah, like yeah. |
| A Shah: | They have no problem [unintelligible 0:18:12]. |
| Plaford: | When are they going out of business? |
| Lumiere: | I don't know. Just the – it's the rumor mill. Usually it's within three months the rumor mill started. |
| Plaford: | I thought you told me that like a year ago. |
| Lumiere: | I know. But like, no, I heard they were doing poorly. They weren't catching up, and they're not going to survive. But like I don't know, I guess, I guess wind down takes time and it just happens in one day. Right? They don't want everybody to know. But um, there's no way they're making money. And they can't support the staff, the offices they have. Like I know, Luke, Luke was there, and he, like was professing it, was like a big volume place and after he quit he said that was a lie to get more business. But they're not doing shit. |
| Plaford: | All right [unintelligible 0:18:58]. |
| Lumiere: | Maybe we can get, uh, maybe we can get a Norwegian broker to quote them for us. |
| A Shah: | Yeah, why not, yeah. Japanese [unintelligible]. |
| Lumiere: | Yeah. That's actually not a bad idea. All right, later Chris. Feel better. |
| Plaford: | Hey, can you guys just have the conversation with Josh [unintelligible 0:19:14]. Ameesh? |
| A Shah: | Yeah. Yeah – |
| Lumiere: | Yeah, we're here. |
| A Shah: | We're here. |
| Plaford: | Just [unintelligible 0:19:21] just explain it to him again. Look, it's the same conversation we had before. But there's not any of the Tier 1, you know, that can trade. And you know, again, the notice has already gone out. You know, we have – just explain it, look, we had to get, we couldn't just finalize the |

7

A 140

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

tiering structures [unintelligible] we had to give holders one more chance to switch tiers, so they don't get sued later.

So just explain to him the sensitivity is, you know, there's not a lot of brokers who know that, and we don't want to, we don't, you know, we don't want to, um, you know, as soon as that's done, then we can quote, you know, we can quote all three and differentiate between the two. But you know, we don't want, we don't want to give everyone a heads up by sending people out. You know, because we don't want people switches classes.

A Shah:     Yup. He, you know, his whole thing was, okay, if that's the case, then this should be a Level 3 asset and blah blah blah. I think that was – I don't think he wanted [unintelligible 0:20:23].

Lumiere:    Well, I think he said something a little bit different than he usually says. He said, not like, like I understand you're going to get a quote from like Danny, but like I need you guys to substantiate it. He just came from – I thought it came from [unintelligible 0:20:33] easy to substantiate somehow. It wasn't, it didn't sound really like [unintelligible]. Like it was a, it was like a, I don't know. Maybe I'm reading too much into it. Like it just didn't help that he was over my shoulder.

A Shah:     Like looking at –

Lumiere:    Looking at the quotes, and it just didn't look good.

Plaford:    [Unintelligible 0:20:58] yeah, but, right. I'll, uh –

Lumiere:    You want to talk to him and ask him what he means, like what do you, or if you just give him the quotes and then let him come with anything else, if he has further questions.

Plaford:    I'll, I'll just talk to him.

Lumiere:    All right.

Plaford:    All right, thanks.

A Shah:     [Unintelligible 0:21:21]

Lumiere:    What?

A Shah:     [Unintelligible]

Lumiere:    What?

A Shah:     [Unintelligible]

P 140

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

Lumiere:          It's a new –

A Shah:           [Unintelligible]

Lumiere:          [Unintelligible 0:21:39] but the only time it's done, it's in big names, right, where there's an actual old loan and a new loan, and they're actually physically [unintelligible] in trading.

A Shah:           Okay.

Lumiere:          So it's kind of a new [unintelligible].

A Shah:           [Unintelligible] the thing is, you can't blow this up for ourselves. If we're getting a better deal and all of a sudden we let everyone else know about that, that's bad news. We don't want any more dollars coming into the pool.

Lumiere:          Where's aerospace stand on that? Did they join the group? Did they get a larger group?

A Shah:           They are – they, they're part of the directing holders, but they are, they are buying so that they can be Tier 1. They are going to join us as Tier 1.

Lumiere:          They are, okay.

A Shah:           But it's not, it's clear because they doubled their position, if they want to do that.

Lumiere:          Yeah, no. I spoke to them. I said, listen, I can't, I can't tell you anything [unintelligible 0:22:48] like I know you're small, like buy a little bit more and then we'll let you in. But –

A Shah:           Because of that, they're in. Don't want – obviously we don't want anybody else to come in now, because [unintelligible 0:22:59] so that's the major thing [unintelligible] so we just need that sensitivity. I mean after the 11th it doesn't matter. We can talk about the structure all we want. And it's like this is like [unintelligible 0:23:14] next 11 days that matter [unintelligible].

Lumiere:          Fuck. Maybe I should buy this for my PA and become part of the group.

A Shah:           What's that?

Lumiere:          Maybe I should buy it for my PA and the [unintelligible 0:23:24] the group. Will you let me in? Actually, it's actually [unintelligible] my resignation [unintelligible] at 5?

[End of recorded material 0:24:12]

A 140

1                                   CP Bonus Review 2013
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                          1

A141

1   CHRIS PLAFORD:  Good morning.

2   STEFAN LUMIERE:  Hey.

3   [0:05:00]

4   CHRIS PLAFORD:  Yes, [INDISCERNIBLE 0:06:16].  So, yes, [INDISCERNIBLE

5   0:06:28].

6   STEFAN LUMIERE:  Hey.

7   CHRIS PLAFORD:  [INDISCERNIBLE 0:06:39] Or a lunch meeting.  We can do lunch

8   in a nice restaurant [INDISCERNIBLE 0:06:48].  Either one [INDISCERNIBLE

9   0:06:51].  Okay.  Oh, and they can't get out during the day.  No, that's

10  fine.  You want me just -- you want me to just [INDISCERNIBLE 0:07:16]

11  Stefan Lumiere:  Hello?

12  Chris Plaford:  [INDISCERNIBLE 0:07:19].

13  Stefan Lumiere:  Yes, hold on.

14  Chris Plaford:  [INDISCERNIBLE 0:07:24].  You got your sling off?

15  Stefan Lumiere:  Yes.  Got the sling off a couple days ago.  It was getting

16  kind of like tight, so all the cartilage and scar tissue [PH0:07:48]

17  obviously, just wanted out, literally.  Have a look.

18  Chris Plaford:  [PH 0:07:56] I don't know.  Well, hold your arm over your

19  head.

20  Stefan Lumiere:  Yes.  I get a -- I get can a couple degrees.

21  Chris Plaford:  Yes.  [INDISCERNIBLE 0:08:03].

22  Stefan Lumiere:  Yes.  If tough when you're a righty.

23  Chris Plaford:  What's that?

24  Stefan Lumiere:  It's tough when you're a righty.

25  Chris Plaford:  Oh, you don't have an electric razor?

A 141

1   Stefan Lumiere:  No, no.

2   Chris Plaford:  All right, so can you, you know, like, move it on a -- a

3   little bit though?

4   Stefan Lumiere:  I mean I can move the hand.  It don't have a lot of motion

5   up and down.

6   Chris Plaford:  [INDISCERNIBLE 0:08:29].  Well, that's not very good.

7   Stefan Lumiere:  Right now?  [PH0:08:32] I got a finger movements so -- and

8   that takes -- that's just going to take like a couple weeks.

9   Chris Plaford:  Yes.

10  Stefan Lumiere:  So it's just like all the scar tissue and stuff like that

11  [PH0:08:44] feeling.  You got to force it, you know, I've got to -- like the

12  exercises are like to passively move it, like up to here.

13  Chris Plaford:  Yes.

14  Stefan Lumiere:  [INDISCERNIBLE 0:08:53].

15  Chris Plaford:  Sweet, [PH] you know, you're lucky to actually be walking on

16  that [INDISCERNIBLE 0:08:58].

17  Stefan Lumiere:  Yes.  I know the foot's healing up.

18  Chris Plaford:  What's that?

19  Stefan Lumiere:  The foot is healing up.

20  Chris Plaford:  [INDISCERNIBLE 0:09:07].

21  Stefan Lumiere:  Well, yes, you know, the tendon's there, right?

22  Chris Plaford:  No.

23  Stefan Lumiere:  Yes.  I tore my tendon in October.

24  Chris Plaford:  And where --

25  Stefan Lumiere:  In my ankle.

A 141

```
1   Chris Plaford:   [INDISCERNIBLE 0:09:19] They didn't want to knock that out at
2   the same time?
3   Stefan Lumiere:   They couldn't because I got -- I can't -- I can't bear
4   weight.  They would have, but I can't bear weight on my shoulders, and then I
5   won't be able to bear weight on feet without crutches, I can't use crutches
6   so while we wait for this one to heal first.
7   Chris Plaford:   [PH0:09:40] Awesome [INDISCERNIBLE 0:09:42].
8   Stefan Lumiere:   Otherwise I would have had it done all at the same time.  I
9   guess they could have just transported me on the bed [INDISCERNIBLE 0:09:51].
10  Chris Plaford:   All right.  So you would have had that, but you never did
11  your review.
12
13  [0:10:04]
14
15  Just FYI.
16  Stefan Lumiere:   Yes.
17  Chris Plaford:   The -- I saw -- I saw your request to accounting for one of
18  the versions which had multiple years --
19  Stefan Lumiere:   Yes.
20  Chris Plaford:   -- stuff on there.
21  Stefan Lumiere:   Yes.
22  Chris Plaford:   That can become very problematic --
23  Stefan Lumiere:   Why?
24  Chris Plaford:   -- with names.  Because you had names like [PH0:10:39] Blonde
25  and Insight and stuff like that that you worked on several years ago.
```

4

19141

1   Stefan Lumiere:  Yes.

2   Chris Plaford:  But accounting doesn't know how to segregate it out.  Like

3   [PH0:10:48] Emesh's been really active in Insight for a long -- you know,

4   like last year, you know?

5   Stefan Lumiere:  No, no, I know but that's why -- that why [PH0:10:55] Philly

6   said for a given year, right?

7   Chris Plaford:  The one that I saw said, you know, it was like several years

8   and just a bunch of -- and just --

9   Stefan Lumiere:  No, no, no.  I like -- I sent them something that said for

10  this -- specific for these years, for this event or whatever it was.

11  Chris Plaford:  Well, I mean you have gotten your P&L every year for the

12  names for that, right?  What do you want to go back -- or what --

13  Stefan Lumiere:  I just want to see what the [INDISCERNIBLE 0:11:34], like

14  what the --

15  Chris Plaford:  But don't you have that saved?  Didn't you save these each

16  [. . .]

17  Stefan Lumiere:  No.  I didn't physically get -- I don't remember physically

18  getting anything.

19  Chris Plaford:  You've gotten one of those every single year for the names

20  that you've [INDISCERNIBLE 0:11:45].

21  Stefan Lumiere:  No.  No, you -- I think last year or the year before that

22  was a -- I didn't get one last year.  I didn't get one last year, and the

23  year before that, I didn't get one but you showed it to me in your book.

24  That was it.  Never got one.

25  Chris Plaford:  Yes.  I mean --

5

M141

1  Stefan Lumiere:  I never -- and I never physically got something with a

2  breakdown.  No.

3  Chris Plaford:  What did I show you?  I mean are you sure?

4  Stefan Lumiere:  [INDISCERNIBLE 0:12:18] --

5  Chris Plaford:  I know it was down, but I don't --

6  Stefan Lumiere:  [PH0:12:18] Hundred percent.

7  Chris Plaford:  I -- it's done -- it's done every year.  I mean it's, you

8  know, it's calculated every year so.

9  Stefan Lumiere:  No, I know my -- it must be calculated every year, but I

10  didn't physically get one.  I remember like last year we didn't get one.  I

11  don't know if everybody else did.

12  Chris Plaford:  What do you mean I -- what do you mean I showed it to you?

13  What does that mean?  [INDISCERNIBLE 0:12:37] --

14  Stefan Lumiere:  Last year we weren't shown anything because it was a flat

15  year.  So we got -- literally we didn't get shown anything, or I didn't at

16  least.  And we were talking about it, and Jake said there was no money to go

17  around.  And then we made -- we had a conversation about why we didn't get

18  anything for the assets raised and kind of building up the portfolio.

19  [INDISCERNIBLE 0:12:58].  And the year before that, you just kind of gave me

20  a number.  But I didn't physically get anything.  So --

21  Chris Plaford:  Yes.  That's not usually -- that sheet is -- I know that, you

22  know, last year your names were down.  So, you know, that sheet is calculated

23  and it might have been done in December or so --

24  Stefan Lumiere:  Hmmm.

25  Chris Plaford:  -- it might have been without a couple weeks left.

A141

1  Stefan Lumiere:  Yes.

2  Chris Plaford:  And obviously, you know, through the end of the year it was

3  still down.  So, you know, maybe there -- maybe there wasn't an official --

4  I'll try to go back and -- I'll try to go back and check.

5  Stefan Lumiere:  Yes.

6  Chris Plaford:  But the thing is this, you know, just understanding with

7  accounting, for something that's complex, they don't know, you know, they're

8  given instructions not to give, you know, other people's, you know, P&L out,

9  right?  I mean think about it.  You wouldn't want, you know, you wouldn't

10 want the other guys, you know, to get your sheet just the same way that they

11 probably don't want you to have their sheet, right?  So --

12 Stefan Lumiere:  Yes, I don't - I don't know why but --

13 Chris Plaford:  Well, think about it.

14 Stefan Lumiere:  -- [PH 0:14:23] they must -- '

15 Chris Plaford:  It's people's -- it's people's comp.

16

17 Stefan Lumiere:  Yes.

18 Chris Plaford:  So, you know, they're sensitive to that.

19 Stefan Lumiere:  Yes.

20 Chris Plaford:  So when they have -- when they have, you know, significant,

21 you know, when there is a lot of complexity.  Like they don't know,

22 especially when you go in and ask for a multiple time period.

23 Stefan Lumiere:  Hmm?

24 Chris Plaford:  They don't know.  But, you know, they -- they're like what,

25 you know, and you could give any names you want and they have no, you know?

A 141

1   Stefan Lumiere:  Yes.

2   Chris Plaford:  They have no way of knowing what names you worked on and what

3   [INDISCERNIBLE 0:14:54].  I'll check -- I'll check.

4

5   [0:15:02]

6

7   I'm sure -- I'm sure that I have that.  I -- you were given one the, you

8   know, like what would you get paid, like, $600,000 or $700,000 grand or

9   something like that.

10  Stefan Lumiere:  Four hundred.

11  Chris Plaford:  [INDISCERNIBLE 0:15:18].  You were given a P&L in that year.

12  Stefan Lumiere:  I was given.

13  Chris Plaford:  I 100%, I know you were because I --

14  Stefan Lumiere:  I know you showed --

15  Chris Plaford:  [INDISCERNIBLE 0:15:25].

16  Stefan Lumiere:  You showed me something.  You didn't give it to me.  You

17  showed me something.  You said, look, and you had it in an [INDISCERNIBLE

18  0:15:31], but you didn't give me anything.  Hundred percent.

19  Chris Plaford:  [INDISCERNIBLE 0:15:33].

20  Stefan Lumiere:  That's how, you know, I would -- I would -- I would have had

21  it, I would have remembered.

22  Chris Plaford:  So I gave you a piece paper and then I took the piece of

23  paper back.  Why would I do that?

24

25

8

A 141

1   Stefan Lumiere:  You showed it to me and [PH0:15:44] what you -- look, I

2   didn't -- I didn't keep it.  You said that -- you said -- you showed it to

3   me.

4   Chris Plaford:  Well, look, I mean --

5   Stefan Lumiere:  Yes.

6   Chris Plaford:  -- I can tell you -- I can't tell you the exact number.

7   Stefan Lumiere:  Yes.

8   Chris Plaford:  But, you know, we've had this conversation, you know, the --

9   it's [PH0:16:11] done, has refuse to pay.  Actually, I can't -- I can't do

10  that anymore, but you guys can go ahead.  Well, I'll tell you what?  Why

11  don't you have [PH0:16:40] April schedule something that works for -- to make

12  sure that people can do it, because you don't want to have them come in

13  multiple times.  Yes -- well, yes.  I mean I'll get -- [INDISCERNIBLE

14  0:16:55], but the thing is we don't use [PH0:16:57] Extract, and I want -- I

15  don't want to pay for something that I, you know, another -- even if it's a

16  better service.  I don't want to pay for something that we're not going to

17  use, right?

18

19  But when we signed up for it, everyone said they wanted to use it which is

20  why I wanted -- right, which is want to have this in so it's not just we're

21  replacing one thing [INDISCERNIBLE 0:17:19].  So -- perfect.  Well, yes, we

22  couldn't switch anyway.  So -- [PH0:17:31] like making it right so.  We

23  should have some time.  Probably not.  All right, thanks.  So you -- you

24  know, look I mean barring any -- the goal is around 5% payout, which we've

25  talked about, barring anything, you know, crazy, anything like really severe

9

A 141

1  and adding risk or something like that, right?  But that's the goal

2  [PH0:17:57] to do with your names.  You were paid significantly more than

3  that in ten --

4  Stefan Lumiere:  Hmm.

5  Chris Plaford:  -- than 5%, because the assets were small, right?  So it was,

6  you know, I mean we -- it's a lot of -- I'll go back and check, see what we

7  have about -- [PH0:18:22] and I'll try to reprint -- well, here.

8  Stefan Lumiere:  I mean what is it -- another point that I'm trying to make

9  is, you know, stuff that was out of my control that I, like -- [PH0:18:30] HL

10  could have blown, we got a zero.  And I've spent a lot of time on that and

11  getting us a reasonable recovery, and we -- it would have [PH0:18:36]

12  doughnut had I not done what I did, intervened.

13  Chris Plaford:  Right, but that's your name?

14  Stefan Lumiere:  And --

15  Chris Plaford:  Right?  What would happen if I said --

16  Stefan Lumiere:  I mean it was a new issue that blew up.  I mean it had a

17  fraud.

18  Chris Plaford:  Yes, but --

19  Stefan Lumiere:  Or like that's just an example --

20  Chris Plaford:  Let me ask an example.  [INDISCERNIBLE 0:18:54].

21  Stefan Lumiere:  And then names that -- names that have --

22  Chris Plaford:  You don't get paid on --

23  Stefan Lumiere:  But if I -- if I spend time on it, though.

24  Chris Plaford:  [INDISCERNIBLE 0:18:59]

25  Stefan Lumiere:  Right?

1   Chris Plaford:  Yes, but [INDISCERNIBLE 0:19:00]

2   Stefan Lumiere:  But if I'm getting -- if I'm spending six months --

3   [PHO:19:02] that was fucking six months on something I'm told to dedicate my

4   time entirely to that, and that's all I'm doing, because in order to -- your

5   words, not mine, if this blows up we're going to lose the fund.  And then go

6   back to the same rules.  Like you're changing the rules.  You're telling me -

7   -

8   Chris Plaford:  How is that changing the rules?

9   Stefan Lumiere:  You're -- because you're telling -- you're telling me to not

10  focus on anything else.

11  Chris Plaford:  Was ATI your name?

12  Stefan Lumiere:  It was a name that we invested in as a fund and a new issue

13  --

14  Chris Plaford:  [INDISCERNIBLE 0:19:25].

15

16  Stefan Lumiere:  -- that was -- that was -- had no liquidity and it had a

17  fraud attached to it.  And I did what we could to save it.

18  Chris Plaford:  What is -- are you the primary on ATI?

19  Stefan Lumiere:  I am the primary on ATI.

20  Chris Plaford:  If we would have made, you know, $20 million on ATI --

21  Stefan Lumiere:  Yes.

22  Chris Plaford:  -- would you have said, well, you told me to spend all my

23  time on this and --

24  Stefan Lumiere:  If we had made $20 million --

25  Chris Plaford:  -- [INDISCERNIBLE 0:19:45].

A 141

1   Stefan Lumiere:  -- and was part of a new issue that we just flipped or we

2   held on for a little bit, then it should have gone into the new issue bucket

3   and split with everybody like everything else.  Or I assume that's where

4   everything else is.

5   Chris Plaford:  Look, the -- you know the rules of [PH0:20:00] Bond.

6

7   [0:20:00]

8

9   The rules are --

10   Stefan Lumiere:  Okay, but you -- but you --

11   Chris Plaford:  -- names that you work on, [PH0:20:04] you get paid off on.

12   Stefan Lumiere:  Well my -- that's -- those are the rules, but then -- but if

13   you change the rules by saying you need to focus 100% of your time on this

14   for a long period of time and you can't work at anything else, that kind of -

15   - that [INDISCERNIBLE 0:20:13].

16   Chris Plaford:  What do you mean?  How many names are there on your -- on

17   that sheet?

18   Stefan Lumiere:  Well, most of these we've been selling off.  I mean most of

19   these had been sold off mid-year.

20   Chris Plaford:  Stefan, let's be real.

21   Stefan Lumiere:  Yes.

22   Chris Plaford:  Do you think your performance has been good --

23   Stefan Lumiere:  I think --

24   Chris Plaford:  -- the last couple years?

25

A 141

1   Stefan Lumiere:  I think it has been good, yes.  It's not 100% reflected in

2   this right now because it's been --

3   Chris Plaford:  The mark -- how much is the -- how much is the market up in

4   the last couple years?

5   Stefan Lumiere:  The credit markets?  Fifteen percent.

6   Chris Plaford:  Last year the high yield market was up 16%, [PH0:20:49] and

7   it was distressed --

8   Stefan Lumiere:  Yes.

9   Chris Plaford:  -- you know, it was probably similar.  The year before that

10  it was up --

11  Stefan Lumiere:  Yes.

12  Chris Plaford:  -- significantly as well, right?  [INDISCERNIBLE 0:20:55].

13  Stefan Lumiere:  And the year before was at 11%.

14  Chris Plaford:  You've had two years of down P&L.  You've been -- and not

15  just flat, down --

16  Stefan Lumiere:  Yes.  But look I was -- I was told I had -- like it was

17  nothing to -- like I had no investment.  Everything was wind down for the

18  entire year.

19  Chris Plaford:  But think about --

20  Stefan Lumiere:  Right?

21  Chris Plaford:  -- why that is.  Because -- let me ask you a question?

22  Stefan Lumiere:  Did -- why that is --

23  Chris Plaford:  If you had a -- if you had a --

24

25

A141

1   Stefan Lumiere:  Why that is is because I assume it had been told -- we have

2   been told to not invest in non-healthcare and a lot of these were non-

3   healthcare.

4   Chris Plaford:  And your performance.  We've been losing.  It's not just ATI

5   --

6   Stefan Lumiere:  What -- yes.

7   Chris Plaford:  You know, how many names on there?  [PH0:21:25] Seban,

8   Nebraska.  What else [PH0:21:30] stands on there, they're all down.  You

9   know, all of those positions, you know, --

10  Stefan Lumiere:  Yes, but -- yes, but the problem --

11  Chris Plaford:  All those names that we were investing in, we've lost of ton

12  [INDISCERNIBLE 0:21:38].

13  Stefan Lumiere:  Yes, well, first of all Nebraska -- they're all unique

14  situations, right?  So it's about timing, like whether it's down now, it's

15  back up to -- like the bonds are back up to par, the loans are above par.

16  Chris Plaford:  We advocate --

17  Stefan Lumiere:  [PH0:21:48] Because we're reinforcers --

18  Chris Plaford:  The -- would you invest in that if we -- if we would have

19  said, look, the game plan on this investment is lose 20% --

20  Stefan Lumiere:  No.  But like the --

21  Chris Plaford:  And then --

22  Stefan Lumiere:  No, but --

23  Chris Plaford:  Then we'll make [INDISCERNIBLE0:22:01] --

24  Stefan Lumiere:  -- if your strategy is to allocate money to a group of

25  assets that have higher than the average return, one or two of them are not

14

A141

1   going to work.  That's you're -- that's the bet you're making.  One or two of

2   them are not going to work and you have manage it.  Obviously, you'd sold off

3   much more than we expected.

4   Chris Plaford:  We didn't --

5   Stefan Lumiere:  And there were technical issues.

6   Chris Plaford:  You didn't have -- you didn't -- it wasn't just one or two.

7   You don't have P&L that's making it up for it in the other names.  That's the

8   thing.

9   Stefan Lumiere:  [INDISCERNIBLE 0:22:25] --

10  Chris Plaford:  [PHO:22:25] We show we've been very poor.

11  Stefan Lumiere:  Yes, the problem is like -- I think I've been restricted

12  from investing.  Like, I've been -- like as a fund I think we've been limited

13  to what we could look at.  So that's been a big problem.  I mean you asked me

14  why I haven't come up with a lot of ideas --

15  Chris Plaford:  Stefan --

16  Stefan Lumiere:  -- this year.

17  Chris Plaford:  -- you realize --

18  Stefan Lumiere:  Yes.

19  Chris Plaford:  You realize that had we done well on those names over the

20  last several years, we could be doing other things.  If we were building a

21  track record, that could have become a separate strategy where we're

22  expanding outside of healthcare.  I would have love to do that.  I would have

23  loved to be able to build out, you know, and do -- and carve out a track

24  record, which then we could go to people and say and look -- and look at our

25  non-healthcare stuff.  Look at how well we've done.  Not only would we not be

A141

1  having to, you know, reduce them.  [INDISCERNIBLE 0:23:15].  It's because --
2  it becomes really hard to explain to people why we're losing money in non-
3  healthcare stuff.  That's why we have to punt it out, and that's, you know,
4  that we're lose -- we lost Bluemix, a $100 million plus account for us.
5  That's a big reason why, you know, they're looking at the non-healthcare
6  stuff, and looking at their performance and going, you know, why am I giving
7  you money, you're supposed to be doing healthcare and then you're losing all
8  this money in these other names.  That's why money hasn't been allocated.
9  It's not, you know, --
10 Stefan Lumiere:  Yes.
11 Chris Plaford:  I would have loved for it to be like this.
12 Stefan Lumiere:  Yes.
13 Chris Plaford:  But it didn't work out like that.
14 Stefan Lumiere:  I mean the problem is that there are -- there are
15 circumstances, and like when you have a fraud situation, you have to take
16 that into account and work the way out.  There's like very little way to
17 protect against that, right?  And if [PH0:24:06] Seban was a fraud, ATI was a
18 big fraud --
19 Chris Plaford:  Well, let me [INDISCERNIBLE 0:24:08] --
20 Stefan Lumiere:  -- and we just manage through those.
21 Chris Plaford:  Why don't we, you know, why don't we simplify this?  And just
22 think about this.
23 Stefan Lumiere:  I mean [PH 0:24:19] CMED --
24 Chris Plaford:  Yes.
25 Stefan Lumiere:  CMED was a fraud, right?

16

A141

1   Chris Plaford:  [INDISCERNIBLE 0:24:21].

2   Stefan Lumiere:  That was a big fraud.

3   Chris Plaford:  And --

4   Stefan Lumiere:  And we're working through it.

5   Chris Plaford:  And Emesh's, you know, and me have taken that P&L bit, right?

6   And what we don't do though, is -- and, you know, you wouldn't want this, I

7   don't think either if the tables were reversed, you know?  I didn't say or

8   Emesh didn't say, look, you know, this is a fraud, therefore, you know, we're

9   going to add part of a, you know, CMED loss to your P&L as well.  And, you

10  know, say you -- say you were up, you know, $15 million bucks this year.

11  Stefan Lumiere:  Yes.

12

13  [0:25:01]

14

15  Chris Plaford:  Oh, by the way you got to take, you know, you got to take a

16  $5 million hit in CMED because, you know, I'm, you know, Emesh invested in a

17  fraud and there was nothing you could do about it.  What would you say to

18  that, you know?  It's -- look, if ATI is a fraud, then ATI is a fraud, but

19  it's still your name.  We can't -- and the fund doesn't get paid on, you

20  know, it's not like the fund gets paid on every name except fraud.

21  Stefan Lumiere:  Yes.

22  Chris Plaford:  It's your name.  It's your P&L, you know?  Look --

23  Stefan Lumiere:  No, I understand -- I understand your point, Chris.

24  Chris Plaford:  -- the bottom line --

25

17

A141

1   Stefan Lumiere:  But it's like -- but the point is that if you're telling me

2   that you told me don't work on anything else, just work on CMED, and that's

3   all you're focused on like you told me for six months, that limits my ability

4   to do anything.  So it limits my ability to make anything outside of it.  So

5   you ask like where's the outperformers.  Here it's like -- I'm limited here.

6   Like, you -- like we're selling things that should -- that necessarily should

7   be sold because --

8   Chris Plaford:  You were -- you were being limited because your book is being

9   cut down.  Even before that, your book was being cut down because of

10  performance.  The way to increase your book, right, is to have good

11  performance.  Just like any other [PHO:26:14] pad here, right?  What happens

12  when you have [PHO:26:18] PM that's having a draw down, do you they get a

13  capital increase?  No, you get a decrease, right?  That's investing 101.

14  It's not just [PHO:26:27] for us, and it's not for a specific portfolio

15  manager.

16  Stefan Lumiere:  Yes.

17  Chris Plaford:  What does any fund do when there's, you know, there's periods

18  of volatility?  You cut back, you get smaller, right?  You cut out the low

19  conviction ideas, right?  That's how things work, and then what do you, you

20  know, and then when you're making money --

21  Stefan Lumiere:  Yes.

22  Chris Plaford:  -- you get additional capital.  It's not just specific to

23  ATI.  But look, at the end of the day, if you had the performance and all the

24  rest of the stuff, and the ATI ended up being a fraud, you know, as of right

25  now, we haven't lost all that much money in ATI.  We're down what, a few

18

A141

1  million bucks?  That's not an insurmountable, you know, delta to overcome,

2  but, you know, we're not - we -- we're also losing money in this bond and the

3  Nebraska and, you know, the rest of the names. 'It's not --

4  Stefan Lumiere:  I mean like Seban, they were two frauds.  I mean that --

5  Chris Plaford:  [INDISCERNIBLE 0:27:17] --

6  Stefan Lumiere:  It was those three -- two fraudulent loans.

7  Chris Plaford:  What do you want me to tell you?  It's a business.  The fund

8  doesn't get paid when we lose money.

9  Stefan Lumiere:  No, I understand that.  I understand that.

10  Chris Plaford:  Then how --

11  Stefan Lumiere:  And like, I'm not -- I've never said that, you know, like, I

12  [PH0:27:28] should have taken that day.  We missed calculated like the

13  company and the bankers all lied to us.  Our own advisors lied to us.  Like

14  could of -- listen we could have hit the ball out of the court in that one if

15  we were able to commit to the capital we needed to buy it.  It's done very

16  well.

17  Chris Plaford:  Well --

18  Stefan Lumiere:  It's actually it's up -- it's up over 100% now.  But we

19  weren't in a position to do that.

20  Chris Plaford:  Look --

21  Stefan Lumiere:  Like I -- like why am I getting dinged for [PH0:28:01]

22  Bellus when I'm like --

23  Chris Plaford:  I actually didn't --

24  Stefan Lumiere:  -- I had nothing --

25  Chris Plaford:  -- have Bellus on that sheet.  You sent that to Josh.

19

A141

1  Stefan Lumiere:  I did.  I asked him for Bellus --

2  Chris Plaford:  [INDISCERNIBLE 0:28:09] --

3  Stefan Lumiere:  -- because I've been -- because I've been spending a lot of

4  time, and if this would have been -- if you compared it to what we've gotten

5  had I not fought for our stake.  We would have --

6  Chris Plaford:  Like I said --

7  Stefan Lumiere:  -- lost a lot more.

8  Chris Plaford:  -- I actually -- I actually didn't put Bellus on

9  [INDISCERNIBLE 0:28:21].

10  Three:  Yes.

11  Chris Plaford:  I only added it -- I only added it subsequently.

12  Stefan Lumiere:  No, my point is the way to look at Bellus or something to

13  that effect that was not my name but I've been instrumental and just

14  [PH0:28:32] delta which we would have gotten otherwise.  I know that you're

15  not getting paid on it, difference, but, listen, I'm spending hours upon

16  hours, days upon days, weeks upon weeks negotiating, dealing with this thing.

17  And I go -- we -- I take it -- I take it going from an $8 million hit down to

18  a $3 million or $4 million hit, like there should be some level of

19  compensation for that.  I mean that's time.  It's time dedicated to that

20  that's not dedicated elsewhere.  Or if you have me work on something like

21  CMED --

22  Chris Plaford:  I --

23  Stefan Lumiere:  Like CMED or [PH0:29:03] Laurel Lardon, I'm spending

24  countless hours on those names at some point, then there should be some

25  compensation for that.

20

A 141

1  Chris Plaford:  Fine taking -- I am fine taking Bellus off and, you know, and

2  even, you know, in addition to that, try to think about a way -- I agree that

3  that wasn't a name that, you know, you were the primary on originally and

4  that's fair.  But it's still not going to be a big enough delta --

5  Stefan Lumiere:  But my point --

6  Chris Plaford:  -- [PH0:29:40] to jump on it.

7  Stefan Lumiere:  My point is keep in mind and consider like most of the funds

8  if you have somebody come and is a work out guy and they help turn something

9  around, they're paid off of the performance of what they would have got

10  otherwise.

11  Chris Plaford:  Yes.  And that's fair.  And that's fair.  That's a very

12  reasonable point.  Let's think about this though, too.

13

14  [0:30:01]

15

16  Do you think you're working that hard right now?

17  Stefan Lumiere:  Right now?

18  Chris Plaford:  Or just last year?  Just that you --

19  Stefan Lumiere:  Last year I was working my tail off, what are you talking

20  about?

21  Chris Plaford:  For this portfolio?

22  Stefan Lumiere:  For credit, yes.  Like I don't know why there was a

23  miscommunication.

24  Chris Plaford:  [INDISCERNIBLE 0:30:17] --

25

A141

1   Stefan Lumiere:  Like I wasn't spending almost any time on M&A.  I had no

2   interest in the M&A.

3   Chris Plaford:  This is what I see.  You come in at nine, sometimes 9:30.

4   You leave, you know, at five.  Sometimes earlier.  You don't respond to half

5   -- probably over half of my e-mails.  People call you, can't get ahold of you

6   for half a day, right?  If you're -- if you're, you know, and we've had this

7   conversation before and in addition to that, it sets a bad example for

8   everyone else, right?  It doesn't look good.  If everyone else on the desk

9   has to be in their seat at least by 8:30.

10  Stefan Lumiere:  Yes.

11  Chris Plaford:  You're going to be on the [INDISCERNIBLE 0:30:59] --

12  Stefan Lumiere:  First of all -- first of all I came in at nine today for

13  other reasons, but I usually don't come at 9:30.

14  Chris Plaford:  When was the last time you came -- I haven't seen you come in

15  before nine for a long time.

16  Stefan Lumiere:  I usually -- I'm usually here by 8:15, 8:30.

17  Chris Plaford:  No you're not.

18  Stefan Lumiere:  I am.

19  Chris Plaford:  No.

20  Stefan Lumiere:  No, I don't walk in at nine o'clock.

21  Chris Plaford:  You're not.  I sat here -- I sit here, I have a direct line

22  of site on your desk.

23  Stefan Lumiere:  I know you do.

24  Chris Plaford:  And I see what time you come in and you were not coming in.

25  Look, this is the point.  It looks from our perspective like you're not

A141

1  working all that hard.  You're getting paid, you know, a couple hundred

2  thousand dollars a year for basically a nine to five job and if you're doing

3  work outside, you don't respond to anybody's e-mails or answer their calls

4  for most of the time.  And I'm not -- I'm not exaggerating that.

5  [INDISCERNIBLE 0:31:45] --

6  Stefan Lumiere:  You know I -- [INDISCERNIBLE 0:31:46]

7  Chris Plaford:  [INDISCERNIBLE 0:31:46] read your e-mails that I sent you

8  last week and you still haven't responded to.  Sometimes you respond to an e-

9  mail two weeks later like it was yesterday.  I'm just saying, look --

10  Stefan Lumiere:  But you're using as an example times that I've been

11  partially out due to -- due to surgeries --

12  Chris Plaford:  No, I'm not.

13  Stefan Lumiere:  -- and stuff like that?

14  Chris Plaford:  I'm not counting any of [INDISCERNIBLE 0:32:02] --

15  Stefan Lumiere:  Yes.

16  Chris Plaford:  -- or any of your medical issues.

17  Stefan Lumiere:  I have -- like there are --

18  Chris Plaford:  Before that.

19  Stefan Lumiere:  There are multiple -- there are multiple ways to communicate

20  with me all the time, like I've always got them back.  Like there was one

21  situation with ATI, that was a miscommunication.  Like nobody had been trying

22  to reach me all day.  I had already talked to someone [INDISCERNIBLE

23  0:32:14].

24  Chris Plaford:  Stefan, I'm getting you honest feedback here.

25  Stefan Lumiere:  Yes.

A141

1  Chris Plaford:  And this is --

2  Stefan Lumiere:  But it's -- I think --

3  Chris Plaford:  [INDISCERNIBLE 0:32:22].

4  Stefan Lumiere:  I think it's probably exaggerated, all right?

5  Chris Plaford:  Okay.  So let me -- let me -- let me help to put this in

6  perspective for you.  I think that for your career, don't write that off.

7  People who you -- people who we both know who you've worked with outside of

8  this firm have said the same thing to me.  I'm not -- I'm not exaggerating

9  that.  Your communication skills could be improved on a lot.  I think you

10  would be doing yourself a benefit not to blow that off and say that I am --

11  and, look, we've had this conversation multiple times.  We've had this

12  conversation -- how many times have I asked you to be in your seat by 8:30,

13  you know?  And --

14  Stefan Lumiere:  Three?

15  Chris Plaford:  What?

16  Stefan Lumiere:  Three.

17  Chris Plaford:  Over a multi-year period.

18  Stefan Lumiere:  Yes.

19  Chris Plaford:  I stopped asking you because, you know, you're own world half

20  the time.

21  Stefan Lumiere:  I think I'm in the office by 8:30 [INDISCERNIBLE 0:33:15].

22  Chris Plaford:  You're not.

23  Stefan Lumiere:  I think am.

24  Chris Plaford:  I'm telling you, you're not.  Listen, there is times -- have

25  you -- have you noticed sometimes there's -- like when [PH 0:33:25] Leo,

24

A141

1   like, jokingly says, Stefan, when you read this e-mail next week, you know,

2   think about this.  And we make a joke out of it.  There's a reason for that.

3   Stefan Lumiere:  Well, we started joking about that from a long time ago.

4   Listen, there was a period maybe in '09 where my e-mails are just getting

5   overwhelmed by too many e-mails coming in.

6   Chris Plaford:  Listen.

7   Stefan Lumiere:  That's it.

8   Chris Plaford:  Look, you didn't -- I have -- I have written you e-mails --

9   [INDISCERNIBLE 0:33:46] --

10  Stefan Lumiere:  And what e-mail have I not responded to?

11  Chris Plaford:  The Nebraska book two days ago.  Did you respond to that e-

12  mail?  No.

13  Stefan Lumiere:  I didn't see that e-mail.

14  Chris Plaford:  Well, what -- we just [INDISCERNIBLE 0:33:53] --

15  Stefan Lumiere:  Well, what was -- what was -- what was the context of the e-

16  mail?

17  Chris Plaford:  You sent me the thing about the pay down and I said, okay,

18  what does that mean?

19  Stefan Lumiere:  I didn't see yet.

20  Chris Plaford:  Right.  Okay, well, but that's --

21  Stefan Lumiere:  Yes.

22  Chris Plaford:  Like there's all sorts of e-mails like that -- like -- and --

23

24  Stefan Lumiere:  When was that?  That was yesterday.

25

A 141

1  Chris Plaford:  Let me -- let me take a step back as well, you know, so look,

2  I would -- you get paid, right, as a risk taker, right?  You get paid for,

3  you know, performance, you know, first and foremost, right?  Now look, you

4  know, you've been down the last couple years, right?  I want you to be, you

5  know, if you're interested in committing and contributing, I want you to, you

6  know, to be -- I would say back on the team, because frankly it feels like

7  you really haven't been for quite a while, and I assume that was because you

8  were spending a lot of time doing the other stuff, which, you know, frankly

9  is preferable to, you know, just not, you know, if you're telling me you're

10 not --

11

12 [0:35:02]

13

14 Stefan Lumiere:  [INDISCERNIBLE 0:35:03] the M&A.  We'll, I'm telling you,

15 M&A wasn't more than 20% of my time.  Like I don't know what --

16 Chris Plaford:  If you work primarily for me, I would have been all over you.

17 I would have been all over you.  It's not -- look, let me -- so like Rotech.

18 Stefan Lumiere:  Yes.

19 Chris Plaford:  It was literally the summer of last year where I started

20 asking you about, you know, Rotech, like, building out a model and doing

21 that.

22 Stefan Lumiere:  Yes.

23 Chris Plaford:  And over the last eight months, right, we've finally got

24 there.  That is so much slower -- so much slower than I would put up with

25 from anybody else on the team.  Now, look, there's, you know, you're not a

A141

1   stupid guy, so what does that tell me?  That you're not spending your, you

2   know, are you -- are you spending 12 hours a day working on that?  No.   I

3   think the answer has to be no.  You're not -- you're not spending the same

4   amount of time and effort that the other people are.

5   Stefan Lumiere:  No, I haven't eight months on it, on Rotech I didn't spend

6   eight months on.

7   Chris Plaford:  And the thing is this, dude, it's, you know, look, it comes

8   down to it, you know, it comes down to performance.

9   Stefan Lumiere:  But you also have to -- you also have to consider also

10  [PHO:36:29] for my work about Rotech that there was a lot of issues and

11  situations that we don't know.  It's still highly complex.  I spent a lot of

12  that time just digging and digging and digging and trying to find out

13  catalysts and trying to find out data points.  That kind of like uses an

14  input for the model. Otherwise, how do you model it?  We don't know --

15  there's no -- the model is useless unless you get another understanding.

16  Chris Plaford:  Of course.

17  Stefan Lumiere:  I had a rough model before, but it's somewhat useless.

18  Chris Plaford:  But what -- you're telling me that you're full capacity is

19  only to cover one name.

20  Stefan Lumiere:  But, you know --

21  Chris Plaford:  [INDISCERNIBLE 0:37:02].

22  Stefan Lumiere:  We know that's not true.

23  Chris Plaford:  Then you should -- hopefully you can make a lot of money in

24  that one name.

25  Stefan Lumiere:  Yes, yes, hopefully that's not true.

27

A141

1  Chris Plaford:  I think you can do more and I think you can do it quicker.  I

2  think you can commit more.  I think that, you know, I think if you really

3  were in your seat at eight o'clock and, you know, and leave at six, I mean

4  that's not -- that's, you know, like a solid ten hours a day, I think you'd

5  be doing a lot better.  I mean, you know, I don't know what you do when

6  you're out of the office, you know, I, you know, I tried multiple times to

7  conform you to what everyone else does.  You know, that hasn't seemed to

8  work.

9  Stefan Lumiere:  Right.  Well --

10 Chris Plaford:  And at the end of the day, if you want to get paid -- but so

11 -- okay, so --

12 Stefan Lumiere:  [INDISCERNIBLE 0:37:44].

13 Chris Plaford:  If you're not going to do that -- if you're not going to do

14 that --

15 Stefan Lumiere:  Do what?

16 Chris Plaford:  And you're only going to respond to half the e-mails and

17 [INDISCERNIBLE 0:37:50].

18 Stefan Lumiere:  Well, that's -- I'm not responding to half the e-mails.  I

19 might miss --

20 Chris Plaford:  Literally --

21 Stefan Lumiere:  I might -- I miss --

22 Chris Plaford:  Literally --

23 Stefan Lumiere:  Might miss [INDISCERNIBLE 0:37:56] --

24 Chris Plaford:  [INDISCERNIBLE 0:37:56].

25 Stefan Lumiere:  It can't be --

28

A141

1   Chris Plaford:   [INDISCERNIBLE 0:37:58].

2   Stefan Lumiere:   I'm trying -- I'm not.

3   Chris Plaford:   Look [INDISCERNIBLE 0:38:02] --

4   Stefan Lumiere:   It's not half the e-mails, all right?

5   Chris Plaford:   The e-mails [INDISCERNIBLE 0:38:03].

6   Stefan Lumiere:   Yes.

7   Chris Plaford:   I'm giving you honest feedback.

8   Stefan Lumiere:   Yes.

9   Chris Plaford:   I -- and like I said, it's not just from me.  There -- I

10  think you'd be doing yourself a big favor too, you know, to systematically,

11  you know, work on your, you know, your communication stuff.  You know, I've

12  had other people -- multiple -- not just one person, multiple other people

13  that we both interact with that told me, look, you know, Stefan disappeared

14  for a few days.  He hasn't responded to this, what do I do?  You know, I'm

15  not hearing anything back from Stefan.  You know, [INDISCERNIBLE 0:38:35] --

16  Stefan Lumiere:   Well, I mean I can't respond that because --

17  Chris Plaford:   It's not always --

18  Stefan Lumiere:   I can't respond to that because I don't know what

19  [INDISCERNIBLE 0:38:39] is.

20  Chris Plaford:   I know, and I'm trying not to blow up, you know --

21  Stefan Lumiere:   Yes.

22  Chris Plaford:   -- the --

23  Stefan Lumiere:   Well --

24  Chris Plaford:   -- people as well.

25

29

A 141

1   Stefan Lumiere:  -- keep in -- keep in mind where it's coming from and the --

2   maybe the potential bias there.

3   Chris Plaford:  They're not the people that you would think of.  They're not

4   the people that you're thinking of that would have a bias.  These people

5   don't have a bias.

6   Stefan Lumiere:  I'm thinking of [PH0:38:57] Struck.  And that seems like

7   it'd be an easy bias, [PH0:39:01] sort of give them an excuse for --

8   Chris Plaford:  It's not Struck.  It's not.

9   Stefan Lumiere:  You sure?

10  Chris Plaford:  Well, exactly now that I think about it --

11  Stefan Lumiere:  Yes.

12  Chris Plaford:  Does [PH 0:39:11] Jamie have a bias against you?

13  Stefan Lumiere:  It's not against me, it makes him and firm -- look, they're

14  doing a job and they're trying to get stuff done.  So they're obviously want

15  to throw somebody up to that.  I don't think it's got bias against me, but

16  it's a very easy --

17  Chris Plaford:  Not on ATI.

18  Stefan Lumiere:  [PH 0:39:23] Not on what?

19  Chris Plaford:  ATI, on other stuff.  Stefan, I'm not -- I am giving you

20  honest feedback.

21  Stefan Lumiere:  And I'm listening to it.

22  Chris Plaford:  [INDISCERNIBLE 0:39:31].  Okay.

23  Stefan Lumiere:  I'm listening to it.

24  Chris Plaford:  I think you'd be doing yourself a big favor.  That's my

25  [INDISCERNIBLE 0:39:35].  Look at the end of the day, right, you're

A 141

1  [INDISCERNIBLE 0:39:45].  You know, look, if you were up a lot of money, you

2  know, in the last even couple -- even in, you know, one of these years in the

3  last couple years.

4  Stefan Lumiere:  Yes.

5  Chris Plaford:  You're going to want to get paid -- you're [PH 0:40:00] going

6  to want to pay that person [INDISCERNIBLE 0:40:00]

7

8  [0:40:00]

9

10  Stefan Lumiere:  Yes, but I just feel like it's going to be tough to do that

11  if I -- they don't know the rules and I'm being strapped.  Like, I don't know

12  what the rules are.  Like what we are -- what you have been telling me was

13  that one of our biggest investors does not want non-healthcare.  [PH 0:40:14]

14  Mark had been telling me it's like we should be investing in non-healthcare,

15  period.  So that's my assumption.  So forget about offering any ideas outside

16  of healthcare because it's not going to do anything.  It's a waste of time.

17  In the healthcare domain, it's like, okay, well, what are the names I can

18  focus on, right, that aren't already taken care of.  Like this space is

19  covered.  I just spend time on Rotech [INDISCERNIBLE 0:40:35] --

20  Chris Plaford:  Honestly, there is -- there is a lot.  There's a few names

21  that we are under capacity to look at right now.  You're not being given

22  those because you're not working that hard, and you're not -- you're -- it --

23  there is so much more of a delay.  Look, if I need a name modeled out in a

24  timely basis, I don't have eight months, you know?  You could have -- you

25  could have gone through, you know, a couple dozen names in that time.  You'd

31

A141

1   have a lot more positions in the portfolio.  There's plenty of stuff within

2   healthcare for you to do.  You're not committed.  You're not committed to

3   this.  You're not, you know, that's the thing.  So, you know, at a point, you

4   could have been all over -- what was the name we started talk about like

5   Apria.  Eventually I had to give that to [PH 0:41:30] Andrew.  You're -- it's

6   not --

7   Stefan Lumiere:  That's fine.  I spent a lot of time on Apria and you -- like

8   -- whatever.

9   Chris Plaford:  Stefan --

10   Stefan Lumiere:  So what --

11   Chris Plaford:  -- there's nothing [INDISCERNIBLE 0:41:40].  One of two

12   things.  You have to work on your communication so that --

13   Stefan Lumiere:  But you knew I was working on Apria.

14   Chris Plaford:  [INDISCERNIBLE 0:41:49] -- but there's nothing that comes

15   back.  There's nothing.  Let me -- it's been eight months, Stefan.  It's been

16   eight months and nothing comes back.  What would you do in my -- in my

17   situation?

18   Stefan Lumiere:  All you have to do is ask me [INDISCERNIBLE 0:42:02].

19   Chris Plaford:  But I have.

20   Stefan Lumiere:  That I've built the full model on Apria and run that

21   program.

22   Chris Plaford:  [PH 0:42:08] You still working on it.  But like look --

23   Stefan Lumiere:  Well, if you want -- you want the -- you want the -- an [PH

24   0:42:12] intermediary or you want back complete?

25

32

A 141

1   Chris Plaford:  It comes back to communication, right?  If it's the case

2   where you're, you know, you're diligently working on it 10 hours a day, first

3   of all, it doesn't take eight months to do that, okay?  Right?  I mean --

4   Stefan Lumiere:  It didn't take me eight months, no.

5   Chris Plaford:  Okay.  Give me a status update.  Communicate.  There is --

6   there was multiple e-mails that I sent you, you know, that just -- it -- if

7   you don't respond to the e-mail -- if I, you know, look somebody asks you

8   something multiple times and you just don't respond, how am I to know what

9   you've done.  You didn't send me anything.  You don't respond when I ask you

10  about it

11  Stefan Lumiere:  Hmm.

12  Chris Plaford:  What am I -- how am I supposed to --

13  Stefan Lumiere:  How Nebraska --

14  Chris Plaford:  [INDISCERNIBLE 0:43:00] --

15  Stefan Lumiere:  Yes, I just don't know the examples that we're talking about

16  in terms of the timeline between e-mails.  So like you're saying that -- but

17  like I understand I didn't see the response back from Nebraska.  I guess I

18  missed some things, but you didn't send something back immediately so I don't

19  know what that timeline is.  And when did you send that out?  If it's before

20  that, I don't know.  I haven't looked at my Blackberry this morning yet.

21  Chris Plaford:  But there -- there is not -- it comes down to this.  I would

22  like to have you on the team and committed, right?  But like anything else,

23  you're in a senior position, you're not going to get paid as a -- as a -- as

24  a junior analyst.  And I couldn't do that anyway because you're not, you

25  know, I don't have the same degree of ability to just have a normal

33

A/41

1   communication with you such that, you know, we're working things out

2   systematically. Like -- and Andrew for instance, you know, there's multiple

3   names that we'll bang out every week, you know, up into [PH 0:44:19] my list

4   -- into my list.   It takes communication to do that.   If I were to give you a

5   name like that and then nothing comes back and you don't respond when I ask

6   you about it and you don't send me anything proactively, I'm not going to

7   wait -- I'm not going to wait a month.   I mean how would I have any way even

8   to know if you're not responding when I ask about it, right?   How am I

9   supposed to know what you've done or what you haven't done?   So, you know, go

10  -- that only leaves not [INDISCERNIBLE 0:44:48] --

11  Stefan Lumiere:   We haven't -- we haven't had a meeting like this in a while,

12  first of all.   We used to go over this and we used to give status updates.

13  That's stopped, like over six, five months ago.

14  Chris Plaford:   And do you know why?

15

16  [0:45:01]

17

18  Stefan Lumiere:   No, don't know why.

19  Chris Plaford:   Because there wasn't any -- as the names in your book start

20  coming down, which is solely based on performance, and I would try to give

21  you new things to work on.   I remember very distinctly, it was like late

22  spring when I started last year when I started asking you about the Rotech

23  [PH 0:45:25] on.

24  Stefan Lumiere:   Hmm.

25

34

35

1   Chris Plaford:  And, you know, it -- nothing is coming back on a timely
2   basis.
3   Stefan Lumiere:  My next question, let's just go on Nebraska for example,
4   right?  So from what I understand is like we're selling stuff, it doesn't
5   matter if it's right or wrong.  Like we had very good intel on what was
6   happening and I've called it pretty well since the bankruptcy.
7   Chris Plaford:  But we lost a ton of money.
8   Stefan Lumiere:  Well, and I've called very well since the bankruptcy.  Term
9   loans, we're going to get paid out at 105, like top of the structure.
10  Chris Plaford:  There --
11  Stefan Lumiere:  They've got a huge vendor [INDISCERNIBLE 0:45:58] --
12  Chris Plaford:  There --
13  Stefan Lumiere:  That's coming -- that's coming from somewhere else.  Jake's
14  saying sell it.  You told me this every week, Jake said to sell it.
15  Chris Plaford:  Which let me tell you again, the reason that is because we
16  lost too much money in the non-healthcare stuff.  It's become a significant
17  focus for investors and we've passed the point of anything I can do to change
18  that.
19  Stefan Lumiere:  So what -- why the focus on that one name.
20  Chris Plaford:  It's not.  All of your non-healthcare things have had to come
21  down.  Systematically, we've passed the point where we're able to have --
22  Stefan Lumiere:  Yes.  I mean the problem is --
23  Chris Plaford:  [INDISCERNIBLE 0:46:36].
24  Stefan Lumiere:  The problem is there's a ton of partner
25  frauds and kind of recovering from those.  Most all the names worked out.

A 141

36

```
 1    Most all the names worked out.  Lee Enterprises, way up above where it was.
 2    Washington everything, Great Atlantic [PH 0:46:52] Basilica.  Everything.
 3    Nebraska was still not there, but I'm pretty confident it will get there.  It
 4    takes time sometimes so --
 5    Chris Plaford:  But there has been -- there has been a two-year period where
 6    you're down money and the market's ripped.  Two years in a row where you've
 7    lost money.
 8    Stefan Lumiere:  Yes.  And sometimes there are uncontrollable circumstances.
 9    Chris Plaford:  We haven't lost that much money in ATI.  Just so you're
10    clear.
11    Stefan Lumiere:  Well, I didn't see the last year's, like, data.  So the --
12    in the last --
13    Chris Plaford:  On your sheet.
14    Stefan Lumiere:  Year before.
15    Chris Plaford:  Okay, it wasn't -- it wasn't a big loser the year before.
16    Stefan Lumiere:  No, well, what was then besides Seban and that, where did I
17    lose money?
18    Chris Plaford:  You were down more than -- you were down more in 2011 than
19    you were in 2012.  You know, no --
20    Stefan Lumiere:  And outside of Nebraska, I don't even know what the [PH
21    0:47:47] lights were --
22    Chris Plaford:  I sent you an e-mail.  I remember this very clearly.  I sent
23    you an e-mail with your P&Ls on it.  You do have a copy of your P&Ls.
24    Absolutely you do.
25    Stefan Lumiere:  You sent me an e-mail?
```

1    Chris Plaford:  I sent you that -- I sent you your P&Ls, 100%.  I'll go back
2    through my file and dig it up again.  You have those.  There's no -- there's
3    no way that I wouldn't give you your P&L.  And I remember because I did sent
4    it on an e-mail and you probably didn't have the final one.  You probably had
5    it through mid-December which was through the time of your review, and it
6    probably wasn't done -- like the official one was never even done because you
7    were down.  But the -- you do have your names.  Absolutely.
8    Stefan Lumiere:  I mean I just can't even think of names that have lost money
9    apart from ATI, Seban and Nebraska.
10   Chris Plaford:  All right, well, I mean I'll go -- I'll try to go back
11   through and --
12   Stefan Lumiere:  I mean --
13   Chris Plaford:  -- dig through, you know, your -- just dig through.  But,
14   look, the facts are the facts.  I mean there wasn't -- I think you were --
15   Stefan Lumiere:  I guess I just don't know the names that lost money.
16   Chris Plaford:  Okay, well --
17   Stefan Lumiere:  Like maybe that's a bigger problem.  Like everything --
18   Chris Plaford:  Maybe that is the bigger problem.
19   Stefan Lumiere:  I mean unless we were forced out of something for temporary
20   move and whatever, but --
21   Chris Plaford:  Well, I'll have to -- I'll try to get you those again, but,
22   look, at the end of the day --
23   Stefan Lumiere:  So --
24   Chris Plaford:  -- you're not -- you're not going to win the argument that --
25   Stefan Lumiere:  So let me ask --

37

38

1   Chris Plaford: -- we're out money in 2011 because you won't. I'm just --

2   I'm --

3   Stefan Lumiere: I was up in 2011?

4   Chris Plaford: No, you weren't. You were down in 2011. You've been down

5   the last two years. That's a fact. I'll go back and try to get you the

6   documentation again, but you're not going to win the argument by saying I

7   just don't know what the names would have been [INDISCERNIBLE 0:49:56] --

8   Stefan Lumiere: I mean I, you know, who knows,' [PH 0:49:57] That's a new

9   market, so I don't know, maybe [PH 0:49:58] Leash would have showed it --

10  show something down.

11

12  [0:50:02]

13

14  Chris Plaford: You were down in 2011. And, you were down in 2012. And, you

15  know, and that's a pretty big -- that's a pretty big delta versus the market

16  in the, you know, I'm just -- that's -- [INDISCERNIBLE 0:50:15] --

17  Stefan Lumiere: 2011 was down -- the market was down 11%.

18  Chris Plaford: [PH 0:50:20] No market was 11%

19  Stefan Lumiere: Distressed credit. Most funds were down 11% in '11 --

20  Chris Plaford: [INDISCERNIBLE 0:50:29] --

21  Stefan Lumiere: And we were -- and we were flat.

22  Chris Plaford: -- was not down 11% in 2011.

23  Stefan Lumiere: I'm pretty sure they were. What was -- what was not -- what

24  was -- what do you think that the market is going to be up or down?

25

1414

39

1  Chris Plaford:  Well, I can actually tell you that right now.  [INDISCERNIBLE

2  0:50:46] --

3  Stefan Lumiere:  And what is that based on?  What benchmark?

4  Chris Plaford:  Well, I'll tell you.  Hold on a second.

5  Stefan Lumiere:  I thought we were up like 50 BIPS in 2011, right?

6  Chris Plaford:  Our fund was basically flat in 2011 [INDISCERNIBLE 0:51:08].

7  Stefan Lumiere:  And I knew that was very good compared to our peers.

8  Chris Plaford:  [INDISCERNIBLE 0:51:15].

9  Stefan Lumiere:  I don't know.  I mean I'm going to by most of the credit

10  funds that I know were down like significantly, 7% to 11%.  Oh, update.  So

11  [PH 0:51:45] FriendFinder, they're going to be doing a restructuring, I think

12  it's coming pretty soon.

13  Chris Plaford:  [INDISCERNIBLE 0:51:50].

14  Stefan Lumiere:  Supposed to talk to one guy today, but they are going to

15  equitize when it's done, they're going to equitize the [PH 0:52:00] tech

16  wing.  I think they're doing it outside of bankruptcy.  [PH 0:52:04] They're

17  through negotiations.  I don't know -- there was some mention of something

18  about 50%, like the bond was not wanting 50% of the equity because they don't

19  want to have it on their books for [INDISCERNIBLE 0:52:20].  [PH 0:52:23]

20  maybe retentions or what not.  Or maybe just one fund.  Who was -- that was

21  saying that it was one of the larger holders.  So and they're going to try to

22  dilute that down.  So there's probably, [PH 0:52:36] one to go in, I think

23  it's broken up between that and a new money plan.  But right now it's like

24  it's volatile but it could recovery from -- [PH 0:52:48] within multi-set

25  because performance has been pretty good at the company.  I think they're

40

1  doing about $85 million in run rate right now.  They want to reinvest some
2  money into the business.  They should be able to do 20 -- they got $15
3  million in earnings.
4  Chris Plaford:  Next year?
5  Stefan Lumiere:  Once they do -- once, you know, once they equitizes.
6  Chris Plaford:  So what [INDISCERNIBLE 0:53:17] --
7  Stefan Lumiere:  In the end, the bonds could be worth, you know, 55 -- 50, 55
8  [PH 0:53:22] FX.
9  Chris Plaford:  Well, what --
10  Stefan Lumiere:  I don't know what happens if they come back
11  and if they do this on a, you know, a pre-pack, you know, consent type thing
12  like they did with Lee Enterprises.  You got to agree to this, but we're
13  going to -- do a pre-pack anyways.  So you have to agree.  I don't know, I'll
14  get more details on it today.
15  Chris Plaford:  So the JPMorgan --sorry the high yield corporate bond [PH
16  0:54:02] fund index was about 2.6% in 2011.
17  Stefan Lumiere:  And what was distressed then? ,
18  Chris Plaford:  It was [INDISCERNIBLE 0:54:16].  I have [PH 0:54:21] event
19  which was up 1.5% [INDISCERNIBLE 0:54:23] something I had were have good.
20  loans were up, bonds [INDISCERNIBLE 0:54:32].
21  Stefan Lumiere:  I think -- I think more high yield distressed [PH 0:54:35]
22  angle funds were down.  See what they were.
23  Chris Plaford:  Yes, and that's fine, but if you look at that sheet, most of
24  your P&Ls are coming from, you know, coming from more high yield type stuff.
25  I'm not saying that, you know, change the strategy, but --

1  Stefan Lumiere:  Well, you're not?

2  Chris Plaford:  What?

3  Stefan Lumiere:  You're not?

4  Chris Plaford:  But, well, look, if the, you know, again, the bottom line is

5  --

6

7  [0:55:03]

8

9  Stefan Lumiere:  I don't understand Great Atlantic is down 238.  We got taken

10  out in [PH 0:55:07] in May cold.  Why is that down $238,0000?  It doesn't make

11  any sense.

12  Chris Plaford:  What was the P&L last year?

13  Stefan Lumiere:  Hum?  I don't -- we -- all I know is we bought bonds at 85,

14  we had to take it out at 105 plus [PH 0:55:26] coupon.

15  Chris Plaford:  And when was that?

16  Stefan Lumiere:  In 2012, beginning of 2012.

17  Chris Plaford:  Yes, but that was the beginning of 2012, and maybe all the

18  money was made in 2011.  And if it would happen in the beginning, it had

19  already realized the gain in 2012.

20  Stefan Lumiere:  But it still shouldn't be down.

21  Chris Plaford:  [INDISCERNIBLE 0:55:53].  I'll try to send you your P&L for

22  2012 again.  I'm going to have to try to find it.

23  Stefan Lumiere:  For when?

24  Chris Plaford:  For 2011.

25

41

42

```
1    Stefan Lumiere:  Well, I mean if it's 2011, and in 2011, we should have that
2    in e-mail, right?  Or most of it, whatever that new system is.
3    Chris Plaford:  Yes.  [INDISCERNIBLE 0:56:25].
4    Stefan Lumiere:  Let me go finish on Rotech.  Let me know what names you
5    think need working on this [INDISCERNIBLE 0:56:31].
6    Chris Plaford:  It's like this the bottom line.  [INDISCERNIBLE 0:56:34].
7    There are other names, right, which I would -- we're not covering all the
8    names like [PH 0:56:45] Mmodo.
9    Stefan Lumiere:  I'm looking in Mmodo, I've been working on it for a week.
10   Chris Plaford:  Okay.  Well, you know, nobody's doing any work on Mmodo.  Or
11   like another name -- there -- and I'll go back and kind of [INDISCERNIBLE
12   0:56:56].
13   Stefan Lumiere:  Besides two -- two new names.
14   Chris Plaford:  There is CRC, there's all -- let's put it this way.  There is
15   usually a list of [INDISCERNIBLE 0:57:08] --
16   Stefan Lumiere:  I've done a lot of work on CRC.  I've spent a lot of time on
17   CRC.
18   Chris Plaford:  Okay.
19   Stefan Lumiere:  I've done probably seven calls on it, have built out models
20   --
21   Chris Plaford:  When?
22   Stefan Lumiere:  Over the past year.
23   Chris Plaford:  Is it -- is it up to date?
24   Stefan Lumiere:  Yes.
25   Chris Plaford:  Do we have an updated model?
```

43

1  Stefan Lumiere:  Yes.  The problem with that one is like we -- I looked at

2  it, I thought like you -- every time we invest in something, like, I know

3  it's a liquid.  It's going to be -- it's a smallish [PH 0:57:34] hue, very

4  liquid.  You got counter information about a sales [PH 0:57:39] bar, and the

5  fact -- and the fact of the -- of one of the businesses and that

6  was false.  I checked on that of the [PH 0:57:51] fact cam.  So I'm looking

7  for catalysts.  I mean I know everything we're doing needs a hard catalyst

8  so, you know, 85, yes, looks like [INDISCERNIBLE 0:57:59], but now it's par.

9  Chris Plaford:  Was

10  Stefan Lumiere:  It was.

11  Chris Plaford:  You don't [INDISCERNIBLE 0:58:04].

12  Stefan Lumiere:  Yes.

13  Chris Plaford:  Look --

14  Stefan Lumiere:  [PH 0:58:06] Some bonds par, they're probably fine with make

15  a point, you know?

16  Chris Plaford:  Okay.  In a market like this, you know, you can get, you

17  know, a low, you know, even a low double digit yield that's reasonably safe,

18  that could be interesting.

19  Stefan Lumiere:  I didn't think you were interested in that stuff.  I didn't

20  -- not that you were interested in insurance.  I didn't think you were

21  interested in liquid names.  It sounds like every time we get involved in a

22  liquid name, like, it's too small or we can't do that. [PH 0:58:34] nothing

23  it.  We can't allocate enough capital to it to make sense because it can't be

24  more than 10%.  I know it's a liquid because I know firms have been trying to

25  sell it.  It takes a month to make a single sale.

44

1  Chris Plaford:  But --

2  Stefan Lumiere:  Really off the run off the radar.  You buy it, you own it.

3  And it's levered.  I'm not saying it's not levered.  It sold almost six

4  times.  [PH 0:58:56] I mean if it was me, [INDISCERNIBLE 0:58:57].

5  Chris Plaford:  I mean we've got -- we've got positions that are, you know,

6  250 million, 300 million size of the bonds.  And, look, if it's something

7  that we [INDISCERNIBLE 0:59:10] --

8  Stefan Lumiere:  This is smaller though.  This is -- that's what, you know,

9  and this is like a $160 million issue.

10  Chris Plaford:  That's fine.  I'm just saying, you know, we do have positions

11  that are not -- well, if it's 150, then that would be small.

12  Stefan Lumiere:  Literally, like I'd be -- I doubt whether we could

13  buy more than 3 million if we wanted to at this point.

14  Chris Plaford:  Okay, well --

15  Stefan Lumiere:  So it's like are we going to spend time -- I guess why even

16  bring it up.  Like what are we going to do?  We're going to put $3 million on

17  it and it gets taken out in like three months.

18  Chris Plaford:  For $3 million, no, but there's a disconnect somewhere because

19  hasn't Jason talked to you about this name?  [INDISCERNIBLE 0:59:54].

20  Stefan Lumiere:  Well, I did talk about it.

21  Chris Plaford:  -- about it?

22  Stefan Lumiere:  Yes.  Talk to him many times.

23  Chris Plaford:  He's been pressing and I asked him several times to check on

24  the liquidity and he seemed to think that it is --

25

45

1    [1:00:01]

2

3    Stefan Lumiere:  Yes.

4    Chris Plaford:  -- [PH 1:00:05] not transactable.

5    Stefan Lumiere:  It was.  There was a period at, you know, throughout the

6    years where there's been 8 million for sale.  He had been trying

7    to sell it and has not been able to sell it.  And that's been it.  It's been

8    [PH 1:00:18] Liberatas trying to sell it.  So it was transactable on $8

9    million and it took that long to place it.  It's not there now.  I know

10   they've traded most of it.  I think there might be two, three more in line.

11   and now it's at a level where it's like, okay, now everybody's betting on it

12   on their refi.  Likely will get done, there's value there.  It's covered, but

13   like there is -- am I going to say it's an impossibility that there is [PH

14   1:00:46] somewhat hope for a structuring?  No., I don't think it's likely.

15   [PH 1:00:50] We'll take [INDISCERNIBLE 1:00:50] --

16   Chris Plaford:  Look, if the name -- if a -- if the name that has, you know,

17   [INDISCERNIBLE 1:01:01]

18   Stefan Lumiere:  Sorenson is a name I've spent countless weeks and hours on.

19   Chris Plaford:  Sorenson's getting harder because it's -- [PH 1:01:12] not if

20   we argue about healthcare.  I think the -- like I said before, there is not -

21   - there is a -- there is a lot of shit that we -- that we are -- it takes us,

22   a long time.  I mean there is enough names in healthcare that it takes us,

23   you know, longer than, you know, there's always things that we'd like to be

24   doing that we're not.  I would be very happy to plug you in to having more

25

46

1   responsibly on this stuff, but we have to have a better communication.  I

2   mean that's the bottom line.

3   Stefan Lumiere:  Well, it sounds like it.

4   Chris Plaford:  I can't -- I can't go, you know, when Jason asks me, hey, has

5   anybody looked at CRC?  And I say, oh, I don't know.  I think Stefan may have

6   looked at it a while back.  I have no idea.

7   Stefan Lumiere:  Jason knows that [INDISCERNIBLE 1:02:18], but we talk -- but

8   we talked about it many times.  He knows I've done the calls up until, you

9   know, August of last year.

10  Chris Plaford:  But that's still -- but August of last year, that was six

11  months ago.

12  Stefan Lumiere:  Yes, and the way I looked at it, it was like I didn't think

13  you would want to.  I didn't think you'd want it.  It's a very liquid.  I

14  knew there was 8 million for sale.  No buyers.

15  Chris Plaford:  Yes.

16  Stefan Lumiere:  Down at, you know, 88.  No buyers.  So it's like if there

17  are no buyers, there's nobody to transact.  We buy it, like if you decide you

18  want to take some off, like, we're screwed.

19  Chris Plaford:  That's fine, but CR -- and maybe CRC is too small.  But I

20  look, I look at the workload for all the guys for any -- in any given week,

21  right?  I'm struggling to get -- and there's stuff to do in equity, you know?

22  There is a lot of moving pieces in healthcare right now.  There's ACA

23  implementations going on right now.  The exchanges are all brand new.  That's

24  going on right now.  There's all kinds of potential changes to reimbursement.

25  You know, labs are a new area for us we've been spending a lot of time with.

47

1   right, in addition to all of the other stuff, you know? I don't have enough

2   people, you know, to work on even all of the ideas that I have, right?

3   There's plenty of stuff to do, but, you know, in a given -- in a given week,

4   right, we'll bang out, you know, probably three or four of those types of

5   names, right? So it has to go on a -- look it -- you -- go one of two ways.

6   You're going to get paid on the ideas that you work on regardless. If you --

7   if you want to have, you know, more autonomy, right, then we're going to need

8   more communication either way. But it'd be a lot easier, right, to have the

9   communication beforehand as opposed to you trying to guess, you know, what

10  we're interested in and what we're not interested. Who's been doing work on

11  this or that, right? Then we should sit down and talk about them. I mean it

12  has to be a quicker turnaround time than eight months.

13  Stefan Lumiere: I know we've had this [INDISCERNIBLE 1:04:36], like in --

14  like the size of the fund, it does not make sense to invest unless we get at

15  least $15 million on [PH 1:04:42] the pat of something. And I didn't think

16  there'd be one that we put $50 million on.

17  Chris Plaford: And CRC may not.

18  Stefan Lumiere: Yes.

19  Chris Plaford: But Miodo's a lot bigger.

20  Stefan Lumiere: Yes.

21  Chris Plaford: Nobody's looking at that at all. And I didn't even know --

22  Stefan Lumiere: I e-mailed you. I told you I was looking at it.

23  Chris Plaford: Yes. You did, and then I said, and I told Jason and -- Jason

24  asked about it because Jason had a conversation [INDISCERNIBLE 1:05:05].

25

48

```
 1   [1:05:05]
 2
 3   Stefan Lumiere:  I told him everything about the business.  Explained to him
 4   how it worked.  Explained to him how the evaluations worked and I think he --
 5   I think he liked the loans better, but --
 6   Chris Plaford:  Jason's not [INDISCERNIBLE 1:05:22] --
 7   Stefan Lumiere:  But --
 8   Chris Plaford:  [INDISCERNIBLE 1:05:23] generation.
 9   Stefan Lumiere:  I'm looking for the catalyst, like right now.  So I think
10   it's -- I think it's interesting.  It's trading down significantly.  They've
11   had an operation mishap.  We could probably -- something we probably need to
12   get comfortable with management.  Is it possible that it's a Nebraska book
13   situation, like are they [PH 1:05:43] fucking up that bad internally?
14   Possible.  [INDISCERNIBLE 1:05:49].  They've done a very poor job of getting
15   their sales and that work up to speed in reselling this new platform.
16   Really bad, bad job.  So there's a not -- and not -- and it's not a function
17   of the business.  It's a function of the way they're trying to sell.  There's
18   a change -- they're changing a little bit and moving away [PH 1:06:12] from
19   many use, and they're trying to sell on a per monthly minimum usage.  So
20   that's a change in structure and people, and they haven't explained very well
21   how that might benefit the customer base.  So they're having trouble
22   explaining that and getting people to convert over.
23   Chris Plaford:  Okay.  So --
24   Stefan Lumiere:  They haven't lost any contracts, but there is definitely an
25   issue there.
```

49

1   Chris Plaford:  Okay.  So when we can sit down and do a thorough review?

2   Stefan Lumiere:  Mmodo?  Monday, Tuesday.

3   Chris Plaford:  Well, why don't you let me know when you're ready?  That

4   would be a great name for you-- for us to [INDISCERNIBLE 1:06:55].

5   Stefan Lumiere:  I'm just building the model now.  It's really scattered

6   because I got very limited financial information.

7   Chris Plaford:  Okay.

8   Stefan Lumiere:  So --

9   Chris Plaford:  That would be a great --

10   Stefan Lumiere:  [INDISCERNIBLE 1:07:01].

11   Chris Plaford:  Okay.  But, again, you know, I want -- I want to be very

12   clear here.  I would love to have you take on more responsibility, but I mean

13   the communication is so key, right?  I -- it -- I would -- I would love --

14   and, you know, and not just that.  Even on, you know, regular stuff.  There

15   is plenty of, you know, like I said, you know, even equity ideas.  That we're

16   doing a lot more of those.  There's plenty of stuff with catalysts, there's

17   plenty of stuff that needs to be vetted out.  Look, you know, I would -- I

18   would love -- I would love to see you, you know, with a dozen names

19   back on the -- back on the pad.  I mean, you know, we're completely aligned

20   in that respect and there's plenty of stuff to do, but, you know, it -- for

21   now at least it has to be in healthcare as we talked about.  And, you know,

22   it -- we have -- but we obviously have to be -- we have to be making money,

23   right?  I mean that's, you know, granted I think there is a lot of stuff, you

24   know, that's harder -- that's harder for you, you know, that it's harder to,

25

50

1  you know, think about what is an appropriate compensation on, you know, on,
2  you know, a name where, like a -- like a Bellus, right?
3  Stefan Lumiere:  I got it.  I got it.
4  Chris Plaford:  But at the same time, you know, we're still -- at least in
5  the last couple years, we still have been losing money.  And it's not like
6  Bellus is, you know, making the delta between --
7  Stefan Lumiere:  Yes, I'm not saying it's just Bellus.
8  Chris Plaford:  It's not like Bellus is worth five --
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

58

1    end, my end and and we should do it because if we don't,
2    there's other people that will.
3    STEFAN LUMIERE:  Yeah, but who else will?
4    JASON TITTLE:  Again, I don't know, but I don't
5    know.
6    STEFAN LUMIERE:  Well, I don't want to use it as
7    a bargaining chip and I told them don't use this as
8    bargaining chip because you can'-- that's when I spoke
9    about lawyers.  You try to use this as a bargaining chip,
10   it's going to be considered extortion.
11   JASON TITTLE:  Yeah.
12   STEFAN LUMIERE:  And that's an offense.
13   JASON TITTLE:  But that's good for us then.
14   STEFAN LUMIERE:  If what?
15   JASON TITTLE:  Meaning (indiscernible) is not
16   going to do it, then we know we're first in, right?
17   STEFAN LUMIERE:  (indiscernible) is not going to
18   do it.
19   JASON TITTLE:  Yeah, that's good then.  But I'm
20   just saying there's other people that could.  So --
21   STEFAN LUMIERE:  But who else?
22   JASON TITTLE:  Look, I don't --
23   STEFAN LUMIERE:  But there's nobody else that was
24   involved in the credit stuff.
25   JASON TITTLE:  Lee and Ammish.

A143 p1

8/31 Lemere / Indemnity / Advancement –

Licensure to implicate – Biggest thing

Chizman – Going through [illegible]
[illegible] – Sam Gray – Supplement → replace
Asks: Indemnification; Advancement

Options: 1) No
2) Yes – blank check
3) Conditions

A is substantive matter – [illegible] [illegible]
Pros 1) Not guilty
2) Plead = no coop
3) Convicted
4) Cooperating

Facts: [illegible] technical [illegible] type
& [illegible] getting info

There are ways to figure out if [illegible] (Facts)
or [illegible]

JT-JG-6-4-13 00:00:22 - 00:04:48

A144 p1

A 144 p 2

2

1  [00:00:22]
2  JASON THORELL:  Kind of a serious matter and I'm trying to strike a fine
3  balance between my own job safety and respect for Vistium, uh, as a firm.  So,
4  I guess it has to do with backing up a year and a half ago.  Um.  Chris
5  called me into his office and said they're - he wants to change the way he
6  does the monthly pricing process, where he'll send me an attachment of the
7  pricing overrides, on email, no subject, and then I attach it to like my
8  desktop or whatever.  And then reattach it to a new email where I send out to
9  Accounting and Ops and all that, basically creating the façade that it's
10  coming from me.  Which, I didn't like the idea, but, you know, I felt like I
11  had to comply just because, you know, I had job safety concerns and there's
12  no proof of the conversation that took place.  So, I was put in a very
13  difficult spot.
14  JACOB GOTTLIEB:  So what happens when Chris sends you a template?
15  JASON THORELL:  Yeah.  On a blank email.
16  JACOB GOTTLIEB:  Yeah.
17  JASON THORELL:  On a blank email.  I get the email, immediately attach it to
18  a separate email, send it off to Accounting and then Ops.  Um.  And then,
19  Chris, you know, made it clear not to convey this to anyone else in the firm,
20  and basically to maintain the façade that I have complete jurisdiction over
21  the pricing process, which I have zero.  Um.  And my concern is that - I mean
22  it's pretty obvious, my concern.  It's disingenuous.  Um.  Whether or not the
23  marks are accurate or not, I don't think is the issue.  I think the issue is
24  that I'm put in a spot where it looks like it's coming from me and I have
25  discretion over the marks, when it's not, and my name is behind that.  Um.

3

1  So, with month-end coming up, this is not a precedent I'd like to continue.
2  I think it's largely unethical, um, along, just to put it modestly. And the
3  fact that the whole conversation was unrecorded; no meetings, no phone calls,
4  just word of mouth, and told not to mention this to anyone. It was a very
5  troubling situation to be in. Um. And I want to maintain my job. So, I had
6  nothing of substance to point to, to say this conversation took place. Um,
7  and I know that was done by design. I've probably been in Chris's office,
8  other than my two reviews, probably two times. So that is saying
9  something. Um. The whole thing is just - all I want to do, my only
10  objective, is to fix this where I'm not in that position. Um. And to move
11  on, and to be the credit trader for this firm, and so on. Um. That's my only
12  intention. I've not disclosed this to anyone but an attorney I'm working
13  with, and there's - outside of that, that's it. 'Cause I felt like I needed
14  legal advice.
15  JACOB GOTTLIEB: Uh.
16  JASON THORELL: And I just want to make sure that you're aware that's my only
17  objective, is to somehow figure out a solution to fix this, where I'm not
18  putting my name behind that email. It's a very, as you can imagine,
19  unenviable position I was put in. Um. And I don't want to maintain that
20  precedent.
21  JACOB GOTTLIEB: And so, um [long pause] So you're, you're getting the
22  spreadsheet, Excel spreadsheet -
23  JASON THORELL: Umhuh.
24  JACOB GOTTLIEB: And then you're forwarding.
25  JASON THORELL: Not. No. That was made abundantly clear.

1   JACOB GOTTLIEB:  You're cutting and pasting it.

2   JASON THORELL:  Cutting and pasting it.

3   JACOB GOTTLIEB:  Yeah.

4   JASON THORELL:  So, to eliminate any representation that it's coming from

5   Chris.

6   JACOB GOTTLIEB:  Right.

7   JASON THORELL:  New email.

8   JACOB GOTTLIEB:  And what are these marks? These marks are --?

9   JASON THORELL:  The overrides.  So anything — we get our bond marks from —

10   JACOB GOTTLIEB:  So they're the ones that are not traceable?

11   JASON THORELL:  Not necessarily.  They're the ones that — the way it works is

12   that if we're going to override a position, uh —

13   JACOB GOTTLIEB:  These are the overrides.  Okay.

14   [0:04:48]

15

16

17

18

19

20

21

22

23

24

25

4

[00:06:55]

1

2   JACOB GOTTLIEB:  Yeah.  So, so, let me ask you this question.  I mean, do you

3   think that those things are being mismarked?

4   JASON THORELL:  Um.  There are times when I—

5   JACOB GOTTLIEB:  Do you think that they're being materially mismarked?

6   JASON THORELL:  See, on some of the bigger positions, CMED, I'm not in the

7   valuation committee—

8   JACOB GOTTLIEB:  So you don't know.

9   JASON THORELL:  On CMED, something like that, that is a material position --

10  JACOB GOTTLIEB:  [inaudible]

11  JASON THORELL:  I don't want to comment on those because I'm not involved.

12  Yet my name is behind it.  So I can kind of answer your question, but my main

13  point is whether they are or not, I don't want to be the one sending it out

14  when I'm not, you know, approving it, or involved in the process.  I'm just

15  the guy sending it out, um, in response to someone else telling me this is

16  the mark.  So, outside of those names, I think some are aggressively

17  mismarked, to be candid.

18  [00:07:51]

19

20

21

22

23

24

25

2

1    [00:09:35]

2    JACOB GOTTLIEB: We talked about that before. Um. And, and I appreciate

3    that you are bringing this to my attention, that is, I think, you know, the

4    right thing to do, to get it fixed and resolved. Now, you know, in the last

5    number of weeks, we've actually been working on pricing and we've determined

6    to, uh, the last I heard, the Valuation Committee had just determined not to,

7    uh, have investment-side input into it, so I think that this issue might be,

8    uh, completely obviated.

9    JASON THORELL: Okay.

10   JACOB GOTTLIEB: Which pretty much is like the best –

11   JASON THORELL: That would be great.

12   JACOB GOTTLIEB: Well, that – that's sort of the best thing that I've heard

13   so far in this conversation, that since, you know, because of the

14   redemptions, because of – uh – the – uh – doubt in pricing some of the

15   securities – uh – the Committee was moving to work on, work off of,

16   observable trades.

17   JASON THORELL: Umhm.

18   JACOB GOTTLIEB: Rather than as much, uh, any analysis.

19   JASON THORELL: Umhm.

20   JACOB GOTTLIEB: And then also, for CMED and ETI, in particular, we had third

21   party valuation, uh, for that, and then they're doing that again.

22   JASON THORELL: Right.

23   JACOB GOTTLIEB: So, you know, I think that, overall, I think that the

24   actual-effects are not large.

25   [00:11:37]

2

1 [0:21:00]
2 JACOB GOTTLIEB: Right. Right. Um. Okay. So, you know, look, you know,
3 like this is a problem. Uh. And you know, I think that what we were doing
4 was going to sort of obviate that problem anyway, by having the Valuation
5 Committee do without investment team input.
6 JASON THORELL: Mhm.
7 JACOB GOTTLIEB: You're —
8 JASON THORELL: I wish I had known that.
9 JACOB GOTTLIEB: Right.
10 JASON THORELL: Yeah.
11 JACOB GOTTLIEB: Then you might not have had this conversation.
12 JASON THORELL: Nope.
13 JACOB GOTTLIEB: Uh, but, uh, like, you did. Uh. And I think that's the
14 right thing, because you didn't know that. How would you know that?
15 JASON THORELL: Yeah.
16 JACOB GOTTLIEB: So, uh, you know, I'll — I'm going to have to go to
17 Compliance. Uh, and —
18 because I think that's the only — that's the only possible —
19 JASON THORELL: Mhm.
20 JACOB GOTTLIEB: — thing for me to do.
21 [00:22:13]
22 I don't know what, you know, what the issues are. Hopefully there are none,
23 but I have to tell Compliance, and you know, they'll be able to look at it.
24 And hopefully there's nothing they'll need to do.
25

A14Y P8

3

1    JASON THORELL: I hope so. That's all I want to do, is just move on and get
2    over this, and --
3    JACOB GOTTLIEB: Yeah, it's a crappy, uh --
4    JASON THORELL: It's a tough. It's a --
5    JACOB GOTTLIEB: -- situation.
6    JASON THORELL: It's not good for you; it's not good for me; and I hate to be
7    here.
8    JACOB GOTTLIEB: It's not good for anybody. And, you know, on top of the
9    fund's losing assets, and that means that we make this tougher, and you know,
10   selling our positions and
11   start putting a little pressure on them, and, you know. Part of the problem
12   is that our performance has been a little -- uh -- has been soft -
13   JASON THORELL: Um.
14   JACOB GOTTLIEB: - for the last couple of years. Hasn't been terrible, just
15   soft.
16   JASON THORELL: Yeah.
17   JACOB GOTTLIEB: And that's, you know, it's - uh - it's not awesome.
18   JASON THORELL: No.
19   JACOB GOTTLIEB: But you know.
20   JASON THORELL: So how much will we have left in the credit fund?
21   JACOB GOTTLIEB: I think, after these redemptions, about 200. Then we have,
22   we have assets in the
23   Balanced, so -
24   JASON THORELL: 200's nimble enough when you don't - like, a hundred, you
25   almost have no safety cushion. Not - you do have some, but --

4

1    JACOB GOTTLIEB: Leverage.

2    JASON THORELL: Leverage, right. But 200 is – you're nimble enough, where –

3    I'm trying to put a positive –

4    JACOB GOTTLIEB: That's the Fund. And, then, you know, there're, there're

5    Balanced Assets –

6    JASON THORELL: Yeah.

7    JACOB GOTTLIEB: and [unclear] Credit, so, that's something. That's potential

8    for P&L. Um, [unclear].

9    JASON THORELL: Yeah, um, you know, just being credit traders here, I'm

10   open to putting new ideas in front of you, if I see something, then, whether

11   it's structured products or like the royalty pharma payments that actually –

12   I was looking at that, like, 2 years ago, so it was interesting to see when

13   we hired those guys. Um, when I saw that there was a like a, you know,

14   [unclear], a haircut to receivables, that we had 20% exposure. Those things

15   trade like – that's something that was put in front of me, and then I see

16   these guys being hired, like that's what they do. So, I would like to be

17   more, you know, out in front, and communicating ideas that the firm, credit-

18   wise, would be open to.

19   JACOB GOTTLIEB: Yeah, I mean. I don't think anybody will complain about

20   being shown ideas. Um. You know, I don't do individual securities.

21   JASON THORELL: Right.

22   JACOB GOTTLIEB: So, it's not for me. In my run of the bandwidth, I have –

23   JASON THORELL: Yeah.

24   JACOB GOTTLIEB: -- other – you know, other things going. Uh, but I'm sure

25   everybody would – you know – I mean, if [unclear] to complain about not being

1  shown ideas — the problem is that a lot of times, you know, most of the

2  time, ideas that flow down, you know, are derivative of some fund trying to

3  unload that onto the rest of the world.

4  JASON THORELL: Right.

5  JACOB GOTTLIEB: Or a broker that has some inventory that they're trying to

6  unload.

7  JASON THORELL: Really.

8  JACOB GOTTLIEB: To the rest of the world. Yes. So, uh, you know, and you

9  know, that it — but, but certainly, ideas are always, I think, people would

10  want to get a peek at ideas that are out there. Uh. All right. So I'm going

11  to balance [?] this appropriately.

12  JASON THORELL: Okay.

13  JACOB GOTTLIEB: And then, uh, you know, somebody [unclear] will talk to you.

14  JASON THORELL: Okay.

15  JACOB GOTTLIEB: Will give you a ring.

16  JASON THORELL: Okay.

17  JACOB GOTTLIEB: All right? Thanks for coming in.

18  JASON THORELL: All right. You're welcome. Hopefully, you understand the

19  situation, and apologies if it's not the best conversation.

20  JACOB GOTTLIEB: Yes.

21  JASON THORELL: Thanks, Jake. JACOB GOTTLIEB: Thank you.

22  [00:26:16]

23

24

25

5

1

JT-SK-1-7-13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1            [0:01:16]
 2    David Kelly:  I think the other point you raised was the concern about
 3    potentially illicit activity that was happening, and that you might have been
 4    having a hand in being involved in that --
 5    Jason Thorell:  Yes.
 6    David Kelly:  -- over a period of some time.  And, in part, I think, the
 7    reason we have Steve here is, really, when I mentioned this issue to him --
 8    neither one of us, by the way, can figure out why Chris would have asked you
 9    to keep that process secret.  We have no doubt that he did.  We're not sure
10    why he did, and we will never find out without being able to ask him, which
11    of course, defeats --
12    Jason Thorell:  Yes.
13    David Kelly:  -- the whole purpose of making sure that there's no retaliation
14    against you.
15    Jason Thorell:  Yes.
16    Steve Ku:  Yes.
17    David Kelly:  But I wanted Steve to explain exactly -- and this is also to
18    reassure you -- why what appeared to be something that was bad, in fact,
19    because of the way things are handled --
20    Jason Thorell:  Yes.
21    David Kelly:  -- in the back office, wouldn't have made a bit of difference
22    anyway.
23    Jason Thorell:  Okay.
24    Steve Ku:  So I think that'll clarify a lot of things first of all.  So the
25    reason why I wanted to
```

2

3

1  speak to you is because being on the Valuation Committee --

2  Jason Thorell:  Yes.

3  Steve Ku:  -- I understand how all this works.  So I think to have a clearer

4  picture of that I think would be very helpful.

5  Jason Thorell:  Yes.

6  Steve Ku:  So the first thing is, as David says, I'm not sure why we had to

7  have this process where Chris would provide numbers, and then you would have

8  to --

9  Jason Thorell:  It's been a while, but from what I recollect, the rationale

10 was that -- and I don't want to get this wrong, because it's important, but

11 it -- I'm pretty sure this is the case -- it's been a while, but I think the

12 way it was pitched was that it was a decision made, what committee I don't

13 know, and I'm probably spoken in general terms, a decision had been reached

14 that did -- marks have to come from the trader.

15 Steve Ku:  Okay.

16 Jason Thorell:  Does that make sense?

17 Steve Ku:  I am aware that came from, because you said -- as you said it's

18 probably something that happened a long time ago, but just so you know, on

19 our side, as part of the Valuation Committee, whether it's Operations or

20 Accounting, whether it comes from a trader --

21 Jason Thorell:  Yes.

22 Steve Ku:  -- or a portfolio manager at Visium, it's all internal.

23 David Kelly:  [INDISCERNIBLE 0:03:42].  Yes.

24 Steve Ku:  So it doesn't really matter to us.

25 Jason Thorell:  Right.

1 Steve Ku: And internal data that we get, like pricing, credit spreads --

2 David Kelly: Yes.

3 Steve Ku: -- market color or whatever, we use that as indications, so that

4 we know --

5 David Kelly: Right.

6 Steve Ku: -- that if we get a price from the outside, whether it's Reuters,

7 or Bloomberg, or a broker, that it's something within reasonable

8 expectations. So we use it as indications.

9 Jason Thorell: Right.

10 Steve Ku: We never use internally generated information, especially for

11 valuations, for our official NAV for investors, or our track record, and

12 especially not in the audits, of

13 course. Okay? So here is the whole process. Once we get -- and you're not

14 the only person. Other people in the firm also provide us with --

15 Jason Thorell: Yes.

16 Steve Ku: -- indicative prices for their books.

17 Jason Thorell: Yes.

18 Steve Ku: Once we get that, we use that as sort of a yardstick. Then,

19 depending upon the

20 position, whether it's a bank loan --

21 Jason Thorell: Right.

22 Steve Ku: -- or a bond, or whatever, we'll get prices from different

23 sources.

24 Jason Thorell: Yes.

25

4

5

1   Steve Ku:  All independent.  Not only do we use those independent prices

2   internally for marking our month-end books --

3   Jason Thorell:  Yes.

4   Steve Ku:  -- which is the official NAV, and I'll just show you this, this is

5   really just --

6   Jason Thorell:  Yes.

7   Steve Ku:  -- for investors, but- Mortgage Fund Services -

8   Jason Thorell:  Yes.

9   Steve Ku:  -- our administrator, has to independently [PH 0:05:03] see the

10   prices themselves.

11   Jason Thorell:  Yes.

12   Steve Ku:  So, if you look, recently 90% was independently confirmed by them.

13   [0:05:10]

14

15

16

17

18

19

20

21

22

23

24

25

2

```
1    [0:05:33]
2    Steve Ku:  So, Fund Services independently verified --
3    Jason Thorell:  Right.
4    Steve Ku:  -- the prices anyway.  They don't care about our internal marks.
5    Jason Thorell:  Right.
6    Steve Ku:  Secondly, Ernst & Young, our auditors, will also review
7    everything.  And this is their most recent letter, this is a -- something I
8    can show you.
9    Jason Thorell:  Yes.
10   Steve Ku:  This from March.  It's for all of the 2012 numbers, but they do
11   this every year.  So they also independently confirm whatever valuations we
12   use --
13   Jason Thorell:  Yes.
14   Steve Ku:  -- whatever processes we have.  So the internal data, which we get
15   from you and other people on the desk, as well as some PMs, depending on the
16   book they manage, we find it very helpful.  We use that to make sure that
17   whatever we get from the outside is within expectations.
18   Jason Thorell:  Yes.
19   Steve Ku:  But it's really not our final price.
20   Jason Thorell:  Yes, right.  Understood.
21   Steve Ku:  So, the impact, at the end of the day, on our books and records,
22   performance, everything that gets reported to investors and banks and other
23   people who are involved, there is no impact.
24   Jason Thorell:  Right.
25
```

1    Steve Ku:  It's really all done independently.  These are the official

2    figures.

3    Jason Thorell:  Okay.

4    Steve Ku:  Okay?

5    David Kelly:  Was there anything else that you were aware of other than this?

6    I mean just to make sure that we're --

7    Jason Thorell:  No, it's good that we have the checks in place here.  So, I -

8    -

9    Steve Ku:  Oh, yeah, yeah, yeah.

10   Jason Thorell:  I don't know -- I'm confused why I was asked -- told to be in

11   that position, when

12   that's another -- like --

13   Steve Ku:  I thought --

14   Jason Thorell:  -- that's the crux of the issue, but --

15   [0:06:52]

16

17

18

19

20

21

22

23

24

25

3

2

[0:08:02]

1

2  Jason Thorell:  For all the reasons you probably filled in by now, I got the

3  impression that he was doing it so that if there ever was an issue with the

4  mark, I'm the fall guy.  I mean that's -- seriously, that's how I --

5  Steve Ku:  Wow, I feel terrible.

6  Jason Thorell:  But I --

7  David Kelly:  But that's actually a more rational [INDISCERNIBLE 0:08:18]

8  Jason Thorell:  I'm -- I mean, I could not draw any other conclusion.  I was

9  going to be the patsy.

10  Steve Ku:  No, I feel terrible, but as you can tell, it's actually had no

11  impact --

12  Jason Thorell:  Which makes it --

13  Steve Ku:  -- whether you sent it or he sent it.

14  Jason Thorell:  Yes, in -- which makes it confusing why those -- I'm sure

15  Chris knows all this.

16  Steve Ku:  Of course.

17  Jason Thorell:  Yes.  So --

18  David Kelly:  Yes.

19  Jason Thorell:  I don't know why you would do that at that point.  So I don't

20  have an answer for

21  that.

22  Steve Ku:  Okay.

23  Jason Thorell:  But I can't take any other conclusion.  That's what I was

24  drawing as a conclusion there.

25  Steve Ku:  Well, here, let me ask you this.

A 1/15 p g

2

1 [00:09:01]

2 Steve Ku: They get that prices from Reuters, IDC, from, you know, Barclays,

3 Citi and other places.

4 Jason Thorell: Yes.

5 David Kelly: Those are the sources, not --

6 Jason Thorell: Right.

7 Steve Ku: Not us.

8 Jason Thorell: Yes. So like, I guess, that's it -- had those checks not

9 been in place, it's comforting to know that's good. It was also -- but

10 regardless, it was my main focus, clearly we're concerned about the [PH

11 0:09:26] actual levels, I get that. But my focus was, number one, just to

12 not have this continuous process, because I don't get --

13 Steve Ku: Well, you've got -- look, in that regard -- and I'm sorry you felt

14 this sort of, you know, this sort of

15 [00:09:39]

16

17

18

19

20

21

22

23

24

25

2

```
 1    [00:11:13]
 2    David Kelly:  Well, I think you know --
 3    Jason Thorell:  I and it's a delicate balance because I'm not -- I'm not
 4    trying to -- I don't think there's like any -- clearly there's no guilt
 5    being, you know, addressed towards me.  And I'm not about to say I'm guilty
 6    because I'm not.  But at the same time, I've had, you know, legal advice, as
 7    you're aware.  My outside attorney advise -- does -- I would have to agree
 8    with him.  I don't like the concept of putting my name -- and if, you know,
 9    it doesn't matter, no one will see it, all that, but just --
10    Steve Ku:  Okay.  Well, let me take you there.
11    Jason Thorell:  -- the whole concept --
12    Steve Ku:  Why don't you just forward what Chris sends you, with his --
13    Jason Thorell:  Yes.
14    Steve Ku:  [INDISCERNIBLE 0:11:57].
15    Jason Thorell:  Like, that's totally fine with me.  Clearly that -- he --
16    that goes against what he told me, but that, at this point, I'm not really on
17    board with that any more.
18    Steve Ku:  Okay.
19    Jason Thorell:  So --
20    Steve Ku:  Let's just do this, then.  What I'll -- what I'll do is --
21    because, I mean, this is no big deal for us.
22    Jason Thorell:  But --
23    Steve Ku:  What I'll do is, I'll say, look -- because it's 2:30, you know,
24    we've had a lot of --
25    Jason Thorell:  Right.
```

1  Steve Ku:  You know, the Credit Fund has gone through a lot of stress, as you

2  know.  We've had to sell off a lot of stuff.

3  Jason Thorell:  Yes.

4  Steve Ku:  Big redemptions.  And so things are changing.

5  Jason Thorell:  Right.

6  Steve Ku:  So, what we can do, and I'll drive this.  I'll just say, look,

7  from a pricing stand point, now that we're down to fewer positions, rather

8  than getting indicative prices from you any more, right, because you're

9  sending it to who these days?

10  Jason Thorell:  Sudarshan.

11  Steve Ku:  Sudarshan.

12  Jason Thorell:  In Accounting.

13  Steve Ku:  Okay. So what I'll do is I'll call those guys, look, we don't have

14  to get those prices any more.  We'll just use our independent sources, and

15  I'll have a word with

16  Chris.  Tell him, look, we're going just use independent sources.  If you

17  want to start sending us information again, like you've been doing --

18  Jason Thorell:  Yes.

19  Steve Ku:  -- through Jason, then just send it to us directly.  Like, I won't

20  say that you --

21  Jason Thorell:  Yes.

22  Steve Ku:  -- that we spoke, or anything like that because we are changing

23  the process, because the Credit Fund itself --

24  Jason Thorell:  Right.

25  Steve Ku:  -- is changing.

Case 1:18-cv-09170-JSR-BCM   Document 25   Filed 01/31/19   Page 88 of 155

1  [00:15:03]

2  Steve Ku:  Sometimes it's hard to assess the fair mark without some input

3  from the trader or the portfolio manager.  Input.

4  Jason Thorell:  Yes.

5  Steve Ku:  It's like, hey, this is what is happening with --

6  Jason Thorell:  Right.

7  Steve Ku:  -- the name.  This is the indicative price.  Like that kind of

8  thing.  So --

9  Jason Thorell:  I completely agree with you.

10  Steve Ku:  -- basically, what I'm going to say to Chris is, look, what we're

11  going to do going forward is -- and actually, just so you know, a couple of

12  weeks ago, we had a long discussion with [PH 0:15:29] Lee, on a particular

13  name.

14  Jason Thorell:  Yes.

15  Steve Ku:  So, basically, we're going to say that going forward, if you want

16  input for indicative pricing on a name, you can provide that to us, but

17  that's just going to be on a name by name basis, and --

18  Jason Thorell:  Yes.

19  Steve Ku:  -- whether it's you or lee, it should come from the analyst who's

20  working on the name.  You're not working on the name and as --

21  Jason Thorell:  Yes, for the most part.  Yes.  Like, On --

22  Steve Ku:  [INDISCERNIBLE 0:15:55].

23  Jason Thorell:  Like if it's Oncare, then there's a lot to it that --

24  Steve Ku:  Yes.

25

A 145 P13

Jason Thorell: -- goes into it, but like some more flow names, they're more transparent. It could --

Steve Ku: Yes.

Jason Thorell: I'm not disagreeing with [INDISCERNIBLE 0:16:08] but --

Steve Ku: And I've -- and I've told him in the past that, look, getting prices from you or the Desk

Jason Thorell: Yes.

[00:16:13]

```
 1    [00:17:43]
 2    Steve Ku:  So, yes, and also the other thing is I just got filled in on all
 3    the details this morning.  I mean we would have addressed it earlier last
 4    week.  I was just out all week.
 5    Jason Thorell:  Yes, I understand.  And David mentioned that.
 6    Steve Ku:  So having heard the details from David today, I realized, okay,
 7    there's a part of a -- a big part of the story that I think some people are
 8    not getting, and that is, these are just internal indications we use.  It's
 9    not for the NAV.
10    Jason Thorell:  Yes.
11    Steve Ku:  It's not for performance or the books and records.
12    Jason Thorell:  Right.
13    Steve Ku:  Especially -- or for reporting.  That's all officially done,
14    independently done.  Like you said, these checks and balances have
15    always been in place [INDISCERNIBLE 0:18:20].
16    Jason Thorell:  Right.  Okay.  Well, that's good to know.  I hadn't known
17    that.  So it's more [INDISCERNIBLE 0:18:24].
18    Steve Ku:  Yes, I don't think anybody would invest with us if we didn't have
19    these things in place.
20    Jason Thorell:  Yes.
21    Steve Ku:  So those basics we have covered.
22    [00:18:30]
23
24
25
```

2

2

```
1    [00:20:35]
2    Steve Ku:  If you have any other concerns like that, like --
3    Jason Thorell:  Yes.
4    Steve Ku:  -- David said, feel free to go to him.
5    Jason Thorell:  Yes.
6    David Kelly:  And hey, you know, if I had known as much about the Valuation
7    process as Steve, I could have explained it to you better.
8    Jason Thorell:  Right.
9    David Kelly:  Right.
10   Jason Thorell:  [PH 0:20:50] No, that's --
11   David Kelly:  You know, I think I did explain the concept that, you know, you
12   view everything that comes from the [INDISCERNIBLE 0:20:58] anyway.
13   Jason Thorell:  Yes.
14   David Kelly:  So --
15   Jason Thorell:  Okay.
16   Steve Ku:  Yes.
17   Jason Thorell:  Thanks for fixing this --
18   Steve Ku:  Well [INDISCERNIBLE 0:21:06] --
19   Jason Thorell:  -- as best as possible in a tricky situation.
20   Steve Ku:  No, no.  Not at all.
21   Jason Thorell:  Yes.
22   Steve Ku:  Not at all.  So we'll resolve the rest of it.
23   [00:21:11]
24
25
```

2

1    [00:02:40]

2    SK:    Um, so, the bottom line is, these files that have been passing through

3    you, like I expressed last time, really have no consequence. We don't really

4    use this data.

5    JASON THORELL:  Umhm.

6    STEVE KU:   All of the marks and everything we get from Mark-It, or again,

7    from the outside brokers. That's what we use. So there's really no, there's

8    really no, sort of impact of these files that you've been sending us. So,

9    which is why I thought it was more prudent to just kind of respect your

10   concern about [PH] being found out about this, [PH] meaning Chris. So, I

11   haven't done anything directly yet.

12   JASON THORELL:  Umhm.

13   STEVE KU:   So, I figured, if he sent this to you yesterday, and today. This

14   is just the same process that he's done. Uh, [unclear].

15   JASON THORELL:  Right.

16   STEVE KU:   But, there's really no, especially now we're pulling into smaller

17   ... so these files really have no impact. So I can go to him and say, look,

18   Hey, Chris, this — you don't have to bother with this anymore. Just tell him

19   just to kind of stop it. Or, we just leave it, because it doesn't really

20   [PH] bother you.

21   [00:04:08]

22

23

24

25

A 1 4 1 T p 1

**From:** Feingold, Zachary (USANYS) [mailto:Zachary.Feingold@usdoj.gov]
**Sent:** Friday, April 11, 2014 1:28 PM
**To:** Jeffrey Udell <judell@olshanlaw.com>
**Subject:** Re: Attorneys

Jeff,
Can you please give me a call at 212-637-2436?
Thanks,
Zac

**From:** Udell, Jeffrey A. [mailto:JUdell@olshanlaw.com]
**Sent:** Thursday, April 03, 2014 04:50 PM
**To:** Feingold, Zachary (USANYS)
**Subject:** Attorneys

- Zak

Three things.

First, do you have any ETA on when Mr. Lumiere can receive his computer back, post imaging? I thought that the agent had said a week or two ago that it was almost ready.

Second, as discussed, I look forward to hearing from you shortly about another meeting.

Third, for your review of seized documents, below is a list of the attorneys with whom Mr. Lumiere has had privileged communications. Note that the list is divided into two groups: (i) those with whom he had privileged communications related to personal legal advice about a myriad of things (some related to issues we've discussed and some not at all), including advice received AFTER the execution of the search warrant on his apartment; and (ii) those with whom he had privileged communications in his capacity as a Visium employee.

**Legal Advice Personal:**

Jayme Goldstein-Stroock & Stroock & Lavan
Dennis Hirsch-Stroock & Stroock & Lavan
Dan Ginsberg-Stroock & Stroock & Lavan
Dan Ross-Stroock & Stroock & Lavan
Joel Cohen -Stroock & Stroock & Lavan
Laurence Moy -- Outten & Golden
Tai Park, Doug Jensen, Robert Knuts -- Park and Jensen
Mark Greenwald and others -- Quinn Emanuel
Eric Béffi - Labaton Sucharow
Timothy Barrett- Labaton Sucharow
Alan Abramson, Abramson & Morak
Martin Whitmer- Whitmer & Worall
Guy Petrillo- Petrillo Klein & Boxer
Nelson Boxer- Petrillo Klein & Boxer
Joshua Klein- Petrillo Klein & Boxer
Jay Musoff- Loeb
Jeff Liddle- Liddle & Robinson
Karen Roos- Lawyer
Charles Schaffran-Lawyer
William S. Beslow- Law Offices of William S. Beslow
Jeff Uffner-Stroock & Stroock & Lavan
James Nygard-Stroock & Stroock & Lavan
Ken Pasquale-Stroock & Stroock & Lavan
Bryan Berson- Private Law Practice
Julie Feder Hough- Hough Law Group
Ed LNU- Flabane Law
Louis Flabane- Flabane Law
Josh Bardavid- Bardavid Law

**Legal Advice to Visium**

Jeff Silverstein- Seward & Kissel

Jack Hogoboom- Lowenstein Sandler

David Banker- Lowenstein Sandler

Lawrence Gelber- Schulte Roth

Steven Pohl- Brown Rudnick

Jeb Singer- Brown Rudnick

Robert Stark- Brown Rudnick

Andrew Strehle- Brown Rudnick

Andreas Andromalos- Brown Rudnick

Nicole Runyan- Stroock, Stroock & Lavan

Neil D'Amato- Brown Rudnick

H. Bennett- Stroock, Stroock

Alice Curry- Milberg Weiss

Tony Barnes- Bingham McCutchen

Sayan Bhattacha- Stroock, Stroock & Lavan

Kellie Cairns- Paul Weiss

Jonathan Canfield- Stroock, Stroock & Lavan

Justin Dellecave- Peterson Dellecave

Christine Koo- Sadis & Goldberg

Ron Geffner- Sadis & Goldberg

Jonathan Minikes-Cutler Minikes & Adelman

Jeff Hammapour- Cutler Minikes & Adelman

Timothy Horn- Villani & Deluca

Stephen Peskin- Tolmage, Peskin, Harris

Bob Viner-Securities Lawyer

Richard Nasca- Skene Law

Kurt Roth- Lawyer

Mike Ballas- Louis Flabane & Co

Ward Hendon- Axiom Legal

Steve Hutter- Securities Lawyer

Chris Lombardy- Sadis & Goldberg

Josh Bressler- Bressler Law

10/26/2016

https://mail.google.com/mail/u/0/?ui=2&ik=11ecadce3&view=pt&q=Judel%40wmllaw.com&qs=true&search=query&th=157f839f69f22cd&siml=157f839f69f22cd   3/5



Rebecca Cohen- Paul Weiss

Alex Cotta- Stroock, Stroock and Lavan

Hannah Wright- Bingham McCutchen

James Terry- Bingham McCutchen

Rebecca Zubaty- Paul Weiss

Helena Huang- King & Wood

Cosimo Borelli- Borelli Walsh

Neil McDonald- Hogan Lovells

James Pardo- King & Spalding

Michelle Carter- King & Spalding

Margaret Phillips- Paul Weiss Phillips

Charlotte Rowley- Bingham McCutchen

Claudia Saffar- Brown Rudnick

Dan Saval- Brown Rudnick

Liz Osborne- Bingham McCutchen

Andrew Rosenberg- Paul Weiss

Bruce H. Schneider-Stroock & Stroock & Lavan

Curtis Mehling-Stroock & Stroock & Lavan

Chris Lombardy-Stroock & Stroock & Lavan

Lewis Kruger-Stroock & Stroock & Lavan

Kris Hansen-Stroock & Stroock & Lavan

Howard Lavin-Stroock & Stroock & Lavan

Denise Wilds-Stroock & Stroock & Lavan

Lindsay Wolf-Stroock & Stroock & Lavan

Brett Lawrence-Stroock & Stroock & Lavan

Daniel Epstein Day- Stroock & Stroock & Lavan

Bruce Sneider- Stroock, Stroock & Lavan

Jeffrey A. Udell

OLSHAN

OLSHAN FROME WOLOSKY LLP

Park Avenue Tower

65 East 55th Street

New York, NY 10022

Direct: 212.451.2238

Facsimile: 212.451.2222

Email: JUcell@olshanlaw.com

Web: www.olshanlaw.com

---

To ensure compliance with requirements imposed by the IRS, we inform you that unless specifically indicated otherwise, any tax advice contained in this communication (including any attachment to this communication, other than an attachment which is a formal tax opinion) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.

Electronic transmissions by the law firm of Olshan Frome Wolosky LLP may contain information that is confidential or proprietary, or protected by the attorney-client privilege or work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents hereof is strictly prohibited. If you have received this transmission in error, please notify Olshan Frome Wolosky LLP at once at 212.451.2300.

A 147 p5

⊙ Gilbert LLP

Hunter

Thanks,

Would 4pm EST work for everyone?  I want to briefly discuss next steps this afternoon.

team to briefly discuss next steps this afternoon.  Would 4pm EST work for everyone?

I received a call this morning from Visium's outside counsel, Rita Glavin at Seward and Kissel.  The call was cordial.
At the outset, she said that she was pleased to hear that you are considering retaining counsel and we talked a little
about where things stand with the US Attorney's office.  I told her that given the possibility of there being some
developments in this matter in the coming weeks, you would like to retain counsel promptly, which, at the outset,
requires confirmation that such counsel will be compensated.  I requested that she provide us with copies of any
potentially applicable D&O or other insurance policies from 2014 to the present, as well as any potentially applicable
partnership or other governance document that would set forth an indemnification obligation for the company.  She
said that this "may not have to go that far," and that it is possible the company will be fine with funding your defense,
provided that you execute an undertaking agreeing to return any advanced defense costs in the event it is later
determined that you were guilty of a crime or fraud.  I told her that we would need to see the documents that govern
any such scenario before we can assess what you should or should not do.  She said that she would talk to people at
the company about what they can share and what they are willing to do.

In the interim, she said that she needs to better understand what is going on with the US Attorney's investigation and
what may be on the horizon – she didn't seem to know much about your situation and needs to know more to advise
the company.  She asked that your counsel that is dealing with or going to deal with the US Attorney give her a call to
discuss and stated that she would be glad to share with your counsel the information she has regarding the status of
the investigation as to the company.  I think it would be useful to convene a brief call with us and the Gibson Dunn

Stefan,

Cc: "Brodsky, Reed (RBrodsky@gibsondunn.com)" <RBrodsky@gibsondunn.com>, "Halperin, Jason P.W.
(JHalperin@gibsondunn.com)" <JHalperin@gibsondunn.com>, "Gilbert, Scott D" <gilbertscD@gotofirm.com>
To: "Stefan Lumiere (stefanlumiere@gmail.com)" <stefanlumiere@gmail.com>
**Winstead, Hunter** <winsteadh@gotofirm.com>                                                    Wed, Mar 16, 2016 at 12:31 PM

# Visium

M Gmail

2/13/17, 2:41 PM                                                                                                    Gmail - Visium

Subject: Fwd: RE: Re:
Winstead, Hunter
To: RBrodsky@gibsondunn.com<mailto:RBrodsky@gibsondunn.com>; Halperin, Jason P.W.; Gilbert, Scott D;
Sent: Wednesday, March 16, 2016 6:00 PM
From: Stefan Lumiere [mailto:stefanlumiere@gmail.com]

Hunter

Regards,

up with Rita and let you know when I receive a substantive response. Please let me know if you have any questions.
matter before we can evaluate what the dynamic should be between you and the company going forward. I will follow
and that we need to see the documents that address our questions on insurance and/or indemnification as an initial
regarding how companies often deal with similar situations. I clarified for Rita that you have not yet retained counsel
indemnification or advancement to you, and that her comments yesterday were in the nature of a general observation
also clarified that she does not know whether Visium has any sort of governing document that provides for
company and that she understands that this is time sensitive and will push the company to respond promptly. She
forth an indemnification or advancement obligation. Rita confirmed that she has relayed those requests to the
applicable insurance policies and/or any relevant partnership agreement or other governing document that may set
I have spoken further with Rita Glavin at Seward & Kissel and reiterated that we need to see the company's potentially

Stefan,

Subject: RE: RE: Re:
To: Stefan Lumiere; Brodsky, Reed; Halperin, Jason P.W.; Gilbert, Scott D
Sent: Thursday, March 17, 2016 12:59 PM
From: Winstead, Hunter [mailto:winsteadh@gotofirm.com]

gibsondunn.com>
JHalperin@gibsondunn.com<mailto:JHalperin@gibsondunn.com> • www.gibsondunn.com<http://www.

Tel +1 212.351.2690 • Fax +1 212.351.5290
200 Park Avenue, New York, NY 10166-0193
Gibson, Dunn & Crutcher LLP
GIBSON DUNN
Jason P.W. Halperin

Jason

on her to get us the policies/information we need so Stefan can be in the best possible position. Thanks very much,
heard from her by COB today, can you please give her a call first thing in the morning? We want to keep the pressure
Hunter, thanks very much for the update. I take it Rita didn't say when she would get back to you? If you haven't

Subject: RE: RE: Re:
To: Winstead, Hunter; Stefan Lumiere; Brodsky, Reed; Gilbert, Scott D
Sent: Thursday, March 17, 2016 2:08 PM
From: Halperin, Jason P.W. [mailto:JHalperin@gibsondunn.com]

and its attachments, and all copies thereof, without further distributing or copying them.
recipient or have received this communication by error, please notify the sender immediately and destroy this email
This email and any attachments may contain confidential information that is privileged at law. If you are not a named

wevegotyoucoveredblog.com/>.
Visit our blog, We've Got You Covered, at www.wevegotyoucoveredblog.com<http://www.

gotofirm.com<http://www.gotofirm.com/>
Washington, DC 20005
Suite 700
1100 New York Avenue, NW
C 202.368.7167
O 202.772.2344

winsteadh@gotofirm.com<mailto:winsteadh@gotofirm.com>
Hunter Winstead

<image001.gif><http://www.gotofirm.com/>

Hunter

Regards,

I will continue to follow up with Rita and push for these documents.

On the insurance side, Rita said that her partner, who is more conversant on coverage, is in touch with the company and will be reaching out to me to discuss.

I would convey these comments to you, but that we need to see the documents(s) that set forth the company's indemnity obligation before we respond on these points. Rita said she would send us the relevant language.

I have spoken further with Rita Glavin. On indemnity, Rita told me that there is an indemnification obligation for Visium, but it does not include any requirement that the company advance your defense costs. Given the existence of an indemnity obligation, but the absence of an advancement requirement, Rita believes that advancement of your defense costs is not mandatory, but rather is in the discretion of the company. She says that she believes that Visium may be willing to advance your defense costs, but that its willingness to do so would be tied to certain conditions. The conditions that she identified during our call were that: (1) you consider using an attorney that Visium would recommend that is "fabulous" on these matters; and (2) you "talk with the company" about your case. I told her that I would consider these comments to you, but that we need to see the documents(s) that set forth the company's indemnity obligation before we respond on these points. Rita said she would send us the relevant language.

Stefan,

Subject: RE: RE: Re:
Cc: Halperin, Jason P.W.; Brodsky, Reed; Gilbert, Scott D
To: Stefan Lumiere (stefanlumiere@gmail.com<mailto:stefanlumiere@gmail.com>)
Sent: Friday, March 18, 2016 9:01 AM
From: Winstead, Hunter [mailto:winsteadh@gotofirm.com]

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

Visit our blog, We've Got You Covered, at www.wevegotyoucoveredblog.com<http://www.wevegotyoucoveredblog.com/>.

gotofirm.com<http://www.gotofirm.com/>
Washington, DC 20005
Suite 700
1100 New York Avenue, NW
C 202.368.7167
O 202.772.2344

I spoke further with Visium's counsel, Mark Hyland, today and reiterated the following points consistent with our discussion:

1. We are entitled to the policies, particularly given the company's acknowledgment that you are an insured, and if they aren't turned over by COB Friday, we are going to start writing letters in which we assert that the company is tortiously interfering with your rights and that we will take appropriate action to address the company's wrongful conduct with respect to those rights.

2. With respect to the company's obligations in connection with your defense, I reiterated that the excerpt of the partnership agreement that Visium has provided (attached above) requires that the company to defend you and its obligation in this regard necessarily requires that it contemporaneously pay for your attorneys' fees and expenses. I also emphasized that the excerpt that has been provided, in no place, requires you to accept any of Visium's proposed conditions that you execute an undertaking, consider their suggestions for your counsel or have your defense costs subject to any cap. I further emphasized that although I could not disclose who was likely to represent you, it is one of the top firms in the world for these matters and to the extent that the company's concerns really are rooted in making sure that you have competent counsel, as it has stated, that won't be an issue. I asked that Visium acknowledge its unconditional obligation to furnish you with a defense by COB on Friday or else we will proceed with next steps.

As reflected in the attached emails, we have previously made and documented these requests, but the company has obfuscated. In anticipation that they will continue to do so, we will prepare an appropriate letter along the lines that we discussed.

Please let me know if you have any questions.

Regards,

Hunter

⌃ Gilbert LLP

**Hunter Winstead**
winstead@gotofirm.com

O 202.772.2344
C 202.368.7167

1100 New York Avenue, NW
Suite 700
Washington, DC 20005

gotofirm.com

Visit our blog, We've Got You Covered, at www.wevegotyoucoveredblog.com.



**Gilbert** LLP

**Hunter Winstead**
winstead@gotofirm.com

O 202.772.2344
C 202.368.7167
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
gotofirm.com

Visit our blog, We've Got You Covered, at www.wevegotyoucoveredblog.com.

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

**From:** Winstead, Hunter
**Sent:** Thursday, March 31, 2016 4:12 PM
**To:** Hyland, Mark J.
**Cc:** Glavin, Rita M.; Gilbert, Scott D
**Subject:** RE: Stefan Lumiere

Mark,

As I mentioned during our call, it is imperative that Mr. Lumiere immediately receive copies of any insurance policies that potentially provide coverage to him for this matter. These policies were first requested several weeks ago and Visium's continuing refusal to provide them is prejudicing Mr. Lumiere's ability to obtain representation in this matter. I understand from our discussion that you have identified potentially applicable policies that may provide coverage. Please obtain Visium's consent to disclose them immediately.

Please also obtain your client's consent to disclose the entire partnership agreement of which you provided an excerpt last week. As I explained, we cannot be expected to make any assessment regarding Ms. Glavin's representations about indemnity/advancement based on anything less than the entirety of the agreement. If Visium has specific concerns regarding confidentiality, we can discuss an appropriate arrangement that addresses these concerns.

Regards,

https://mail.google.com/mail/u/0/?ui=2&ik=bdab8e6e5b&view=pt&q=ecreiz&qs=true&search=query&th=155656515b0cc52388&siml=155656515b0cc52388   Page 1 of 45

# M Gmail

## Visium

**Eric Creizman** <ecreiz@creizmanllc.com>                                         Wed, Jun 15, 2016 at 7:06 PM
To: Stefan Lumiere <stefanlumiere@gmail.com>

It seems like a waste of time; he's writing letters and if they don't respond, they'll write a more strongly-worded letter. Why keep spinning wheels? Just file a simple lawsuit demanding the policies? They're not agreeing to provide the materials so far. Their demands appear to have no teeth if they don't show they're willing to back it up with action. I don't think it would cost more to draft a simple lawsuit than to draft one of their "stern" letters.

Second, why is he copying  Is he aware you were charged today? And that you had counsel there? Obviously, if you want to retain ▇▇▇▇ then I will not stand in your way. You need to be absolutely comfortable with who you hire. I know their approach would be a lot different from mine, as I was there for 2.5 years and I purposely focused on civil securities litigation and SEC and FINRA matters because I hated the way they handled criminal cases (and they rarely represented individuals, and when they did, they flooded the U.S. Attorney's Office with presentations and pitches to drop cases -- they didn't stand up and litigate). But that doesn't mean they're not great lawyers and smart. They are. But I was there too. I'm just as smart. And better looking.

Let me know if you still want me to call ▇▇▇▇▇ or what.

Best regards,

End.

On Wed, Jun 15, 2016 at 5:42 PM, Stefan Lumiere <stefanlumiere@gmail.com> wrote:

-------- Forwarded message --------
From: "Winstead, Hunter" <hwinstead@gotofirm.com>
Date: Apr 20, 2016 7:33 PM
Subject: Visium
To: "Stefan Lumiere (stefanlumiere@gmail.com)" <stefanlumiere@gmail.com>
Cc: "Brodsky, Reed (RBrodsky@gibsondunn.com)" <RBrodsky@gibsondunn.com>, "Halpern, Jason PW (JHalpern@gibsondunn.com)" <JHalpern@gibsondunn.com>, "Gilbert, Scott D" <gilberts@gotofirm.com>

Stefan,

A 149

37

The terms of the Directors appointment and the Fund's Articles of Association provide that the Directors shall not be liable to the Fund for any acts or omissions in the performance of their services in the absence of gross negligence, willful default, dishonesty or fraud and the Articles of Association contain provisions for the indemnification of the Directors by the Fund against liabilities to third parties arising in connection with the performance of their service to the fullest extent permitted by law.

## 15. ADMINISTRATOR

Morgan Stanley Fund Services (Bermuda) Ltd. is the Administrator for the Fund.

The Fund and the Administrator have entered into an agreement (the "Administration Agreement") pursuant to which the Administrator shall provide the Fund with accounting services including, without limitation, computation of the Fund's net asset value, in exchange for a fee. The Administrator bases its computation on the assets and liabilities reported to the Administrator by the Fund, its prime brokers, custodians and Investment Manager. The Administrator will assume that these assets and liabilities represent a complete record of the Fund's investments as of the date of the Fund's accounting statements as prepared by the Administrator. The Administrator in computing the net asset value of the Fund will use prices that are determined by the Fund in the Fund's sole discretion, and described in the Administration Agreement. In particular, the Fund may specify pricing that the Administrator shall use (such as the prices of listed, liquid securities reported on exchanges and quoted by third-party vendors) or, alternatively, the Fund shall require the Administrator to accept valuations provided by the Investment Manager. The prices of assets and liabilities used by the Administrator in computing the net asset value of the Fund may vary from prices that the Administrator uses in providing comparable services to other clients and from prices that affiliates of the Administrator use in connection with their customer or proprietary business. The Administrator does not assume any duty with respect to the accuracy of any information supplied to it by the Investment Manager. The Administrator is not an auditor and does not provide tax, accounting, valuation or auditing advice, nor is it a fiduciary to the Fund, the Investment Manager or the Fund's investors. The Fund has agreed to indemnify the Administrator for any claim, liability, cost or expense asserted against the Administrator in connection with the provision of services under the Administration Agreement, except to the extent of the Administrator's fraud, willful misconduct or gross negligence. The Administrator may terminate this Agreement by giving to the Fund not less than ninety (90) days prior written notice and the Fund may terminate this Agreement by giving to the Administrator not less than ten (10) days prior written notice although it may be terminated on shorter notice in certain circumstances as described in the Administration Agreement. The Administrator is not responsible for monitoring the Fund's portfolio to determine whether the Fund is in compliance with the investment guidelines and restrictions set forth in this Memorandum.

The Administrator may delegate certain of its obligations under the Administration Agreement to third parties, including its affiliate, Morgan Stanley Fund Services (Ireland) Limited. The Fund is not authorized or supervised by regulatory authorities in Ireland. Shareholders may receive communications from, and direct communications to, Morgan Stanley Fund Services (Ireland) Limited. The Administrator is not licensed by the Bermuda Monetary Authority under the Bermuda Investment Funds Act of 2006 as it does not carry on fund administration business in or from Bermuda. As a consequence, the Administrator is not subject to supervision as a fund administrator by the Bermuda Monetary Authority.

The Administrator is an indirect subsidiary of Morgan Stanley, a global financial services firm providing services in securities, investment management and credit services with more than 600 offices in 27 countries. The Administrator conducts its fund administration business independently from the other financial services provided by Morgan Stanley and its affiliates.

## 16. TAXATION AND ERISA MATTERS

The tax status of the Fund and its Shareholders under the tax laws of the Cayman Islands and the United States is summarized below. The summary is based on the assumption that the Fund is owned, managed and operated as contemplated. The summary is considered in the opinion of the attorneys indicated below to be a correct interpretation of existing laws as applied at the date of this

**Moustakis, Philip**

| | |
|---|---|
| **From:** | Conway, William T. |
| **Sent:** | Thursday, July 16, 2015 10:10 AM |
| **To:** | Szczepanik, Valerie; Riely, Charles |
| **Cc:** | Moustakis, Philip; Sunshine, Jason; Fitzpatrick, Brian |
| **Subject:** | Rozenberg interview recap |

Visium did not, and still does not, have any concerns with ██████████████████████████ the Credit Fund's valuation practices or the valuations of its securities such as ATI and CMED, which we cited as having been marked widely different from where the market was. Rozenberg also said that he was not aware of any pressure from management to keep securities at Level 2.

We also spent some time walking through their valuation process and ███████████████ Rozenberg to concede that broker quotes, regardless of how different they are from the administrator's pricing feeds, were never really questioned. Rozenberg pointed to two securities (ONC and SVNT) where they noted a disparity between John Brooks' quote and the Reuters price and decided to average them out, but he did not have an explanation for why the same treatment was not applied to other apparent mismarkings such as ATI.

-Bill

████████████████████   ███████████████████

William T. Conway III | Senior Counsel | U.S. Securities and Exchange Commission | New York Regional Office | Brookfield Place, 200 Vesey Street, Suite 400, New York, NY 10281 | direct: 212 336 0956 | conway.w@sec.gov

PRIVILEGED & CONFIDENTIAL: This email message (including any attachments) from the United States Securities and Exchange Commission is for the exclusive use of the intended recipient(s) and may contain confidential, non-public, and privileged information. If you are not the intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this email in error, please notify the sender immediately by return email and promptly delete this message and its attachments from your computer system. The sender of this email does not intend to waive any privileges that may apply to the contents of this email or any attachments to it.

3509-3
Rozenberg

FD-302 (Rev. 5-8-10)

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    01/11/2016

- 1 of 8 -

On Wednesday, July 15, 2015, JOSHUA ROZENBERG (ROZENBERG), date of birth [redacted] 1986, social security number [redacted], was interviewed at the New York Regional Office of the United States Securities and Exchange Commission (SEC) by William Conway, Philip Moustakis, and Brian Fitzpatrick of the SEC, Assistant United States Attorney (AUSA) Andrew Bauer of the United States Attorney's Office for the Southern District of New York (SDNY)', and Special Agents (SAs) Matthew Thomas Callahan and Shannon Marie Bienek of the Federal Bureau of Investigation (FBI). Also present for the interview were ROZENBERG's attorneys, Rita Glavin, David Driscoll, and Julia Tebor of Seward & Kissell LLP. After being advised of the identities of the interviewing officials and the nature of the interview, ROZENBERG provided the following information:

ROZENBERG graduated from Yeshiva University in 2008 with a degree in accounting. ROZENBERG passed the Certified Public Accountants (CPA) exam. ROZENBERG worked for PRICEWATERHOUSE COOPERS from September 2008 to December 2010. In December 2010, ROZENBERG joined VISIUM ASSET MANAGEMENT (VISIUM) and has been employed there since. ROZENBERG's current title at VISIUM is Assistant Controller.

In December 2010, ROZENBERG came to VISIUM to work with the firm's Controller, KIM TONG (TONG), and STEVEN KU (KU). From December 2010 to May 2012, ROZENBERG, TONG, and KU were the only members of the VISIUM accounting team. The accounting team's responsibilities focused on the daily, monthly, and yearly reporting of VISIUM's performance. The daily reporting was designed for VISIUM's management and marketing teams. In 2010, VISIUM operated four hedge fund entities with approximately $2.4 billion in assets under management. At the time of this interview, VISIUM operated over 20 entities with assets under management of approximately $7.2 billion dollars. In order to create the daily, monthly, and yearly reporting documents, ROZENBERG worked closely with VISIUM's fund administrator, MORGAN STANLEY FUND SERVICES (MSFS). MSFS was VISIUM's fund administrator since VISIUM's inception in 2005 until 12/31/2013. Subsequently, VISIUM switched fund administrators to INTERNATIONAL FUND SERVICES (IFS).

ROZENBERG was heavily involved in VISIUM's 2011 acquisition of CATALYST INVESTMENT MANAGEMENT (CATALYST). ROZENBERG was involved in the audit of CATALYST that lasted from June 2011 to November 2011. ROZENBERG worked with VISIUM's Investor Relations and Marketing departments in conjunction with the CATALYST acquisition.

Investigation on    07/15/2015    at    New York, New York, United States (In Person)

File #    [redacted]    Date drafted    01/08/2016

by    CALLAHAN MATTHEW THOMAS

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

3509-1
Rothenberg


OFFICIAL RECORD

VISIUM was a multi-strategy hedge fund. Portfolio managers ran individual portfolios. VISIUM had approximately 175 employees – approximately 110 in the front office and approximately 65 in the back office. ROZENBERG was VISIUM employee number 48. Many functions at VISIUM came through the accounting department including profit and loss calculation and trading systems. VISIUM's operations department handles the day-to-day operations of the firm while VISIUM's accounting department handles everything that is not day-to-day.

ROZENBERG's responsibilities have evolved tremendously over time. ROZENBERG supervised the following team of fund accounts:

ZAK KIM, hired May 2012

EVAN CUTLER, hired November 2012

DANIEL LYONS, hired April 2013

HELENA XOO, hired April 2013

GREGORY SNITKIN, hired April 2013

KATIE TANG, hired 2013

CHRISTOPHER KIM, hired 2015

More recently, fund accountants prepared the month end packages for the VISIUM entities. Fund accountants also covered portfolio managers on a daily basis. The VISIUM Credit Fund existed from December 2010 through September 2013. Month end valuation calculations were completed within 10 days after the last business day of the month. For most of the time the VISIUM Credit Fund was in existence, ROZENBERG was involved in the month end valuation process and calculated the monthly net asset values (NAVs). Until recently, VISIUM tried not to silo fund accountants.

The front office team, or investment team, for the VISIUM Credit Fund included CHRISTOPHER FLAFORD (FLAFORD), STEFAN LUMIERE (LUMIERE), LEE BROWN (BROWN), AMEESH SHAH (SHAH), and JASON THORELL (THORELL). THORELL was hired shortly after ROZENBERG started at VISIUM. ANDREW HAN (HAN) was added to the team in 2012. JOHN SHOEMAKER (SHOEMAKER) was an options trader who sat with the credit fund team. The credit Fund back office team included SUDARSHAN JAIN (JAIN), DENNIS MARTINEZ, RAHIR HUSSEIN, STEVEN GILSON (GILSON) and ALAN GREENBAUM (GREENBAUM). At one point, GILSON was the Director of Operations but subsequently moved to the trading team. GREENBAUM took over as Director of Operations when GILSON moved to trading.

At several points throughout the life of the credit fund, ROZENBERG raised questions about the valuation process. ROZENBERG was always satisfied by the

FD-302a (Rev. 05-08-10)

answers he was given. The VISIUM Valuation Committee met quarterly, if not more frequently, to discuss issues surrounding the valuation of illiquid securities.

Beginning at the end of 2012, ROZENBERG reached out to the Credit Fund investment team for pricing support documentation. The Credit Fund traded in more liquid securities prior to the end of 2012 so ROZENBERG did not need pricing support documentation. VISIUM received pricing feeds from Reuters and IDC along with broker quotes. At the end of 2012, ABILITY ACQUISITION (ATI) and CHINA MEDICAL (CMD) were reclassified as level III assets. Prior to the ATI and CMD reclassification, the VISIUM Credit Fund did not hold any significant positions in level III assets. The ATI restructuring was discussed at VISIUM throughout 2012. The ATI restructuring itself began at the end of 2012. VISIUM had inside information about ATI due to VISIUM's involvement in the company's restructuring. VISIUM decided to value its position in ATI based on the information the firm had that was not in the marketplace. In conjunction, VISIUM decided to reclassify the ATI position as a level III asset.

The voting members of the VISIUM Valuation Committee were as follows:

STEVEN KU, Chief Financial Officer

ALAN GREENBAUM, Director of Operations

MARK GOTTLIEB, Partner

AMOL SAHASRABUDHE, Chief Risk Officer

ROZENBERG was a non-voting member of the Valuation Committee. ROZENBERG prepared materials in advance of Valuation Committee meetings.

ROZENBERG was shown a document marked as #1. ROZENBERG recognized the document as Private Investment Pricing Memo as of 12/31/2012. Item #9 in the memo dealt specifically with ATI. VISIUM attempted to value the company as a whole. ROZENBERG compiled information to present to the Valuation Committee. ROZENBERG got most of the information from the Credit Fun investment team including PLAFORD. PLAFORD and LUMIERE forwarded a copy of ATI's budget and plans for ATI's restructuring to ROZENBERG. ROZENBERG also received legal documents from VISIUM's General Counsel that were associated with the ATI restructuring. As a result of taking a role in ATI's restructuring, VISIUM received inside information about the progress of the restructuring. VISIUM knew that ATI was going into Chapter 11 bankruptcy. Since VISIUM had access to information that the market did not have, a decision was made to move ATI to a level III classification. VISIUM was not in possession of inside information about ATI at the end of 2011. LUMIERE was the analyst responsible the ATI position at VISIUM. ROZENBERG had an open relationship with analysts at VISIUM. PLAFORD encouraged ROZENBERG to go to the Credit Fund's analysts with questions.

4151 p 5

Typically, if VISIUM could source multiple broker quotes for a security - at least two or more - they kept that security designated as level II. If a security did not trade it was sometimes designated as level III but sometimes not. If a security was priced using mark-to-model, VISIUM always classified the security as Level III.

ROZENBERG was shown a document marked as #2. ROZENBERG could not recall if he had previously seen the document. In August 2011, a decision was made to switch to using broker quotes instead of the Loanx pricing service. The Credit Fund investment team had to provide supporting documentation for prices.

On the last business day of each month, the Credit Fund investment team sent prices for the positions in the Credit Fund to the VISIUM operations team. The Credit Fund investment team sent the prices that they believed to be correct. The prices were sent to the VISIUM operations team via email or instant message. The prices were used as placeholders by the operations team. Over the following two business days, the Credit Fund investment team was expected to provide supporting documentation for the prices. At the same time, third party pricing information was delivered to VISIUM from MSFS.

One business day after the last business day of the month, the Credit Fund investment team made the decision on which source to use to price each security in the portfolio. In the cases where there was a large divergence between the investment team's price and the operations team's price, ROZENBERG raised the issue to KU. There was no specific guidance on when to raise issues of price divergence to KU. ROZENBERG did not recall any written policies or procedures in place. ROZENBERG used his own judgment on which issues he raised to KU saying, "you know it when you see it."

There were price checks throughout the valuation process. At the end of the month, after the investment team input their prices, a series of checks were done by the VISIUM accounting team to validate the investment team's prices against the prices from MSFS. Price divergences that were raised to KU required two broker quotes from the investment team as justification. The VISIUM Valuation Committee had the final say on prices. Pricing issues were raised to the Valuation Committee sometime between the second and seventh business day after a given month end.

After the close of the market on the last business day of the month, the Credit Fund investment team sent price indications to the VISIUM operations team. The operations team updated the prices in Eze-Castle. Subsequently, the VISIUM operations team sent the prices to MSFS. MSFS went through an overnight process to validate the prices and sent an MS 3913 report back to the VISIUM operations team. On the next business day, the VISIUM operations team prepared a comparison file between the MSFS prices and the Credit Fund investment team prices. The VISIUM operations team sent the price comparison to the Credit Fund investment team. For

FD-1023 (Rev. 05-08-10)

any MSFS prices that the Credit Fund investment team disagreed with, the investment team was required to provide documentation to support the investment team's price. Any security that VISIUM did not have a price for was priced by the MSFS pricing team. The Credit Fund investment team decided which prices were more reflective of the current market and had the authority to override the MSFS prices if they could provide supporting documentation for the investment team's prices. For liquid securities, one broker quote was enough. The investment team went through the MSFS pricing and told the VISIUM operations team which prices to use. The investment team provided price support when they wanted to override an MSFS price. All of the pricing information came to the VISIUM accounting team. The accounting team made sure the "right" price was selected and entered into VISIUM's internal systems which, in turn, were uploaded back into the MSFS system. MSFS then went through a nightly process to make sure that VISIUM's prices were entered correctly in the MSFS system. The "Stratum" report was an independent MSFS report that compared MSFS pricing to VISIUM pricing. The investment team's pricing changes were sent to the VISIUM operations team through the "bond comparison spreadsheet."

Originally, no checks were done on the prices provided by the Credit Fund investment team. At some point in 2013, ROZENBERG got access to a Bloomberg terminal and began checking the investment team's prices. The Credit Fund was still alive when ROZENBERG got access to the Bloomberg terminal. Additionally, ROZENBERG started to check with brokers to confirm their prices.

By the end of the second business day after a month end, everyone was out of the valuation process except for the VISIUM operations and accounting teams and MSFS. MSFS created a NAV package which was reviewed by the VISIUM operations team. The NAV package calculated the Credit Fund's performance. The VISIUM operations team would not sign off on the NAV without having the necessary pricing support from the investment team. For the most part, there was not a lot of divergence in prices between the Credit Fund investment team and MSFS. The first written policies surrounding portfolio valuation were implemented at VISIUM in 2011. The valuation policies were updated in 2013. ROZENBERG did not know if all of the checks were documented in the VISIUM compliance manual. At some point, checking the Stratum report thresholds became part of procedure. The Stratum reports came after the NAV was set in some cases.

ROZENBERG referred to tab "DBC 2012 B" in the binder marked "Joshua Rozenberg, July 15, 2015." In the spreadsheet on page 2 of the tab, the top two lines reflected pricing information for ATI. Page 13 of the tab told VISIUM that the ATI prices were based on a model. In August 2011, there were no procedures in place to confirm broker quotes. Beginning in 2013, when ROZENBERG received access to the Bloomberg terminal, he began to check broker quotes and call brokers to confirm the prices they sent. ROZENBERG called the brokers directly to confirm the quotes. He did not call the brokers' middle offices to confirm the quotes.

At some point in 2013, the VISIUM accounting and operations teams took the Credit Fund investment team out of the valuation process. The investment team no longer gave input into pricing. The operations team pulled bond prices themselves. The decision to remove the investment team from the valuation process was made by KU. ROZENBERG and KU had conversations over time about changing the pricing process. The impetus to change the policy came from conversations between ROZENBERG and KU. One reason for the policy change was the pricing discrepancies that ROZENBERG had seen. Leading up to December 2013, ROZENBERG saw an increased amount of price discrepancies between the Credit Fund investment team and MSFs. The increased discrepancies led ROZENBERG to discuss the pricing policies with KU. Around the same time, the decision was made to reclassify ATI and CMED from level II to level III securities. It was unusual to move two securities from level II to level III and there was concern about moving 8.5% of the assets in the Credit Fund from level II to level III. ROZENBERG never spoke to JACOB GOTTLIER (GOTTLIER) about reclassifying 8.5% of the Credit Fund from level I to level III. ROZENBERG never heard anything about GOTTLIER's position on the move.

ROZENBERG had very little interaction with GOTTLIER. ROZENBERG had a daily relationship with KU. KU and GOTTLIER spoke every day. KU always tried to do the right thing. KU was a good mentor and teacher to ROZENBERG. KU was extremely knowledgeable.

At the time of the ATI and CMED reclassifications, there was no particular focus on the Credit Fund or PLAFORD or LUMIERE. Later, during the liquidation of the credit Fund, there was increased focus on PLAFORD and LUMIERE.

The valuation process was pretty much the same for all VISIUM portfolio managers who submitted prices. Other VISIUM portfolio managers traded credit, macro, and FX. It was not uncommon for portfolio managers to have pricing models that disagreed with VISIUM pricing policies. For example, the portfolio manager of the VISIUM Catalyst Fund, BRAD LEVIE (LEVIE), traded distressed debt. Approximately 20-30% of the Catalyst Fund was classified as level III securities. LEVIE also provided broker quotes to support his prices. ROZENBERG saw similar price discrepancy issues with LEVIE's prices.

The pricing models created by PLAFORD and/or LUMIERE were not used to price securities. The pricing models used to price securities were created by ROZENBERG. The assumptions used in ROZENBERG's pricing models came from the VISIUM Valuation Committee. ROZENBERG may have used the investment team's pricing models as comparisons to his own models.

ROZENBERG received a copy of ATI's budget from PLAFORD or LUMIERE who had a seat on the ATI Board of Directors. ROZENBERG used the budget to create enterprise EBITDA assumptions for his pricing model. ROZENBERG sourced the market comparisons, through Bloomberg, from VALUATION RESEARCH CORPORATION (VRC). VRC was

FD-302a (Rev. 05-08-10)

a third-party valuation company that VISIUM used for the Credit Fund in 2013.

ROZENBERG had conversations with PLAFORD about which market comparisons to use for ATII.

PLAFORD and KU had a good working relationship. In meetings, PLAFORD got upset about pricing and voiced frustration. In particular, PLAFORD got upset about pricing for ONCURE MEDICAL CORP. (ONCURE) and SAVIENT PHARMACEUTICALS (SAVIENT) saying, "You guys got it wrong." PLAFORD and KU talked about valuation outside of ROZENBERG's presence. KU forwarded emails, which included conversations with PLAFORD about valuation, to ROZENBERG. PLAFORD got upset with ROZENBERG over how ROZENBERG priced the Credit Fund. On many occasions, PLAFORD was frustrated at how the Credit Fund pricing was finalized. In 2012 or 2013, PLAFORD threatened to have ROZENBERG replaced by a credit trader.

When ROZENBERG joined VISIUM, LUMIERE was a portfolio manager in the VISIUM Global Fund. LUMIERE was subsequently moved to an analyst position in the VISIUM Credit Fund. LUMIERE was responsible for a level III equity position in FRIEND FINDER NETWORK.

Another way VISIUM got comfortable with the valuation of their portfolios was because of consistent profit and loss over the years.

VISIUM still owns a position in ATII. VISIUM brought in new management to run the company. ATII bought a new school and generated positive cash flow. VISIUM owned equity in ATII.

The VISIUM Credit Fund was closed at the end of September 2013 after significant redemption requests. VISIUM management decided to hold back 10% of the 09/30/2013 redemptions. VISIUM management made a similar decision with the 06/30/2013 redemptions. The 09/30/2013 redemptions included ATII, CMED, and two other positions that VISIUM could not sell. The ATII market was not good and VISIUM could not sell its position. VISIUM was involved in legal process with CMED at the time. In the second quarter of 2013, RURAL METRO went into bankruptcy and the company entered into talks about a potential sale. SAVIENT went into bankruptcy in 2013 and was subsequently bought by a cash buyer. VISIUM is still getting payments on its SAVIENT position.

In March 2012, CMED defaulted. CMED missed a loan payment and the company's bond traded down. The bondholders came together to go after CMED to try to get paid out. At the time, VISIUM was not restricted and was allowed to trade in the equity, class security. VISIUM held convertible bonds that converted to CMED equity. In December 2012, the CMED liquidator made an offer of $105 million for the company via a small. ROZENBERG used that offer to come up with a price to value VISIUM's CMED position. VISIUM retained STROOCK, STROOCK & LAVAN LLP to advise them during the CMED and ATII restructurings.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of Interview of Josh Rozenberg , On 07/15/2015 , Page 8 of 8

ROZENBERG was directed to Attachment 1 in Document #1. The 20% haircut was not done to correlate with prices from the month before. The directing class had to pay the legal fees associated with the liquidation up front. The smaller bondholders on the retail side did not participate in the liquidation. There remained only one CUSIP for the CMED bond. VISIUM has not received any money back from CMED. VISIUM's CMED pricing model was updated using scenario analysis. The CMED market is currently at 18 per VISIUM's model. The CMED liquidators have come back to ask for more money. They expect a full recovery of $300 million dollars within three years. In November 2014, a Hong Kong court approved the wind down of CMED.

FD-302a (Rev. 05-08-10)

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

**2990-13 Talk with Lumiere at Bar V1 7.31.13 1hr 52min**

[Start of recorded material 00:03:11]

Thorell:  No, dude, this is my prepaid phone, which does not work, okay?

Lumiere:  It doesn't work?

Thorell:  Will you stop?

Lumiere:  It works for me.

Thorell:  Do you see a phone thing?

Lumiere:  Why do you carry it around if it doesn't work?

Thorell:  Because I don't want to carry this around. This is going nowhere quick.

Lumiere:  If it doesn't work, why carry it around.

Thorell:  Because it works sometimes. I've been texting you. Look. Dude, I'm really - I can't deal with this.

Lumiere:  What are you so panicky about. You're very panicky. I can see the sweat coming out of your brow. Are you bugging?

Thorell:  No, I'm not bugging. I have nothing to be bugged about. What's this? What's this? Why do you have it on? Let's skip that, all right? Let's move on.

Lumiere:  I'm still [unintelligible 00:04:04].

Thorell:  Dude.

Lumiere:  The guys in the back will take care of you.

Thorell:  You are picking up on frustration. I spent $150 on this and it doesn't work, but only at times, and it's depressing. So if you really want me to sit here, here, this is what I spent $150 on. Okay? So Okay? I'm not happy about it. Do you want me to turn it off?

Lumiere:  Yeah.

Thorell:  I'll turn it off.

Lumiere:  What do you do, you just prepay this? You don't have to use a credit card?

Thorell:  Yeah.

1

A152

Lumiere: Wow. What a piece of shit.

Thorell: Oh, I know. All right, can we just get beyond this, now? All right, let's get back on the same thing. So I'm not poor.

Lumiere: You're not poor?

Thorell: I'm not poor.

Lumiere: What do you mean, you're not poor?

Thorell: So I'm against.

Lumiere: Huh?

Thorell: I'm not poor or old-establishment. I'm against [unintelligible 00:05:18].

Lumiere: So am I, and stuff - let me hold this. Yeah, you're, like, videotaping.

Thorell: Listen, you've got to think about it, like what could I possibly gain?

Lumiere: Okay.

Thorell: What could I possibly gain? Right? Like you [unintelligible 00:05:36].

Lumiere: Yeah, yeah. I get it. Let's work it here. Thanks for the drinks. No, you're buying. You're the employed one.

Thorell: All right, these guys are about to leave. Wait.

Lumiere: That's why I was wanting a table. I'll buy.

Thorell: Huh?

Lumiere: If you get a table [unintelligible 00:06:02], I'll buy.

Thorell: Where?

Lumiere: Here.

Thorell: All right, that's fine. That's what we're going to do. Can we get a table for two, please?

Male: The drinks, yeah, I'll bring it over.

2

Thorell: Okay, great, thank you.

Male: I'll put it together. Enjoy your dinner.

Thorell: Yeah, thanks.

Lumiere: How about this one?

Male: Yes, sir, go right ahead. Of course.

Lumiere: Thank you. You just have too much in your pocket.

Thorell: Because ...

Lumiere: What are you - what is that? Just stop.

Thorell: This is my cell phone case, okay? It's a waste of space. I'm trying to cleanse my pockets of garbage.

Lumiere: Okay, well, you've got to get rid of that.

Thorell: I know.

Male: You want a bottle of water, gentlemen?

Lumiere: Yes, please.

Thorell: I will actually have - just tap water is fine.

Male: [unintelligible 00:07:26]

Lumiere: No, I think I'll just stick to this.

Male: You don't want to mix them up. Don't mix them up.

Thorell: Okay, thank you.

Male: [unintelligible 00:07:35]

Thorell: I'll take another, please?

Male: Which is it?

Thorell: [Oban].

Male: [Oban]?

3

4

| | |
|---|---|
| Thorell: | So everybody keeps asking about [unintelligible 00:07:51]. Like who's ever working the case. |
| Lumiere: | What do you mean? [unintelligible 00:07:59] |
| Thorell: | Like on a regular basis. Like not actually give up names, but ... |
| Lumiere: | Yeah. |
| Thorell: | ... Like [unintelligible 00:08:11], and I'm wondering, like, internal people? No one has asked me, clearly, because they wouldn't because they know. What type of stuff do they ask you? Can you say? |
| Lumiere: | I suspect that the [unintelligible 00:08:44] |
| Thorell: | What information? That has to do with that information, what information? |
| Lumiere: | The information I have. |
| Thorell: | Okay. |
| Lumiere: | [unintelligible 00:08:59] and Chris talking about learning to book. |
| Thorell: | They know ... |
| Lumiere: | And the conversation about [unintelligible 00:09:12] moving stuff from one account to the other. |
| Thorell: | Meaning from [unintelligible 00:09:18] right? |
| Lumiere: | Hm-mm. Before that, I wasn't there when that was happening. Also he was, from early on, from, like, [unintelligible 00:09:28] to global. |
| Thorell: | And he would do it internally? |
| Lumiere: | I believe. |
| Thorell: | So that's interesting to know, and here's why. There's something going on with - let's make an agreement. This is entirely ... |
| Lumiere: | I won't discuss anything with anybody. |
| Thorell: | Okay, good. Let's just have that agreement going forward. And we already understood that, I just had to establish it. So something is going on with [Rural] Metro other than the obvious. |

Lumiere:    [unintelligible 00:10:12]

Thorell:    No. What you said, I think, is what, because [unintelligible 00:10:19] owns 25 million, okay? We had to go ...

Lumiere:    They'll shit it out [unintelligible 00:10:25]

Thorell:    They're going to do it ...

Lumiere:    [Unintelligible 00:10:29]

Thorell:    So Jake has called me into his office a couple of times and he's told me - I'm very careful because he's very shifty, and I didn't know his agenda at first. The second time, he called me and I started to pick up on what he was doing.

Lumiere:    He always has an agenda. Everything he does is an agenda.

Thorell:    And he was kind of very back-and-forth. Like, how are we doing? [unintelligible 00:11:00] we have to meet the deadline. And I'm like, "Well, frankly, I didn't know the - you know, Chris doesn't tell me anything." I'm going to be pissed if [unintelligible 00:11:11], you know, frustrated one day - one morning, because he's slamming me with orders because he doesn't give a fuck [unintelligible 00:11:19]. So I get that, but I'm finally like - it's on the phone, because he's never there. I'm like, "Chris, I don't know ..."

Lumiere:    Chris?

Thorell:    Yeah.

Lumiere:    Chris is still there?

Thorell:    Yeah. He shouldn't be.

Lumiere:    I thought he was gone.

Thorell:    Really? He should be.

Lumiere:    I've been told he's been gone for three months.

Thorell:    He might be, like, doing a, like checking in.

Lumiere:    He's actually physically in the office or no?

Thorell:    Well, he never really was physically in the office. But yeah, he's, from time to time, in the office. Today he wasn't. Yesterday he was.

5

Lumiere: Really? Interesting.

Thorell: So Jake would ask, he'd be like - it's really awkward. It's always an awkward conversation because it's weird when your boss' boss talks to you about your boss. So he wants to accomplish a couple things. He wants to know - he wants to bait me into shitting on Chris, which I'm not going to do. I'm not going to paint him as a great guy, because he already knows.

Lumiere: I heard that we are a shareholder for Chris.

Thorell: Yeah.

Lumiere: Chris is gone.

Thorell: He's got to be.

Lumiere: I know it. I know it for a fact. He's out there interviewing.

Thorell: Well, I've heard that.

Lumiere: Waiting for this, waiting for the [unintelligible 00:12:45] to shut down and he's gone.

Thorell: Yeah.

Lumiere: And so are all of you guys.

Thorell: He's what?

Lumiere: So are all of you guys, Short, Lee, Mason ...

Thorell: Are all gone. I'm pretty sure myself, but is that coming from something that's in plain sight, underneath it?

Lumiere: There's a plan. They're waiting for Craig to be gone.

Thorell: You talking to him?

Lumiere: Yeah, I'll talk to those guys.

Thorell: That's someone from the inside, no?

Lumiere: Somebody who knows people like [Sala].

Thorell: Somebody who doesn't work at this unit?

6

A 153

Lumiere: Don't ask me to tell you.

Thorell: Okay, fine. I'm just curious. But anyway ...

Lumiere: But that's the plan. The plan is that as soon as Craig is gone, [unintelligible 00:13:33] wound down and they're done. They'll tell you that there's something else - should be something else, but not.

Thorell: Yes, okay. So that was exactly what I was thinking. And ...

Lumiere: I heard [Meech] was - already took another job.

Thorell: Really? They didn't tell me that. And Lee might have, too. And they might have gotten a job together and they might have left me out. So thanks. I don't know, but if they did, thanks. Do you know if they did?

Lumiere: I don't think [unintelligible 00:14:07].

Thorell: Huh?

Lumiere: I don't think they got a job together.

Thorell: Okay. Do you know if Lee has a job?

Lumiere: I know he's been talking to people.

Thorell: I don't have a job.

Lumiere: I heard [Meech] had something lined up.

Thorell: Yeah. So anyway, I agree completely, and what makes it really strange is I am the guy creating the time clock, because I'm a trader. And what I'm getting from Chris and Jake in, like, my meetings with Jake, I think he's very concerned with selling - to be able to meet the deadline.

Lumiere: Because he doesn't want to go to end up [unintelligible 00:14:47].

Thorell: What?

Lumiere: He doesn't want to be the guy that ...

Male: I'll come back ...

Thorell: No, no. You can come.

[conversation with waiter]

7

A 153

8

Thorell: So that's exactly what they're doing, because in the meeting with Jake, he's like, "I'm very concerned about meeting this deadline."

Lumiere: But they [unintelligible 00:17:18] it's like a killer [unintelligible 00:17:22].

Thorell: Yeah. But what he's doing is he's ...

Lumiere: It's illegal. It's illegal to buy moving assets because you can't sell them.

Thorell: No, no, we'll get to that. So what he's doing is he can't say to me - he's saying on the one hand he's saying [unintelligible 00:17:37] at exactly this price, I know he wants me to - he doesn't get to jump off. He just wants me to sell it, but he can't say that. So he - but he ...

Lumiere: When he did the last bid for 10 million, that we know.

Thorell: [unintelligible 00:17:52] When they get the last bid for 10 million?

Lumiere: In gold bonds?

Thorell: Well, that's another discussion. There's a lot of shit going on. [unintelligible 00:18:12] I've got a lot of shit going on.

Lumiere: How much do they owe you [unintelligible 00:18:38]?

Thorell: I don't know. Probably nothing. Thirty grand, maybe. I don't know.

Lumiere: So why are you sticking around?

Thorell: I'm working on my life. My life right now is so complicated. This is the biggest issue I'm dealing with. I've got a legal issue with my tenants in one of my apartments that's, like, 70 grand.

Lumiere: A month?

Thorell: No, fixed. Things are [unintelligible 00:19:09]. I'm trying to deal with that. Becky broke up with me because I didn't have time to talk to her because of all this. I don't mean to drag you into ...

Lumiere: [Unintelligible 00:19:19] my fiancée broke up with me because of this shit.

Thorell: My mom just got diagnosed with Parkinson's disease.

Lumiere: Oh my god, really?

Thorell: My dad has pre-diabetes. I can't talk to anyone about this. [unintelligible 00:19:33] I have no one to talk to except my attorneys, who, by the way, what is your attorney charging?

Lumiere: Six-eighty an hour.

Thorell: Okay, average attorneys probably make four to six, maybe, an hour.

Lumiere: It's a firm-specific ...

Thorell: This guy charges [unintelligible 00:19:51]. But I'm okay with that, because ...

Lumiere: That's the most expensive – who do you have? That's the most expensive attorney.

Thorell: Yes, but I want that, I want them to know I have a fucking pit bull and they know that now.

Lumiere: You have an attorney [unintelligible 00:20:07] hired?

Thorell: Yes.

Lumiere: He's [unintelligible 00:20:12]?

Thorell: No, he's an employment contractor, but ...

Lumiere: You only have 30,000 in stock.

Thorell: What about it?

Lumiere: You only have, like, 30,000 in preferred stock.

Thorell: Yeah.

Lumiere: So what are you going to fight for?

Thorell: [unintelligible 00:20:31] even keep an eye on him?

Lumiere: Nobody knows we're here.

Thorell: All right, [unintelligible 00:20:47] I'm not willing to blow the whistle. I don't mean to do it. It's not really the path, I just want to be out of the situation. [unintelligible 00:21:06]

Lumiere: [unintelligible 00:21:08]

Thorell: Yes, when I saw a sinking ship, I knew that ...

9

10

Lumiere:   They're going to try to implicate you.

Thorell:   That, or an investor is going [unintelligible 00:21:18] and I'm the fall guy. So it was done from the guys from day one, and I needed an attorney to protect this, because I don't need to be a fall guy. So I hired - again, I know we already went over this. This is between me and you. I did not tell anything to anyone.

Lumiere:   What firm are you hiring?

Thorell:   [unintelligible 00:21:44] Do you know him?

Lumiere:   The firm, [Devon Boyd]?

Thorell:   You don't know him? What do you think about him?

Lumiere:   They're good. It's good. They don't have time to lose.

Thorell:   They don't? I hired them intentionally because they know I have them now. Are they shitting their pants? Is he that good?

Lumiere:   Yeah.

Thorell:   They are?

Lumiere:   No, they're good. They're really good.

Thorell:   [unintelligible 00:22:20] if you look his bio up ...

Lumiere:   Where'd he go to school?

Thorell:   I don't know, but if you look his bio up, okay, this guy is actually [unintelligible 00:22:30].

Lumiere:   Make sure he didn't go to Brown.

Thorell:   Why?

Lumiere:   Because Jake went there.

Thorell:   Why? Why do you care if he went to Brown.

Lumiere:   Because Jake went to Brown. And if he's tied into Brown, you've got a higher probability they can find somebody to pay him off.

Thorell:    Okay, All right, I will. Thanks for that. I'll check on that. But read his bio. [unintelligible 00:23:03] What do you mean? Try to make it go away?

Lumiere:    Like mis-advise you.

Thorell:    I don't understand. You just give him cash to make this go away.

Lumiere:    It's suspicious, to a degree, of [unintelligible 00:23:21] quality of advice [unintelligible 00:23:25] given the circumstances of the case. If you guys [unintelligible 00:23:27] like, "That guy sounds like he's one of the top attorneys," I think he's been bought off.

Thorell:    So if the [unintelligible 00:23:38] meaning perjury?

Lumiere:    Perjury, but also denying [unintelligible 00:23:48]. He's perjured himself incessantly about the case. The funny thing is he lies about things that nobody can check out. He'll make up stories about [unintelligible 00:24:01]. He will lie about [unintelligible 00:24:04]. He actually went out and told people that he fired me back in March.

Thorell:    That he what?

Lumiere:    That he fired me in March for [unintelligible 00:24:15] insider trading.

Thorell:    Wait, is that when you left?

Lumiere:    I left in April, and he was telling investors they had fired me.

Thorell:    How stupid is that?

Lumiere:    He's an idiot.

Thorell:    First of all, just so you know, I think that's horseshit.

Lumiere:    Of course it is.

Thorell:    And my own ...

Lumiere:    He also knows it's horseshit. It was an extortion mechanism to get [unintelligible 00:24:37] to pay him off.

Thorell:    And by the way, he indirectly mentioned that, [unintelligible 00:24:41], so why would you do that? But just so you know, I've kept that under wraps, for your safety and mine.

11

A 153

Lumiere:   It's going to be dismissed by the ninth, but for him to go up to people and tell them that, that he fired me ...

Thorell:   Because frankly [unintelligible 00:25:00] going through what I'm going through now, I don't find him that [unintelligible 00:25:03].

Lumiere:   He's not.

Thorell:   He's very ...

Lumiere:   He pretends to be, but he's not.

Thorell:   He pretends to be - he's got to be an awful broker, because when he calls me in his office, I actually kind of like it now because I feel like I can outwit him and I know his game, because talking to you, I know how he thinks. And I can kind of pick up on his [unintelligible 00:25:25]. So I think I have actually incriminated him more when I'm in there ...

[conversation with waiter]

Lumiere:   But he's also a pathological liar. But he's also [unintelligible 00:25:42]. It's non-stop, the art of manipulation. He studies this. He's taken courses.

Thorell:   Okay. That's great, but you actually have to be born to be able to do that. You can get better at it.

Lumiere:   He practices all the time, though.

Thorell:   He can do all the practicing he wants, but he's not going to beat me.

Lumiere:   He will play, like, "Hey, you have a big career here. Help me work and ..."

Thorell:   Yeah, sure. He will play on your ego to get - the fact that he's going to those classes is actually a very bad sign, because you should just know how to - you're born with those instincts. It can't be taught, and he doesn't have them and I do. And if he calls me in his office, I get encouraged.

Lumiere:   I've known him for a long time. I just haven't been [unintelligible 00:26:33] I just stopped talking to him, because all he is is lying to me.

Thorell:   Yeah, He's a pathological liar and just messed up. I don't know what he's thinking, but if I were him, I would be scared shitless right now.

Lumiere:   He is scared. He is scared. He's trying to sell the firm. You know that?

Thorell:   I didn't know that. Disavow?

12

13

Lumiere: He's trying to sell it right now. He's trying to get, like, a bank to buy it. It's on the block.

Thorell: When did this start to happen?

Lumiere: A month ago, but he's been talking about doing it for a while.

Thorell: I now understand ...

Lumiere: And when [unintelligible 00:27:17] came on and was pushing on this, he started to freak out.

Thorell: Yeah.

Lumiere: He's started trying to dump it before ...

Thorell: Yeah, because no longer can you plead ignorance because you didn't know. [unintelligible 00:27:33]

Lumiere: [Unintelligible 00:27:35]

Thorell: He was an insider-trading business, and he's not [unintelligible 00:27:43]

Lumiere: [unintelligible 00:27:45] that says, "Hey," I just talked to the banker. They're going to buy out these bonds. I just got a banker that's going to buy me out for 10 million. It's in the network. I don't have it. I never got it. In 2009 ...

Thorell: What do you mean, "In the network?"

Lumiere: It's on their network. They do this on their network.

Thorell: Oh, I can go in and get it?

Lumiere: No, you can't, because they go off and [unintelligible 00:28:10], but the SEC ...

Thorell: If I go today [unintelligible 00:28:15] trying to get a lot of stuff. I figured out, my laptop, I could download distant variations 'and fortunately I was good enough [unintelligible 00:28:28] enough from having the VPN where you can download everything, and then you can go online in your hard drive. [unintelligible 00:28:45]

[conversation with waiter]

Thorell: So he does not realize it ...

Lumiere: [unintelligible 00:29:40] extent to how - check what you're doing, and that's when I was like, "I'm fucking gone. I ain't being involved in this shit."

Thorell: You know what I'm trying to get to, there's shit on the - what is it? The P or the H drive, whatever it is, that I can't believe people put on there. [Unintelligible 00:30:04] valuations on there still from, like, '07. It must have blown up, because it said [unintelligible 00:30:15] to fix my mistakes. It says, "How are we going to fix it?" And it goes - one of his bullet points was, "I want to get an edge." And you know, by now we all know what that means. You're going to write that? That's pretty bad. "I'm looking for an edge."

Lumiere: [unintelligible 00:30:39]

Thorell: But he wasn't even [unintelligible 00:30:42], right?

Lumiere: No, no. He was their vol trader. He was a vol trader, and then he gave him, like, something [unintelligible 00:30:54].

Thorell: Yeah. I know this story. I met with, you know, the last guy …

Lumiere: They are [unintelligible 00:31:03] claiming that Chris had extensive credit.

Thorell: I know the whole story. But - so what is your agenda, what are your problems? What do you need? What can I help you with? What can you do for me? Where are you at?

Lumiere: [unintelligible 00:31:20]

Thorell: Are you in trouble?

Lumiere: I need tangible information.

Thorell: What?

Lumiere: No, I'm not in trouble.

Thorell: Okay.

Lumiere: I need tangible information and tangible evidence to help me out with the case. I've got enough [unintelligible 00:31:34].

Thorell: You've got enough what?

Lumiere: [Unintelligible 00:31:44] anything that makes it easier. The more information, the better. Anything tangible, like fax, emails, stuff like that.

Thorell: What do you have?

14

Lumiere:   I told you, a lot of different things. Obviously I've got [unintelligible 00:31:59].

Thorell:   Have you followed up on that?

Lumiere:   No.

[conversation with waiter]

Thorell:   Have you followed up on that?

Lumiere:   It's sitting with my attorneys.

Thorell:   Hmm?

Lumiere:   It's sitting with my attorneys.

Thorell:   You are sitting?

Lumiere:   It is sitting with my attorneys.

Thorell:   So they're evaluating whether you have a case?

Lumiere:   Well, they know I have a case. They told me I have a case. They're really just evaluating whether to do it or not. They will get back to me and back to some friends of mine, if this goes down, back to my sisters, if this goes down, what does that mean for every employee that is no longer with them as a result of it? It's going to get tarnished and tarnished?

Thorell:   What does it mean for me, who is, like, could be implicated because I've been sending ...

Lumiere:   You're not going to be implicated.

Thorell:   But they – what point are you at? Like have they given you feedback very quantitatively? It's hard to [unintelligible 00:33:30] but how much this is going to be worth?

Lumiere:   [Unintelligible 00:33:40]

Thorell:   As a charge, because you know 30 percent goes to ...

Lumiere:   Yeah, but that's just that. We haven't really discussed that. It's more about the legitimacy [unintelligible 00:33:53].

Thorell:   Legitimacy?

15

91

Lumiere:     Yeah, I mean, [unintelligible 00:34:01].

Thorell:     Right, I know that. They're trying to cover it up right now, but it's too late.

Lumiere:     It's too late if you have evidence for all this.

Thorell:     The problem with that, the problem you have, too is given ...

Lumiere:     The problem is that - how Jake found out that we have this evidence.

Thorell:     That we have this what?

Lumiere:     Evidence.

Thorell:     We as in he knows I do?

Lumiere:     I don't think he knows you do, but ...

[conversation with waiter]

Thorell:     There was no way we could say that [unintelligible 00:35:02]. I have no clue how he found that out, but I will tell you that my paranoia level is so high that I think he may have bugged my personal cell, which is why I didn't want to bring it.

Lumiere:     Get rid of it. Get another one.

Thorell:     I have a pre-paid now.

Lumiere:     So get rid of that one.

Thorell:     Get rid of my pre-paid.

Lumiere:     Get rid of the other one.

Thorell:     I'm going to. But okay, look, if this goes down and this gets in deep shit, number one I can use it to my advantage to manipulate them if I know - if I find out. The only way to find out if the phone is really bugged the right way, you have to play, like, $3,000 for a computer forensics guy to come in.

Lumiere:     Yeah, I know.

Thorell:     So that's not something I'm really ...

Lumiere:     They are prepared to do that.

Thorell: No, they can. They have deep pockets. I don't, okay? But they probably have done that. Actually, in fact, they've done surveillance on counters. Maybe they've done countersurveillance.

Lumiere: I can tell you this for a fact. A fact - they've bugged his entire apartment, so that he hears everything his sister talks about.

Thorell: He bugs his apartment so he hears ...

Lumiere: Hears everything his sister talks about [unintelligible 00:36:24].

Thorell: Okay, so she goes, like, to another room?

Lumiere: [unintelligible 00:36:31]

Thorell: Yeah. He listens to all the conversations. I'm freaking out.

Lumiere: No, they can't.

Thorell: No, they do.

Lumiere: They can't sit in there - what they do is record the sister and look for key words.

Thorell: No, okay, listen - I've been told ...

Lumiere: No [unintelligible 00:36:51]

Thorell: He what?

Lumiere: He doesn't have enough time to do that. It's impossible.

Thorell: I'm telling you, he does. Here's why.

Lumiere: Oh, you mean your conversations.

Thorell: Yeah, not everyone. He probably listens to Chris' and now probably mine. And here's why. A week ago, he was sitting in a meeting, I think this is, like, a while ago - I don't think it had to do with me. It probably had to do with Chris - with Keeling, and Keeling, I don't even know why he even told on us, but he literally goes, "Hold on, I've got to hear this call and you can listen, too." He picks it up and he listens to a phone call that was probably [unintelligible 00:37:29], okay?

So now, my phone has gotten dropped calls, staticky, like just weird stuff. Like I can't make any - if you put a tap on a phone, stuff like that's going to happen.

Lumiere: Yeah. Why would you just, like, bury it? Bury it so he can't record you no more?

17

A 8152

18

Thorell:    Buy what?

Lumiere:    Buy your phone and get another one.

Thorell:    I'm talking about my office phone.

Lumiere:    Oh, your office phone.

Thorell:    Yeah, yeah. You can't really bury that.

Lumiere:    Yeah, I thought you meant your cell phone. [unintelligible 00:38:04]

Thorell:    I've got my pre-paid one that doesn't work.

Lumiere:    And just don't read any emails on your personal phone from anybody at [unintelligible 00:38:19].

Thorell:    No. So what's the status on the job front? Do you have any leads?

Lumiere:    Jobs? I've got a couple things I'm working on.

Thorell:    It's tough out there. There's nothing.

Lumiere:    Yeah. A couple things will work out.

Thorell:    I never heard from [Wingspan].

Lumiere:    They didn't call you? I'd follow up. I haven't seen those guys in a while.

Thorell:    I know that these guys do this, too.

Lumiere:    I know I can get a job tomorrow, I just don't want to do anything about it because [unintelligible 00:39:10] are going to show up.

Thorell:    How long does that go on for?

Lumiere:    Six months.

Thorell:    Jesus Christ. So wherever you can get a job, if they need another guy ...

Lumiere:    I can line something up for you.

Thorell:    Hmm?

Lumiere:    I can line something up for you. You got an [unintelligible 00:39:30]?

19

Thorell: No, I've been looking into that, because everyone asks me that question now, because of all the shit that's going on. Apparently there was a small window where they didn't have those and I was fortunate enough to be in that window. They must have just overlooked it. From what I understand, Lee doesn't have one. All the PMs have one.

Lumiere: No.

Thorell: Bill Goldman had one.

Lumiere: Is that right?

Thorell: Yeah.

Lumiere: Is it part of Catalyst?

Thorell: I don't know. He had one. I think there was a window there. I think everyone - then I just missed it.

Lumiere: So what's holding you there?

Thorell: Because it's a shitty environment to be in. You know what it's like. It's facing evil every day you go to work and being lied to and being counted to deed and create my own timeline sucks, but I'd rather not be on the beach. And I'm going to be there soon, I think. But I do have one lead that - I didn't have time to make the call today. It would have been very telling, so I'm going to make it tomorrow. You know how leads are. It could be like, "You're in," One interview and they're like, "You're in," Or it could just be like [unintelligible 00:41:13], so it's hard to tell at this point.

Lumiere: And it's a good place?

Thorell: That's all I've got is one lead. Even though I think it's weird I've been [unintelligible 00:41:24] and legit hedge funds who have actually asked for referrals and I've gotten them and no follow-up, several times. You're supposed to get in the door when you ...

Lumiere: You don't [unintelligible 00:41:46]. So they don't call your referrals?

Thorell: No, so I'm talking about the old guys I trust on the sell side. And [unintelligible 00:41:55]. And then the old guys came through and said, "Yeah, these guys are looking, [unintelligible 00:42:02] pass it on." Nothing comes back. You're supposed to get in the door if you get a referral like that, right?

Lumiere: Yeah.

Thorell: So something doesn't smell right.

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

20

Lumiere:  You think they're blocking you from getting it?

Thorell:  I wouldn't put it past them, I don't know. I don't know.

Lumiere:  The bucket shops might not like [unintelligible 00:42:36] making money, but they know that it probably is shutting down.

Thorell:  I know.

Lumiere:  [unintelligible 00:42:55]

Thorell:  Well, the one good thing about that is it's starting to get out there. I mean, people know now that credit, [unintelligible 00:43:10] credit is shutting down. So a really good guy that could keep and give them a lot of business would be unselfish and would try and hook you up regardless.

Lumiere:  [unintelligible 00:43:23]

Thorell:  Yeah, yeah. But a lot of guys are going to look out for themselves and be like, "You've given me a lot of business. Why place them now?"

Lumiere:  They don't want you, if you're leaving, first of all, until that portfolio has been sold off.

Thorell:  That's what I'm saying.

Lumiere:  They want ...

Thorell:  I know. That's what I'm saying, I'm saying there is an upside to being on the beach. I think that it's gone - let's just say my execution has gotten a little bit lax, which it's supposed to do.

Lumiere:  Are you saying you're ready now?

Thorell:  Hmm?

Lumiere:  And are you saying you're ready now?

Thorell:  I don't know, dude. So why do you think that - when you called me, you thought that people were talking about you or wanting nothing to do with you. You said no one has reached out to you?

Lumiere:  Yeah, I have friends there. Lee has not called me, Mason has not called me.

Thorell:  People are fucking dealing with their ...

21

Lumiere:   You didn't call me.

Thorell:   I called you, dude. I told you. I called you and you didn't return my call. You didn't return my call, though, after two months. I mean, I called you and you didn't return my call.

Lumiere:   We had a drink and the next day you locked the door. The next day you locked the door on me.

Thorell:   What do you mean, I locked the door.

Lumiere:   The firm locked the door. [unintelligible 00:45:06] Lee reached out to me once [unintelligible 00:45:11] but he called me from his business freaking phone line and I'm not going to respond to that. I need a personal call.

Thorell:   I thought I called you before two months. Dude, it's nothing personal at all. I've got a lot of shit going on. It's not a perception.

Lumiere:   Well, you understand, there's more suspicion.

Thorell:   Okay, fine. But do you understand now, there was no miscontent. I'm trying to deal with a lot of my shit and I know you're going through your shit and I actually, partly for your benefit, figured you might not want to talk to me right now because you might be suspicious, so that's what's going through my head. That's the hard truth. I know Lee has told me, he's like, "Yeah, we should go get drinks with Stephan sometime."

Lumiere:   Yeah, that's great. And then on the other end, he is in a conversation with Jake and trying to hitch him on running and applying credit and replacing Craig.

Thorell:   What are your thoughts on that move?

Lumiere:   On what?

Thorell:   On that move?

Lumiere:   [unintelligible 00:46:32]

Thorell:   Well, I don't know if I can call it because [unintelligible 00:46:37] it's a homerun swing, especially now. But there's no downside, right?

Lumiere:   [unintelligible 00:46:45] Craig.

Thorell:   So you know they're on Craig for shopping on the block?

A 152

22

**Lumiere:** What?

**Thorell:** They're shopping the firm on the block. Do you know who?

**Lumiere:** Yeah, [unintelligible 00:47:00] hire anyone, but they're trying to sell themselves.

**Thorell:** Do you know who a buyer would be?

**Lumiere:** Like Morgan Stanley or Goldman Sachs? They're trying to get a big bank. Blackstone, anybody who wants to buy ...

**Thorell:** Would he sell 100 percent of the equity and just be gone?

**Lumiere:** Yeah.

**Thorell:** I don't think that Goldman was ...

**Lumiere:** He's trying to get a [unintelligible 00:47:30].

**Thorell:** Well, if he was smart, which I don't think he is, he would get a downgrade on that. He's supposed to, because you've got to get out. But it doesn't really matter, because if he was going to sell it - the problem is if you're going to be selling it and then you get investigated, they're going to crawl back. [unintelligible 00:47:50] you can't sell it and be not culpable anymore.

**Lumiere:** I know.

**Thorell:** But I think he's going to hit a downgrade. But I don't even think Goldman would buy him, because they know he's shady. They know the firm is shady. I don't think anybody's buying them at Goldman Sachs. Everybody knows that they came from the same [unintelligible 00:48:15]. You know this was funny? Last Friday, at the investment meeting, he goes - he brought up Sachs and he says, "This should be a lesson to all of us. Any issues whatsoever with compliance, there's a Chinese law, blah, blah, blah." And he goes, [unintelligible 00:48:39], I don't know who she is in sales, but I'm glad she asked this question. I think she's stupid for asking it, but I loved that she asked it.

She goes, "Wait, what are you supposed to be doing anyway?" She goes - because Jake talked about, "I suspect a lot of those fat boys will be laid off selling [unintelligible 00:48:58] or something." So this girl asked would we consider hiring SAC employees, ex-employees? Jake says, "Yeah, we can take a look at them." He never once said - he was supposed to say, "We'd consider it, but we need to do an extreme vetting process." He never once said that. He said, "Yes, we would take a look at them."

A 153

Aren't you supposed to say, like after that, "We're going to take an extreme vetting process." That's what I would have said. I would have said I'd be very cautious. He wants those guys. I have it on audio, too.

Lumiere: Really?

Thorell: Yeah. I have stuff, too, bro.

Lumiere: You should be recording everything you have.

Thorell: I am. All my conversations with Jake, Chris, all of them taped.

Lumiere: Really?

Thorell: Keely, Coop, I have them lying. They're lying. I have them …

Lumiere: You've got to get them for more than lying. You've got to get them to tell you to move shit from one account to the other account.

Thorell: Okay, so let's talk about that, because I'm going to get that after I finish this. So there's some weird shit going on now with moving assets. Like we set up this [unintelligible 00:50:29] fund in London. You know about that? That's designed to transfer assets, right?

Lumiere: It can be, right?

Thorell: Well, it appears to me like it is.

Lumiere: [unintelligible 00:50:45].

Thorell: I don't know. But those level-three assets like ATI and all that shit at [unintelligible 00:50:52]. [Rural] is a little bit of the action, too. It's got to go to bankruptcy. I don't know what they call it now. I don't know. What I'm saying is [unintelligible 00:51:07] got credit, and I think they're going to try and move it, but there's no way they can, so I'm going to try and catch them on it.

Lumiere: [unintelligible 00:51:24]. For ATI, they should be evaluating everything over $12 million.

Thorell: That's why – this is why slowly, they want me out, but I have shit on them and they know it. So they can't force me out, but they don't want me around to see what they're going to do, so I'm slowly, slowly selling our redemption debt line [unintelligible 00:51:48] and I'm going to run the clock out. For 30, you ask me why I haven't left. That's why. Because every day I go in there, I get more and more and more shit.

Lumiere: Tape record it all.

23

H 153

Thorell:     I have everything on tape. If I can get access to that H drive, I have so much shit. I have a ton of stuff.

Lumiere:    Which device did you buy?

Thorell:     Hmm?

Lumiere:    How are you recording it?

Thorell:     I have a – like one of those small things you had.

Lumiere:    Where'd you buy it? Best Buy?

Thorell:     Amazon.

Lumiere:    What did you pay for it?

Thorell:     I think it was, like, a buck forty or something.

Lumiere:    You got a good one.

Thorell:     I bought [unintelligible 00:52:38]. I actually bought a whole set. I spent a long time looking into how to do this. I'm not going to do it anymore, but I'll hang onto it. I spent a lot of money on it, too, because I wanted to tape my calls. So what you do is you get - it's like Task Scan is the name of the thing, I think. It's like what you have.

Lumiere:    Incoming calls?

Thorell:     Incoming, outgoing.

Lumiere:    Oh, your business phone.

Thorell:     Yeah, office phone. And you can rig it up so that - I mean, you can put it all in the back and then you have to have, like, you have to buy a secondary device ...

Lumiere:    Because you keep it on your desk?

Thorell:     Well, you put it behind - I'm not going to do it at this point, I can't. It's way too risky.

Lumiere:    [unintelligible 00:53:21].

Thorell:     Yeah, no, this was a long time ago.

Lumiere:    [unintelligible 00:53:25]

24

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

| | |
|---|---|
| Thorell: | Oh, every time I walk in in – when I walk in in the morning, that first camera before you walk in the main door, I want to know what it is, because I know they're watching. They're so obvious. |
| Lumiere: | [unintelligible 00:53:47]. |
| Thorell: | You know what they did to me? You know how pissed off I am? They want to take me down? I'm in the middle, they're flooding me with sale orders and I don't have time. I am so jammed and [unintelligible 00:54:06] in my three years of being at this I've probably failed to post three trades, maybe, as an off-sell. And in the middle of just being crushed with sell orders, apparently I missed, like, three to [unintelligible 00:54:21] of the trades, recaps. Which, by the way, three [unintelligible 00:54:33]. |
| Thorell: | Why did we stop? Are you putting me on tape now? |
| Lumiere: | No. |
| Thorell: | We already had [unintelligible 00:54:54]. |
| Lumiere: | Dude, one thing you're going to recognize with me is I'm [unintelligible 00:55:00]. I'm being straight-up. |
| Thorell: | You always have an agenda. I'm friends with you, I like you … |
| Lumiere: | I don't have an agenda. |
| Thorell: | … but you do have an agenda. I'm not stupid. |
| Lumiere: | I'm [unintelligible 00:55:11], I'm fucking straight-up. |
| Thorell: | I'm not saying now, but [unintelligible 00:55:15]. |
| Lumiere: | … my friends. |
| Thorell: | What do you mean? |
| Lumiere: | [unintelligible 00:55:25]. |
| Thorell: | Would you do me a [unintelligible 00:55:34] my friend's phone. Thank you. |
| Lumiere: | So now you know I'm not tape recording it. |
| Thorell: | You're probably doing it right now. You're sending a message to your private investigator that you texted earlier. Where was I? Okay. So I missed, like, three trades [unintelligible 00:55:57]. I was doing so much volume because Chris was sending me sell orders, and this was when I didn't understand what was going on. And I now |

25

A 153

26

know that the timeframe was [unintelligible 00:56:09] to meet the deadline. He didn't tell me that, which means - he's like, "Do it your way." Knowing that the two months [unintelligible 00:56:20], I'm not stupid. What's going on?

Lumiere:     The only people [unintelligible 00:56:23] show you that.

Thorell:     I know. So I thought about it and I'm like, "No."

[conversation with water]

Thorell:     Anyway, I was slam busy and missed a few trades. So I get an email from Richard Gruber and clients saying, "Jason, these trades have been missed. Let's stay on top of this." Something like that, I hadn't even seen the email because I was too busy to even see it.

Lumiere:     Stuff like that is [unintelligible 00:57:14].

Thorell:     I don't remember exactly what he wrote in - he wrote the trades I guess I failed to post them.

Lumiere:     Oh my god. Now I know what they're doing.

Thorell:     Okay, I know what they're doing, too.

Lumiere:     They're trying to get you for compliance breach.

Thorell:     Yes. Now, here's the thing, I don't have to explain this to you, but that is ...

Lumiere:     As soon as I left ...

Thorell:     Hold on.

Lumiere:     ... They told my lawyers that the reason they weren't settling with me is because they were investigating compliance issues.

Thorell:     Okay, listen to this. That's what they're doing. I don't have to tell you this. That is an ops issue. Okay? Did I fail to post it? Yes. Why do you have operations as your safety net? Where are they? So I didn't see the email because I was just so busy. He CC'd Allan Greenbaum, who is the head of ops, on that email. It was basically a scolding email to me. And it was weird because I was too busy that I missed that email. Allen must have seen it. And he called me and he was like, "Jason, what's going on?" And it was a weird phone call.

Lumiere:     I've actually never heard of a missing trade - like nobody calls - you never call for that.

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

Thorell:   No, no. If I ever question a trader who's missing a trade, I would be fired that day. That's not your job.

Lumiere:   No, you might not be around for more than [unintelligible 00:58:37].

Thorell:   Oh, it gets worse, okay. Listen to this. So Allen calls me and he's like, "What's going on?" And he probably thinks it's weird, and I hadn't seen the email, so I was kind of like, "I don't know, how's your bandwidth down there?"

Lumiere:   When did this happen?

Thorell:   This was, like, three, four weeks ago. So immediately I was like, "How's your bandwidth down there?" I'm like basically, in a nice way being like, "Where's my safety net? Why aren't you guys catching this?" Which should be on them, okay?

Lumiere:   Where's my assistant trader?

Thorell:   Even better, yeah. No one caught it. [unintelligible 00:59:11], three trades, no one caught it. Okay? So I miss - I hadn't seen that email, and apparently it was pretty important. You're supposed to say, "Please confirm receipt or come down." Call me so I make sure I see it, because before I hadn't seen it. Unfortunately I missed, like, one more in the next two days. I get an email [unintelligible 00:59:38]. They CC'd Allen on that to manipulate it, because they want to manipulate me. They want to make me look bad in front of him so that when I leave, he's like, "Oh, Jason fucked up." Manipulator. So the next email I got for one more missed trade, was a formal letter that ...

Lumiere:   Your warning letter.

Thorell:   It was a letter [unintelligible 01:00:08] an Adobe attachment that said, "You're in violation [unintelligible 01:00:14]. I have that on my record, okay? So they sent that to me. I called my lawyer, the guy who costs me [unintelligible 01:00:25] an hour. I go, "Joe I am so fucking pissed right now. This is bullshit, I'm slammed." He goes, "Send me that email," I go "All right, if they don't [unintelligible 01:00:37] sent out, whatever." Sent it to my Yahoo, sent it to him. That was late on a Friday, I was fuming and pissed.

Lumiere:   What about printing it out?

Thorell:   Hmm?

Lumiere:   What about printing it out and then scan that to your [unintelligible 01:00:51]?

Thorell:   Oh, I was on all of that. So Joe, what he did was he's like, "Your instinct is 100 percent correct, I think. They're trying to take you down and build a case." What he did was first thing Monday morning, you know, I'm like concerned I already missed

27

Transcript Plus
www.transcriptdivas.com
Phone: (888) 494-8474

the prior email. I don't want timing to be an issue, so I came in Monday morning and he wrote the email for me and sent it to my Yahoo. I then had to rewrite it as if it were my own. I sent it out.

Lumiere: Wow, so they're trying to [unintelligible 01:01:21] you.

Thorell: So I sent the most tactically-written email, like that's what you get when you pay for a good attorney is fucking beautiful art.

Lumiere: By the way, [unintelligible 01:01:39] document and everything, then don't do it.

Thorell: I know, dude. I'm not. I'm not. I'm finishing up this story. So I send an email to Keely and I CC'd Joe, so he'd know what was going on. CC'd him and Joe goes, "I want them to see my name. I want them to see my [unintelligible 01:02:08]." Because he's pissed now, too, because he can't believe how stupid they are.

Lumiere: That's who they are.

Thorell: I CC'd Joe - Joe, my lawyer, CC'd my [unintelligible 01:02:21] attorney. I sent an email back, not responding to that. That is a fresh email, but saying "Reply to [unintelligible 01:02:26]." Keeler CC'd my lawyer on it. That is a power move.

Lumiere: Wow. Oh yeah, yeah.

Thorell: So to say me going to work is awkward would be an understatement. That was a fucking power move. They are - they're concerned. He's a big-time lawyer.

Lumiere: So at this point, do they know that you've hired him? [unintelligible 01:02:54].

Thorell: Well, we're going ... At this point ...

Lumiere: You should have him call them. I mean, at this point you're ready for negotiation for settlement.

Thorell: Well, we're going to get there. We're taking our steps. Okay? So as soon as Joe saw that email, he goes, "I can't believe these guys are this stupid," I said, "The only thing I can think of is if they were calling your bluff on having an attorney." Because I told them I didn't like what Chris was going to me, because I thought [unintelligible 01:03:25], right?

Lumiere: And you told Jake that?

Thorell: I went into Jake's office and I saw something [unintelligible 01:03:34] and I said, "I have a crisis and I've talked to attorneys about this; several." [unintelligible 01:03:43] "You told your attorney about this?" I said, "Yeah, I wanted advice."

28

Lumiere:   You told Jake you spoke to an attorney?

Thorell:   Yes.

Lumiere:   When we had this conversation the other day, you never told me that.

Thorell:   I'm telling you now.

Lumiere:   Why didn't you tell me then?

Thorell:   I'm telling you now. I'm telling you, okay? Let me talk. So I go in his office [unintelligible 01:04:01] advised by Joe that said, "Send an email. You've got to play this even keel because you don't want to make it look like you're about to take down the firm. You want to [unintelligible 01:04:11]". So he goes, "Send an email to Jake and say, "I have a serious issue to talk to you about pricing." You want that on record. And it was a very fine - it was the right move.

Lumiere:   [unintelligible 01:04:29]

Thorell:   Yeah, so this was - no, no, no. This was after all the [unintelligible 01:04:35].

Lumiere:   Did Chris [unintelligible 01:04:41] responding to your email?

Thorell:   What are you talking about? Chris responding to what?

Lumiere:   Chris [unintelligible 01:04:48] responded to you about the letter or email?

Thorell:   You think I put him on that email?

Lumiere:   No, No, but you don't think Jake's going to tell ...

Thorell:   Yeah, he probably did, but no, he hasn't responded, no. Okay, so I go in, this is all my stuff. This is where [unintelligible 01:05:11]. And I go in there, probably one of the most nerve-wracking - same day. He called me up, like 20 minutes after. He probably got himself mixed up and everything, as I was. He didn't respond to the [unintelligible 01:05:23] thing. One of the more nerve-wracking days I've had to go in ...

Lumiere:   He says, "Come to my office?"

Thorell:   Yeah, I go in.

Lumiere:   Three weeks ago?

Thorell:   Like, three, four weeks ago. And I go, "So you wanted to talk to me about a serious pricing matter. Here's what Chris did to me. A year and a half ago, he called me in his office, told me never to speak -" I'm confident Jake new. I'm pretty sure he knew.

29

A 153

Lumiere:     Jake knew about this.

Thorell:     Yeah. So he's asking questions, taking notes and I'm like, "I was told never to tell anyone else. I'm the guy sending the email out, so it's like I'm creating sod or manipulating prices." And I was coached by my lawyer [unintelligible 01:06:14] do not bring up whistle-blowing. Do you not say SEC. Just tell him - which is the truth - just tell him you're only looking to absolve yourself from this situation." I knew it would head this direction and I didn't really want to, but naturally it did. Because I [unintelligible 01:06:34] imposing upon him. I just want to fix the process to where I'm not sending out this email, because I'm culpable. I didn't want to say it.

Lumiere:     Yeah, you shouldn't have said "culpable." Just you don't want to be involved.

Thorell:     Yeah. I didn't use [unintelligible 01:06:53]. Yeah. I said it the right way. Beautifully done, by the way. It's pretty funny.

Lumiere:     [unintelligible 01:07:00]. That's what he does.

Thorell:     It's actually very funny, because he had nothing to say. This went on for, like, 35 minutes, and he's just like - and then finally he goes, "This is a problem." I find that very funny.

Lumiere:     Have they corrected that problem yet?

Thorell:     No. No. This is where it gets weird. This is why they're trying to take me down. Because I think Chris - I'm pretty sure he knows. I went to [unintelligible 01:07:36] so far. So I go into - Jake's like, "I got a call from compliance now." [unintelligible 01:07:47]? Jason does.

Lumiere:     So he didn't freaking know?

Thorell:     Yeah, I know. That was kind of towards the end of the quarter, the last week of June. So month-end was coming up. So June 30th comes around. After that discussion ...

Lumiere:     Wait, I need a timeline. Because I understand that relative to my discussion [unintelligible 01:08:17].

Thorell:     I could find out. I don't have it on file.

Lumiere:     Because I want to see both sides [unintelligible 01:08:24].

Thorell:     Oh, you think that ...

Lumiere:     If they were trying to pawn it off on me.

30

A 153

31

Thorell: Oh, you think they might think it's because of you?

Lumiere: They're going to try to blame it on me, the guy who left. That's a natural reflex.

Thorell: Nice. Actually - why? What does that have to do with you?

Lumiere: They'll try to blame it on me.

Thorell: On what grounds?

Lumiere: [unintelligible 01:08:47] build a case around me for that insider trading allegation. They claim they fired me because of that, and this is probably something else they're trying to do with that.

Thorell: Well, maybe, but I think they're trying to do the same thing against me.

Lumiere: Of course.

Thorell: So here's another. Listen to this. So with [Rural], obviously it's bad. Now, Andrew is the guy on it that somebody assigned, who knows nothing about this. And he can be manipulated.

Lumiere: Where are they [unintelligible 01:09:25]?

Thorell: I don't know. It doesn't matter.

Lumiere: It does matter.

Thorell: Why?

Lumiere: [unintelligible 01:09:32] this conversation indicates after [unintelligible 01:09:35].

Thorell: Okay, they wrapped the prices down to the right levels and had a major, major drop in NA [unintelligible 01:09:42] once I had the conversation and [unintelligible 01:09:48]. So already withdrawn. That was kind of just like this was shutting it down. Yeah. So that's what happened. This was not [unintelligible 01:10:04]. That's what I'm doing.

Lumiere: Okay.

Thorell: Okay. So [Rural] is trying to catch me on insider trading, because wherever - they're trying to catch me on insider trading because this is really shady, and apparently we are - Andrew told me that only because I accidentally [unintelligible 01:10:26]. I go - because I knew - I just knew there would be a point where we would get [unintelligible 01:10:33] and he said "Yes," I'm like, [unintelligible 01:10:37] there's no email from Keely. No emails at all. There's nothing. You're supposed to send me an email ...

A 153

Lumiere:  Were you trading?

Thorell:  No, not since then. But I think they might try and get me to trade it at a certain point in time. I hope they do, because that'll build my case. Either way ...

Lumiere:  Why are you restricted?

Thorell:  Hmm?

Lumiere:  Are you restricted or not?

Thorell:  Andrew told me we were. I have not seen an email from [unintelligible 01:11:11].

Lumiere:  Wow.

Thorell:  Okay, listen to this. This is all on tape. Listen, this is what I have on tape right now. So Andrew told me [unintelligible 01:11:25].

Lumiere:  Wow.

Thorell:  Listen, this is getting better, dude. So Jake calls him in to try and manipulate him. He would not be a good poker player, because ...

Lumiere:  Called you in to try and manipulate you?

Thorell:  To try and manipulate me. So I fucking schooled him.

Lumiere:  So what happened? How did he try and manipulate you?

Thorell:  I'm telling you. So what he's trying to do with that second I had is he's, in a way, trying to get me to speed up the selling, but he has to say that I need to get better execution. He's talking out of both sides of his mouth, but what he really wants me to do is sell it fast. So I took that and I'm like, "Okay, I know what you're doing. Thank you. I now understand you. You cannot manipulate me. Now it's my turn." So what I said to him is "I've got some ideas in the back of my head about other credit products to help me branch out," because I wanted to gauge - I'm pretty sure we're done, but I want to gauge ..."

He goes, "No." He didn't even want to hear the idea. So I'm like, "Okay, now I've got more info. I'm taking info one way here." Okay? This is the best. And then I said, "What's going on with [Rural]? We owe them 50 million." I didn't tell him this, but "We owe them 50 million. You think the CEO of the firm, the CIO, whatever it was, would know what's going on?" And he goes, "I don't know." And as soon as I asked that question ...

32

A 1 5 - 3

33

Lumiere:    Wow.

Thorell:    [unintelligible 01:13:03]

Lumiere:    He denies it.

Thorell:    Dude, he need to take classes on body language. He would not be a good poker player, okay? Okay, now, draw a parallel to [unintelligible 01:13:20] ignorance is not a fucking excuse. Then, he stupidly goes "Are we [unintelligible 01:13:26]?" And I go, "I don't know." And he goes, "You don't know if they [unintelligible 01:13:33]?" Shifting the blame onto me when he should know. I go, I don't know, I haven't seen any non-compliance." And he goes - but then I didn't want to - I actually [unintelligible 01:13:46]. It's okay, that's known. So I didn't want to have that fall back in my face.

But on the other hand, Andrew told me restricted. So you know what he told me? He goes, "I mean, I don't know what's going on, because other people could be trading this now and no one knows what to tell me." He goes, "No, they can't," He's lying. He goes, "No, compliance would catch it." I go, "No, they wouldn't."

Lumiere:    This is on tape.

Thorell:    I go, "No, that's not how it works. You pick up the phone, there's other catalysts. There are not [unintelligible 01:14:26]. We wouldn't really be buying it, but technically we could be buying it." Okay, so we're going to expose it firm-wide, and that's insider trading. He could pick up the phone and call. Jake told me that can't happen because he wouldn't go through the order management system.

Lumiere:    There's no order management system.

Thorell:    That's what I told him. I said, "Clearly you're wrong. There's no order management system. Just pick up the phone." Let's just say the conversation ended about five seconds after that. It's all on tape.

Lumiere:    [unintelligible 01:15:00]

Thorell:    Hmm?

Lumiere:    You told him that?

Thorell:    Told him what?

Lumiere:    [unintelligible 01:15:02].

Transcript Plus
www.transcriptdivas.com
Phone: (888) 494-8474

Thorell:     No, I told him that there's no safety net there, and he's like, "Oh, talk to clients." And immediately the conversation ended. He talked himself into a trap. I am so [unintelligible 01:15:19].

Lumiere:     So you have some potent shit, huh? We both do.

Thorell:     Yeah, I've got some really good ...

Lumiere:     From, like, [unintelligible 01:15:40] over years.

Thorell:     Would you sell it to me?

Lumiere:     Sleeping with the enemy.

Thorell:     You want to sell it to me?

Lumiere:     What? What do you want?

Thorell:     To make money.

Lumiere:     What?

Thorell:     To make money.

Lumiere:     The amount of money you're going to make off of that, you can't. Are you talking about just trying to expose them? You can't do that. That's extortion.

Thorell:     No, I just wanted [unintelligible 01:16:01]. We'll see. It depends on a number of ...

Lumiere:     Well, the problem is what's the impact they have? We can talk about that. Wait until my attorneys come back. They're going to come back in a couple of days with an answer and maybe I should have my attorney talk to your attorney, and kind of think about how to proceed.

Thorell:     Well, we're not at that point yet.

Lumiere:     The problem is you don't really [unintelligible 01:16:25] raising money down the road.

Thorell:     That's going to be for what?

Lumiere:     You and I want to raise money down the road, get another job.

Thorell:     Look, I mean, I know I asked, but I'm not even close to that stage yet.

34

35

Lumiere:     Dude, how do you know they don't have a hit on you?

Thorell:     Dude.

Lumiere:     I can imagine.

Thorell:     Yeah, I know, I know. I'm a little tired.

Lumiere:     Absolved is like absolved of your sin.

Thorell:     Yes, removed is a better word.

Lumiere:     Do you want to be absolved or you want to be removed from this process?

Thorell:     Yeah, well, he dragged me in. So he pulls me in. I knew it was going to go down this road and I didn't want to. I made it clear I just want to be absolved from sending out this email. That's my only goal.

Lumiere:     I didn't know you had a meeting with [Coor] about it.

Thorell:     Fix the pricing costs.

Lumiere:     Fix what?

Thorell:     Are you kidding me? It looks like Jason [unintelligible 01:17:44]. So [Coor] told me after my initial meeting with Keely about the how and where to fix this.

Lumiere:     [unintelligible 01:17:40].

Thorell:     You know what I told – yes, they should be, but they're not going to. I ran into the same pricing issue again today. I've had – Chris, again, sent me an email. I had a conversation with him and Keely after the talk with [unintelligible 01:17:34]. It went from Jake, Keely, [Coor] then Keely and [unintelligible 01:17:39].

Lumiere:     At this point, you could be fired [unintelligible 01:17:14] …

Thorell:     Yes, but I told them the only concern was …

Lumiere:     You recorded that.

Thorell:     They – okay, I told them, which is true, I couldn't say – I didn't want to say those words.

Lumiere:     Oh, you are close at this point. You're putting yourself in a position, or they've put themselves in a position to get exposed.

Thorell:        What?

Lumiere:        You don't think they have a hit on you?

Thorell:        They probably do. That's almost a $5 billion hedge fund I'm about to take to court. So [Coor] is - he's all cut from the same cloth. I thought he was [unintelligible 01:18:50].

Lumiere:        He's not. He gets [unintelligible 01:18:53].

Thorell:        There's not a [unintelligible 01:18:56].

Lumiere:        Jake has [unintelligible 01:19:03]. Keely is just fucking - Keely is an idiot. He has no backbone. He'll do whatever it is they tell him to do because if he doesn't, he'll get fired. Is it the worst thing to be fired [unintelligible 01:19:16].

Thorell:        Whatever. So [Coor] and Keely call me into Coor's office. They sit me down, and Coor goes - he's like laughing and he's like, "This is all a big misunderstanding. We don't do pricing overrides."

Lumiere:        What?

Thorell:        He said, "The valuation committee determines the prices. We've never had any overrides." He said that to my face. "We never do price overrides. We should be doing [unintelligible 01:19:47] assets, and that's it." Yeah. What are you sending me that spreadsheet for every month? And he goes, "It's never on NAV."

Lumiere:        Chris is manipulating him.

Thorell:        Yeah, definitely.

Lumiere:        The valuation committee is [John Rosenberg], who's never taken a fucking - any finance classes.

Thorell:        Yeah. So [unintelligible 01:20:11] two things. One is [unintelligible 01:20:23].

Lumiere:        He's hedging himself, because then he'd have to explain writing down everything that they said.

Thorell:        No, listen, so the next thing is [unintelligible 01:20:49] and we're audited on an annual basis, so it wouldn't even matter where they come from, because we had all these last year. I didn't say anything, because, I want to play dumb, "The most incriminating thing I have on [unintelligible 01:21:11] is Coor saying we never use pricing overrides to go into our [unintelligible 01:21:19].

Lumiere:        That is a lie.

36

37

Thorell: Yeah, That hit me. That was like, [unintelligible 01:21:27]. I hope he doesn't, but he goes, "Tell me one thing, prior to the [unintelligible 01:21:49], we were doing pricing overrides going to NAP?" He said, "Yes," I go, "Now this month, [unintelligible 01:21:55] we are no longer using pricing overrides?" He said, "Yes," "How fucked are they?

Lumiere: [unintelligible 01:22:09].

Thorell: That's criminal. It's jail time.

Lumiere: [unintelligible 01:22:16]

Thorell: Yes, yes, I think that's behind bars.

Lumiere: Is that what your lawyer is telling you?

Thorell: No, that's what my uneducated mind is telling me.

Lumiere: I would agree that this price thing is a big focus thing with the SEC, but it's not an actual offense.

Thorell: [unintelligible 01:22:47] How would one go about shopping a firm discretely? Like if you knew it was folding, like, it's going to get out there.

Lumiere: I think a lot of people are suspicious. I went to a conference [unintelligible 01:23:06] Chris is out there marketing [unintelligible 01:23:15].

Thorell: He's been marketing what?

Lumiere: Has been marketing in China. He's got [unintelligible 01:23:19], he's got to market in Korea, too. Everybody knows it.

Thorell: Yeah, Which is bullshit, by the way. Like there's no – when he's folding, and not only that, you can't trust him.

Lumiere: What's bullshit? Why he's marketing in Korea?

Thorell: Yeah.

Lumiere: The guy took off.

Thorell: I know. [unintelligible 01:23:39] told me and ...

Lumiere: Telling you what Chris is telling him?

Thorell: Yeah. And he said that they had a bid come in around [unintelligible 01:23:46].

Transcript Divas
www.transcriptdivas.com
Phone: (888) 494-8474

Lumiere: Basically it's a 30-cent on the dollar bid in new bonds. And the guy is out of fucking town, He's [unintelligible 01:23:55].

Thorell: Oh, you're going to take 30 cents in fraudulent bonds again? The recovery is zero on that, right?

Lumiere: Likely, likely. Unless they can negotiate - the market rate is one. Unless they can get some type of [unintelligible 01:24:12] back to the table at some point, but right now he's done. He's got it. He passed his point. He's [unintelligible 01:24:18]. It's not in discussion. So listen, that was, like, right when I left. When I was leaving, it was right around the same time. I was like, "I'm not fucking going to deal with this shit." I talked to [Meech] about it. If this bullshit is because [unintelligible 01:24:29] he said, "The guy's disappeared. Like, I don't know what to fucking do." [unintelligible 01:24:36]

Thorell: We never had this conversation. Swear to me.

Lumiere: I swear. We need to have your lawyer speak to my lawyer next week.

Thorell: Well, there's a timing thing. You may get to that point, but I have a meeting with him next week.

Lumiere: Yeah, yeah. Let's have them speak, because maybe the best thing for us is to put our evidence together and build a case and have them deal with either recording it or [unintelligible 01:25:14] and maybe the best remedy is they just settle [unintelligible 01:25:18]. Or we decide whether, [unintelligible 01:25:25] from our perspective, whether we're shutting them down.

Thorell: Yeah.

Lumiere: Because basically I don't care. I don't care anymore. I think they - I really only cared about setting it [unintelligible 01:25:36]. That's all I really wanted, but they steered it in a direction - they took it there.

Thorell: I know they did.

Lumiere: They did it. They did it to themselves. I was just looking for a settlement. That's all I wanted. The money that they owed me, that's this.

Thorell: They fucking took it there with me, too. But now they don't know what to do because they [unintelligible 01:25:54] because the fact that I'm still in there and they haven't fired me, they know. They have to know how much information I'm taking out of there. But they can't fire me right now. What they're going to do, waiting for me to sell ...

38

39

Lumiere: Holy shit. You must be shitting like - I was there through all this shit, too, but you've been there [unintelligible 01:26:19].

Thorell: They're letting me stay, which is awkward, but it's good, because at the end of the day, I'm building a case, right? And I [unintelligible 01:26:30] how we play this [unintelligible 01:26:33].

Lumiere: He's got to be fucking stupid.

Thorell: He's an idiot.

Lumiere: You can take off. I'll get the bill.

Thorell: Yeah, we'll talk again.

Lumiere: All right. Fuck. Listen, I didn't know he knew that we know what we know and our evidence.

Thorell: Wait, slow down. What?

Lumiere: I didn't know that Jake basically knew what I knew.

Thorell: What does he know, to be more specific?

Lumiere: I didn't think Jake knew any evidence I had against him.

Thorell: I have no clue.

Lumiere: But now, he fucking knows that you know shit.

Thorell: I have no idea how he would know that.

Lumiere: Know what?

Thorell: What you just told me; that you have evidence.'

Lumiere: Now he knows that you know and you recorded it, so that's a [unintelligible 01:27:34]. They're in fucking trouble. They're fucking drowning. They don't know what to fucking do. They're so lawyered up. Holy shit.

Thorell: They're fucked. I'm at the kind of line of line of demarcation where all I want - I really care about my career, and I was pissed but I just want my career. And I still do. It's the most important thing, but it's affecting my personal life. I'm not sleeping.

Lumiere: You can't [unintelligible 01:28:02].

40

Thorell:      I know. I've lost a girlfriend. You've been through the same shit. My family is
              [unintelligible 01:28:09].

Lumiere:      I lost my girlfriend/fiancée because of all the fucking stress they put me through.
              [unintelligible 01:28:19] day in and day out, of life. For, like, three months I was
              doing that.

Thorell:      Did you know you were going to be gone? Like when you were compiling
              information?

Lumiere:      I knew I was leaving, yeah. Yeah.

Thorell:      So did they give you a heads up?

Lumiere:      [unintelligible 01:28:42]

Thorell:      Okay, I just asked did you know you were going to be gone, because you said you
              were compiling information.

Lumiere:      I knew I was leaving.

Thorell:      So did they give you a heads up?

Lumiere:      No. How would I know?

Thorell:      Okay, I didn't know if you – forget it. I didn't know if they said, like, you have a
              window or you ...

Lumiere:      I told you this. I went to them and I said, "Listen, I'm not happy here."

[unintelligible 01:29:28]

[End of recorded material 01:30:00]

**From:** Feingold Zachary (USANYS)
**To:** Robert Knuts
**Date:** Wed, 26 Feb 2014 17:42:48 +0000
**Subject:** Stefan Lumiere

Mr. Knuts,

Please call me when you can. My contact information (including cell phone) is below. Thank you.

Best,
Zac

Zachary Feingold
Assistant United States Attorney
U.S. Attorneys Office for the Southern District of New York
One Saint Andrews Plaza
New York, NY 10007
Phone: 212-637-2436
Cell: 917-575-9809
Fax: 212-637-2452
zachary.feingold@usdoj.gov

Zac
all?
The agents stopped by your client's building to return his phone to him, but he's not at home. Are you able to reach him at
Bob,

Subject: Lumiere phone
To: 'rknuts@parkjensen.com' <rknuts@parkjensen.com>
Sent: Thursday, February 27, 2014 03:00 PM
From: Feingold, Zachary (USANYS)
----- Original Message -----

Alternatively, you can call Agent Callahan @ Redacted

Subject: Re: Lumiere phone
To: Robert Knuts
Sent: Thursday, February 27, 2014 3:02 PM
From: Feingold, Zachary (USANYS) [mailto:Zachary.Feingold@usdoj.gov]
-----Original Message-----

Bob

I talked to Agent Callahan and it's all worked out. Thanks.

Subject: RE: Lumiere phone
To: 'Feingold, Zachary (USANYS)' <Zachary.Feingold@usdoj.gov>
Sent: Thursday, February 27, 2014 4:09 PM
From: Robert Knuts
-----Original Message-----